WOLF, GREENFIELD & SACKS, P.C.
   Michael A. Albert (Admitted *Pro Hac Vice*)
   Mass. B.B.O No. 558566
   malbert@wolfgreenfield.com
   Hunter D. Keeton (Admitted *Pro Hac Vice*)
   Mass. B.B.O No. 660609
   hkeeton@wolfgreenfield.com
   Stuart V. C. Duncan Smith (Admitted *Pro Hac Vice*)
   Mass. B.B.O No. 687976
   sduncansmith@wolfgreenfield.com
600 Atlantic Avenue
Boston, Massachusetts, 02210
Tel: (617) 646-8000   Fax: (617) 646-8646

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
   Victor M. Felix (SBN: 179622)
   victor.felix@procopio.com
525 B Street, Suite 2200
San Diego, California, 92101
Tel: (619) 515-3229   Fax: (619) 744-5409

Attorneys for Defendant and Counter Claimant Acacia Communications, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ViaSat, Inc.,**<br>*a Delaware corporation,*<br><br>Plaintiff<br>and Counter Defendant,<br><br>v.<br><br>**Acacia Communications, Inc.,**<br>*a Delaware corporation,*<br><br>Defendant<br>and Counter Claimant | Case No. 3:16-cv-00463-BEN-JMA<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ACACIA COMMUNICATIONS, INC.'S MOTION FOR SUMMARY JUDGMENT REGARDING NO LIABILITY**<br><br>**REDACTED**<br><br>Judge: Hon. Roger T. Benitez<br>Mag. Judge: Hon. Jan M. Adler<br><br>Date: February 26, 2018<br>Time: 10:30 a.m.<br>Courtroom: 5A |

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

I.    ACACIA'S AGREEMENT WITH VIASAT ................................................ 2

II.   ACACIA'S OWNERSHIP OF "FOREGROUND INFORMATION" ............ 3

III.  ACACIA'S PERMITTED CONDUCT UNDER THE AGREEMENT........... 4

IV.   VIASAT'S FLAWED ALLEGATIONS .................................................... 4

ARGUMENT....................................................................................................... 5

I.    LEGAL STANDARDS ............................................................................. 5

II.   THE ACCUSED PRODUCTS ARE NOT "LICENSED
      PRODUCTS," SO ACACIA DOES NOT OWE VIASAT FURTHER
      PAYMENT UNDER SECTION 4(B) OF THE AGREEMENT...................... 6

      A.  The Accused Products Do Not Incorporate the "SDFEC Core." ................. 6

      B.  The Accused Products Do Not Incorporate Any
          "Manuals or Documentation" Relating to the SDFEC Core........................ 7

      C.  "Licensed Materials" Does Not Include General Concepts. ........................ 9

III.  SECTION 3(B) OF THE AGREEMENT LICENSES  ACACIA TO
      MAKE PRODUCTS WITH BACKWARD COMPATIBLE  MODES,
      WITHOUT FURTHER PAYMENT TO VIASAT............................................ 11

      A.  Section 3(b)'s Fully Paid-Up License  Covers Backward-Compatibility
          Modes.................................................................................................. 12

          1.  The License's Terms Are Broad. ................................................. 12

          2.  The License's Terms Accord with the Rest of the Agreement. ............... 13

          3.  The License's Terms Cover Products
              With Backward Compatible Modes............................................ 14

      B.  ViaSat's Alleged Trade Secrets Are Required for
          Backward Compatibility, and Thus Are Licensed. ............................. 16

IV.   VIASAT HAS FAILED TO PRESENT EVIDENCE THAT ACACIA'S
      ACCUSED PRODUCTS USE VIASAT'S ALLEGED TRADE
      SECRETS NOS. 1 AND 3 IN NON-BACKWARD COMPATIBLE
      MODES, OR ALLEGED TRADE SECRET NOS. 2 AND 7 IN ANY
      MODE.................................................................................................... 17

      A.  ViaSat Has the Burden To Prove
          Acacia's Accused Products Use Its Alleged Trade Secrets. ............................. 17

      B.  The Accused Products Do Not Use Alleged Trade
          Secret No. 1 in Non-Backward Compatible Modes. ........................................ 18

1        1.   Sky and Meru Products Undisputedly Do Not ███████ in Non-Backward Compatible Modes. ........................ 18

2        2.   Denali and Meru Products Do Not ██████ in Non-Backward Compatible Modes ........................ 18

C.  The Accused Products Do Not Use Alleged Trade Secret No. 2. ................ 18

D.  The Accused Products Do Not Use Alleged Trade Secret No. 3 in Certain Non-Backward Compatible Modes. .......................... 19

E.  ViaSat Failed To Present Evidence that Acacia's Accused Products Use ViaSat's Alleged Trade Secret No. 7 .......................................... 19

    1.  Acacia's Expert's Unrebutted Evidence Establishes that One Must Examine Netlists or ASICS To Determine If the Accused Products Use Alleged Trade Secret No. 7 ................................. 19

    2.  ViaSat's Experts Agree That One Must Examine the Netlists and ASICS To Show Use, But They Failed To Do So. ........................... 21

V.    ACACIA DID NOT REVERSE ENGINEER THE "SDFEC CORE" ........... 23

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Aktiebolaget Bofors v. United States,*
  194 F.2d 145 (D.C. Cir. 1951) ................................................................ 11

*Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.,*
  No. 15478, 1999 WL 743479 (Del. Ch. Sept. 10, 1999) ................................ 9

*Axis Reins. Co. v. HLTH Corp.,*
  993 A.2d 1057 (Del. 2010) ...................................................................... 10

*Bayer CropScience AG v. Dow AgroSciences LLC,*
  No. 126, 2013 WL 5539410 (D. Del. Oct. 7, 2013),
  *aff'd,* 580 F. App'x 909 (Fed. Cir. 2014) ................................................. 12

*Bonanno v. VTB Holdings, Inc.,*
  No. 10681, 2016 WL 614412 (Del. Ch. Feb. 8, 2016) ................................... 9

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ...................................................................... 6, 18, 23

*Chicago Lock Co. v. Fanberg,*
  676 F.2d 400 (9th Cir. 1982) .................................................................. 15

*DVD Copy Control Ass'n, Inc. v. Bunner,*
  31 Cal. 4th 864 (2003) ........................................................................... 15

*E.W. Bliss Co. v. Struthers-Dunn, Inc.,*
  408 F.2d 1108 (8th Cir. 1969) ................................................................ 11

*Garneau v. City of Seattle,*
  147 F.3d 802 (9th Cir. 1998) .............................................................. 11, 18

*Great Am. Ins. Co. v. Norwin Sch. Dist.,*
  544 F.3d 229 (3d Cir. 2008) ..................................................................... 9

*GRT, Inc. v. Marathon GTF Tech., Ltd.,*
  No. 5571, 2012 WL 2356489 (Del. Ch. June 21, 2012) ................................. 9

*IBM Corp. v. Seagate Tech., Inc.,*
  941 F. Supp. 98 (D. Minn. 1992) ............................................................. 10

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

iii

*Laifail, Inc. v. Learning 2000, Inc.*,
   No. 01-599, 2002 WL 31667861 (D. Del. Nov. 25, 2002) ............................................ 23

*Lorillard Tobacco Co. v. Am. Legacy Found.*,
   903 A.2d 728 (Del. 2006) ................................................................................................ 10

*LSVC Holdings, LLC v. Vestcom Parent Holdings, Inc.*,
   No. 8424, 2017 WL 6629209 (Del. Ch. Dec. 29, 2017) .................................................. 9

*Omnitel v. Chubb Grp. of Ins. Cos.*,
   No. 151014, 1993 WL 438839 (Cal. Super. Ct. Mar. 26, 1993) .................................... 15

*Osborn ex rel. Osborn v. Kemp*,
   991 A.2d 1153 (Del. 2010) .............................................................................................. 16

*Quadrant Structured Prods. Co. v. Vertin*,
   23 N.Y.3d 549 (2014) ........................................................................................................ 9

*Sega Enters. Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1992) ........................................................................................ 15

*Wilson v. Costco Wholesale Corp.*,
   426 F. Supp. 2d 1115 (S.D. Cal. 2006) ................................................................6, 11, 18

## STATUTES

CAL. BUS. & PROF. CODE § 16600 .......................................................................................... 10

CAL. CIV. CODE § 3426.1 ........................................................................................................ 17

CAL. CIV. CODE § 3426.1(b)(2) ............................................................................................... 11

## OTHER AUTHORITIES

*McGraw-Hill Dictionary of Scientific and Technical Terms, Sixth Edition* (2003) ....................... 8

*Oxford Living Dictionaries: "exploit"*, Oxford University Press,
   https://en.oxforddictionaries.com /definition/exploit ................................................ 12

*Webster's 3d New Int'l Dictionary* (1993) ................................................................................ 12

## RULES

Fed. R. Civ. P. 56 ..................................................................................................................... 5

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA
iv

# **INTRODUCTION**

Defendant Acacia Communications, Inc. ("Acacia") is not liable to Plaintiff ViaSat, Inc. ("ViaSat") for four inter-related reasons.

First, the accused Acacia products do not fall within the contract's definition of royalty-bearing products.  ViaSat's contract claims arise from an IP Core Development and License Agreement.  (Ex. 1 (the "Agreement" or "Ag.")).[1]  Acacia has paid ViaSat ███████ in royalties for products covered by the Agreement.  ViaSat alleges that Acacia failed to pay royalties for other products.  (Ex. 5; D.I. 1, Ex. 1 ¶¶ 14-27).  Yet the Agreement defines the "Licensed Products" on which royalties are due narrowly, as only those products which incorporate certain specific technology ViaSat provided under the Agreement.  (Ag. §§ 1(k)-(l), 4(a)-(b); Ex. 13 at 3-13).  While the royalty-bearing products incorporate this technology, the accused products undisputedly do ***not***.  Thus, Acacia does not owe royalties for the accused products.

Second, the accused products ***are*** covered by a separate, ***royalty-free*** license in the Agreement.  Acacia owns certain technology developed under the Agreement called "Foreground Information," technology for which Acacia paid ViaSat over $3 million in milestone fees.  (*Id.* §§ 1(j), 2(b), 3(a)).  This fully paid-up license allows Acacia to use ViaSat's technology in any way necessary to "fully … use[]" or "otherwise exploit[]" the Foreground Information.  (*Id.* § 3(b)).  The royalty-free license allows Acacia to make and sell products compatible (sometimes called "backward compatible") with earlier, royalty-bearing products, so as to allow the "full[]… exploit[ation]" and "use[]" of the Foreground Information.

This license alone defeats all of ViaSat's claims.  Indeed, of all its alleged trade secrets ("ATS"), only one (#7) is even arguably not required for compatibility.  But ViaSat failed to show that Acacia uses that ATS.  ViaSat's experts undisputedly did not

---

[1] Except as noted, all exhibit citations are to the Second Declaration of Stuart V. C. Duncan Smith, also filed today.  Any exhibit that is the same as an exhibit to Acacia's prior summary judgment motion uses the same exhibit number.

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

1

1    examine the netlists and ASICs (defined below) for the accused products, which one

2    must do to determine if the products use ATS 7.  ViaSat has no evidence to meet its

3    burden of proof.  It similarly failed to meet its burden for ATS 2, and for a number of

4    non-compatible modes for its ATS 1 and 3.

5         Finally, seeking to salvage its case, ViaSat falls back on arguing that Acacia

6    "reverse engineered" ViaSat's technology in violation of § 8(b) of the Agreement.

7    Acacia undisputedly did not do so.  The Agreement's royalty-free license allowed

8    Acacia to do performance analysis in relation to its compatible products, which is all it

9    did.  Further, ViaSat fails to show evidence of damages from the alleged "reverse

10   engineering," as legally required.  And ViaSat's expert's definition of "reverse

11   engineering" is excessively broad, unsupported, and contradicted by its other expert.

12        For the above reasons, summary judgment of no liability should enter.

13                              **BACKGROUND**

14   **I.    ACACIA'S AGREEMENT WITH VIASAT**

15        In 2009, Acacia hired ViaSat to provide several components to be used in

16   devices that send and receive fiber optic signals.  Acacia and ViaSat executed several

17   contracts, including an NDA and the Agreement.  Delaware Law governs the

18   Agreement.  (Ag. § 19; D.I. 75-1 at 5).

19        Under the Agreement, ViaSat was responsible for making two components: the

20   "DSP Core" and the "SDFEC Core."  (Ag. Preamble para. 3).  The "DSP Core"

21   performs "digital signal processing" (or "DSP"), which typically involves creation of a

22   light signal to transmit data over fiber optic cables, and processing of the received

23   signal to remove distortions that occur during transmission.  (*See generally* Ex. 14 at 7).

24   The "SDFEC Core" performs "soft decision forward error correction" (or "SDFEC"),

25   which involves embedding extra data in the signal to allow all of the data to be

26   recovered even if part of the signal is lost during transmission.  (*See generally* Ex. 15

27   ¶ 42; Ex. 16 at 33-35).  Acacia retained the rights in the "DSP Core," and ViaSat

28   retained the rights in the "SDFEC Core."  (Ag. §§ 1(b), 1(h), 1(j), 3(a), 8(a)).

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

2

Acacia used the "SDFEC Core" in two product lines: its Everest products and its K2 products (the "Royalty-Bearing Products"). (*See* Ex. 16 at 67-68). ViaSat was aware of those products, and accepted Acacia's royalty payments for their use of the SDFEC Core. (Ag. § 4(a)-(b); Ex. 5). However, as Acacia developed new products, ViaSat's SDFEC technology proved disadvantageous: ███████████████ ████████████████ (Ex. 15 ¶¶ 60, 200; Ex.17 at 54:5-61:18; Ex. 8 ¶¶ 66-67). So Acacia designed and developed new components to perform SDFEC that did not use ViaSat's SDFEC Core. (Ex. 15 ¶¶ 60, 200; Ex. 17 at 54:5-55:14).

Acacia's subsequent products (the Sky, Denali, and Meru families) continues to exploit Acacia's "DSP Core" technology, including by having a mode in which they are backward compatible with the Everest products. (Ex. 18 at 38:22-39:4; Ex. 19 at 183:3-9). At the time, Acacia thought that ███████████████████████ ███████████████████ (Ex. 19 at 78:8-83:18). Acacia later realized that █████████████████████████████ and dropped it from products after Meru. (*Id.* at 79:2-11; Ex. 20 at 118:12-25).

## II. ACACIA'S OWNERSHIP OF "FOREGROUND INFORMATION"

The Agreement defines much of the work that ViaSat did for Acacia under the Agreement as "Foreground Information":

> "Foreground Information" means all Intellectual Property Rights, design data and information … that are first developed or first created by VIASAT or its personnel in the performance of its services relating to Digital Signal Processing under this Agreement, and including all changes, additions, revisions, replacements, manuals and documentation thereto which VIASAT may provide under this Agreement.

(Ag. § 1(j). It includes the "the DSP Core and all Deliverables relating thereto." (*Id.*).

The Agreement expressly assigns all "Foreground Information" *to Acacia*: "ACACIA shall own all right, title and interest in and to all Foreground Information, including all Intellectual Property Rights therein and thereto." (Ag. § 3(a)). ViaSat has no right to use "Foreground Information" outside the Agreement, and ViaSat must disclose all such information to Acacia and assign all related intellectual property. (*Id.*).

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

3

## III.    ACACIA'S PERMITTED CONDUCT UNDER THE AGREEMENT

The Agreement limits Acacia's conduct only as to two categories: "Licensed Materials" and "Background Information."  "Licensed Materials" are simply (1) "the SDFEC Core provided to ACACIA as part of the Development Services," including all modifications, and (2) associated "manuals and documentation."  (Ag. § 1(k)).  "Licensed Materials" do **not** include source code.  (*Id.*).

"Background Information" covers ViaSat's information that **predates** or is **separate** from its work with Acacia: "all Intellectual Property Rights, and other design data and information either (a) owned or licensed by VIASAT prior to the Effective Date of this Agreement, or (b) developed or licensed by VIASAT separate and apart from this Agreement."  (*Id.* § 1(b)).  "Background Information" also includes the "SDFEC Core."  (*Id.*).

The Agreement provides Acacia with two licenses, one for "Licensed Materials" and one for "Background Information."  It licenses Acacia to use "Licensed Materials" in "Licensed Products," provided that Acacia pay a per-unit license fee.  (*Id.* § 4(a)).  "Licensed Products" are "integrated circuits … that incorporate all or any part of the Licensed Materials."  (*Id.* § 1(l)).  This means the integrated circuits on which Acacia placed all or part of ViaSat's SDFEC Core, i.e., the Everest and K2 products.

Acacia is also licensed to use "Background Information" to permit Acacia to "fully ma[k]e, use[], reproduce[], modif[y], distribute[] or otherwise exploit[]" any of Acacia's "Foreground Information."  (*Id.* § 3(b)).  Use of "Background Information" does not require a per-unit license fee because Acacia **already paid** ViaSat a set fee of over $3 million to develop the "Foreground Information," which Acacia owned going forward.  (*Id.* §§ 2(b), 3(a)).  Because the types of information interact (as discussed below) Acacia needed this additional license to Background Information so that ViaSat's rights would not hinder Acacia's use of the Foreground Information.

## IV.    VIASAT'S FLAWED ALLEGATIONS

ViaSat accuses Acacia's Sky, Denali, and Meru families (the "Accused

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

4

1    Products") of using ViaSat's technology without payment. (D.I. 1, Ex. 1 ¶¶ 14-18; Ex.

2    16 at 50). ViaSat's understanding when filing suit was that the only technical way to

3    make products that are backward compatible with Everest was by copying ViaSat's

4    "SDFEC Core" and "Background Information." (D.I. 1, Ex. 1 ¶ 16). Once discovery

5    got underway, however, ViaSat's theory fell apart.

6         ViaSat learned that Acacia actually made the Accused Products backward

7    compatible with Everest without copying ViaSat's "SDFEC Core" or "Background

8    Information." (Ex. 20 at 126:24-128:12). ViaSat then pivoted to asserting that the

9    Accused Products improperly used several general concepts relating to the "SDFEC

10   Core" and "Background Information." (Ex. 10). Although no one at ViaSat identified

11   these concepts as special prior to suit (*see* Ex. 22 at 181:19-182:11; Ex. 23 at 212:16-

12   24), ViaSat now calls these general concepts its "trade secrets." (Ex. 10).

13        ViaSat agreed to a contract where it gave Acacia broad right-to-use language,

14   and disclosed confidential information, but never provided any list of alleged "trade

15   secrets" that Acacia was to steer clear of. ViaSat's identification of ATSs in this case

16   was gerrymandered after the fact for litigation purposes. (*See* Ex. 22 at 181:19-182:11).

17        ViaSat should have dropped its case when it realized that Acacia independently

18   developed the Accused Products. Mere use of unpatented general concepts does not

19   require payment of a royalty—indeed, ███████████████████████████

20   ██████████          ███████████ And the Agreement expressly licenses Acacia to use

21   these general concepts (and any purported trade secrets associated with them) to make

22   backward compatible products under Section 3(b).

23                              **ARGUMENT**

24   **I.    LEGAL STANDARDS**

25        Summary judgment is appropriate where "the movant shows that there is no

26   genuine dispute as to any material fact and the movant is entitled to judgment as a

27   matter of law." Fed. R. Civ. P. 56. Where the plaintiff bears the burden of proof, it

28   must point to evidence "to establish the existence of an element essential to [its] case."

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

5

1  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If it fails, there is no dispute of

2  material fact and the Court should enter summary judgment for the defendant.  *See*

3  *Wilson v. Costco Wholesale Corp.*, 426 F. Supp. 2d 1115, 1117 (S.D. Cal. 2006).

4  **II.    THE ACCUSED PRODUCTS ARE NOT "LICENSED**
5  **PRODUCTS," SO ACACIA DOES NOT OWE VIASAT FURTHER**
   **PAYMENT UNDER SECTION 4(b) OF THE AGREEMENT**

6  ViaSat accuses Acacia of making Licensed Products without paying a royalty.

7  (D.I. 1, Ex. 1 ¶¶ 13, 16, 20-21; *see also* Ex. 2 ¶¶ 86-89).  Under the Agreement, Licensed

8  Products must "incorporate" some Licensed Material.  (Ag. § 1(l)).  Licensed Materials

9  consists of (1) the "SDFEC Core provided to ACACIA as part of the Development

10  Services" (including modifications), and (2) any "manuals and documentation thereto

11  which VIASAT may provide under the Agreement."  (*Id.* § 1(k)).  Acacia undisputedly

12  did not "incorporate" either aspect of Licensed Materials into its Accused Products.

13  **A.    The Accused Products Do Not Incorporate the "SDFEC Core."**

14  The first set of Licensed Materials, the "SDFEC Core," consists of certain items

15  ViaSat provided "as part of the Development Services."  (Ag. § 1(k)).  The Agreement

16  points to its Exhibit A to define the "Development Services" as ████████████

17  ███████████████████████████████████████████████████████████

18  (*Id.* §§ 1(e), 2(a); Ex. 13 at 2 (§ 3(b))).  Thus, the SDFEC Core that constitutes

19  Licensed Materials consists of (1) an ASIC netlist, and (2) encrypted RTL[2] provided

20  under the Agreement.

21  Acacia ***did not use either of these*** in its Accused Products, and ViaSat does

22  not allege otherwise.  ViaSat's source code expert, Dr. Hassoun, reviewed Acacia's

23  source code for its Accused Products for eight days, and neither he nor ViaSat's other

---

[2] An "ASIC," or "Application Specific Integrated Circuit," is an integrated circuit that is physically wired to perform a particular task using predetermined logic.  (Ex. 16 at 38; *see also* Ex. 24 ¶¶ 109-10; Ex. 25 at 125).  A "netlist" is a "description of the hardware components and their interconnects which will implement the function specified by" the underlying source code.  (Ex. 24 ¶ 109).  "RTL" is a type of source code that can describe the function of an ASIC.  (*Id.* ¶¶ 107-115).

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

6

1   technical expert, Dr. Narayanan, identified a single instance where Acacia used any

2   part of the "ASIC netlist" or "encrypted RTL" provided under the Agreement.  (Ex.

3   16 at 77-183; Ex. 26 at 52-154).  Indeed, Acacia's witnesses involved in developing the

4   Accused Products confirmed that these products were entirely Acacia's work.  (*See, e.g.,*

5   Ex. 20 at 126:24-128:12; Ex. 19 at 148:17-150:12).

6          Moreover, Acacia **could not** have incorporated any of the code for the

7   Licensed Materials in its Accused Products.  ██████████████████████████

8   ███████████████████████████████████████████████████████  ██

9   ███████████████████████████████████████████████

10  ███████████████████████████████████████  (Ex.

11  27 at 88:4-14; Ex. 24 ¶ 118).  ViaSat provided the encoder (i.e., the part of the SDFEC

12  Core in the optical transmitter) ███████████████████, which the Agreement

13  makes clear is **not** "Licensed Materials."  (Ag. § 1(k)).

**B.     The Accused Products Do Not Incorporate Any "Manuals or Documentation" Relating to the SDFEC Core.**

16         The second part of Licensed Materials is the "manuals and documentation

17  thereto which VIASAT may provide under the Agreement."  (Ag. § 1(k)).  The

18  Agreement's Exhibit A explains that ViaSat was required use "[Microsoft]

19  Word/Adobe [Acrobat]" to deliver those "manuals and documentation" to Acacia.

20  (Ex. 13 at 8).  ViaSat provided written specifications in that format, which ViaSat

21  accuses Acacia of using to make the Accused Products.  (Ex. 16 at 77-183).

22         However, ViaSat does not (and cannot) allege that Acacia "incorporate[d]"

23  those manuals or documentation into the Accused Products, as required to make

24  Licensed Products (Ag. § 1(l)), because the "integrated circuits" that are Licensed

25  Products require information in a different format.  Licensed Products are "ASIC

─────────────────

3  ████████████████████████████████████████████████████

28  █████████████████████████████████████████████████████████

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

7

1   and/or FPGA." (*Id.*). ASICs are physically wired computer chips defined by, for

2   example, a netlist. FPGAs, or "field-programmable gate arrays," are similar, but are re-

3   programmable using computer code, rather than being physically fixed in one

4   configuration. (Ex. 13 at 9; Ex. 24 ¶¶ 109-10; *McGraw-Hill Dictionary of Scientific and*

5   *Technical Terms, Sixth Edition* (2003) (Ex. 25 at 795)). The specifications that Acacia

6   allegedly copied provide high-level information, not RTL, netlists, or anything that

7   could program an ASIC/FPGA. ViaSat agrees. (*See* Ex. 16 at 77-183). This

8   difference is much like that between the initial setup instructions for a stereo and the

9   actual components required to wire its receiver.

10   Indeed, the specifications did not contain the RTL source code necessary to

11   build netlists or ASICs. On the contrary, the record is undisputed that it took at least

12   twenty full-time employees over eight months to develop the RTL/netlists even after

13   the specifications existed. (*E.g.*, Ex. 13 at 8-9; Ex. 22 at 92:5-95:1, 146:12-149:9; Ex.

14   28). Specifications cannot simply be "incorporated" into an Accused Product.

15   In any event, ViaSat cannot expand the meaning of "incorporate … Licensed

16   Materials" to include merely ***using*** the specifications to help design the Accused

17   Products. In fact, ViaSat's early drafts of the Agreement expressly included the ████

18   ████████████████████████████████████████████████ Those drafts defined

19   Licensed Materials as ████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████

21   ████████████ (Ex. 29 § 1(i)). The parties' agreement to remove the emphasized

22   language from the definition confirms that "Licensed Products" cannot now

23   encompass that broader meaning:

> [A] party may not come to court to enforce a contractual right that it did
> not obtain for itself at the negotiating table. This principle applies with
> particular force when the supposedly aggrieved party in fact sought the
> specific contractual right at issue in negotiations but failed to get it…. For
> a court to read into an agreement a contract term that was expressly
> considered and rejected by the parties in the course of negotiations would

---

4 Acacia adds emphasis and omits quotations and citations, except as noted.

be to create new contract rights, liabilities and duties to which the parties had not assented in contravention of [the court's] settled role.

*GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. 5571, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012) (granting summary judgment of no breach of contract); *see also LSVC Holdings, LLC v. Vestcom Parent Holdings, Inc.*, No. 8424, 2017 WL 6629209, at *11 (Del. Ch. Dec. 29, 2017) ("VPH now asks the Court to enforce against LSVC terms that LSVC explicitly struck from the Agreement but provides no compelling grounds on which to do so. Accordingly, I decline."). ViaSat cannot recapture the meaning of Licensed Materials that the parties expressly removed from the definition.

### C.    "Licensed Materials" Does Not Include General Concepts.

ViaSat also cannot rewrite the definition of Licensed Materials to encompass general concepts that may be used in the SDFEC Core or described in its "manuals and documentation." **First**, the definition of Licensed Materials omits the language the Agreement uses elsewhere to cover such concepts. For example, Background Information expressly includes "trade secrets." (*Id.* §§ 1(b), 1(h) (defining "Intellectual Property Rights"); Ex. 16 at 77-183). By omitting such language from Licensed Materials, the Agreement reflects the parties' choice to limit its meaning. *See Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.*, No. 15478, 1999 WL 743479, at *11 (Del. Ch. Sep.10, 1999) (omission of term "speaks volumes" when considered next to included terms, citing *expressio unius* maxim); *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014) (omission of a term from one section included in another leads to "the inescapable conclusion that the parties intended the omission.").[5]

**Second**, ViaSat's attempt to rewrite the definition of Licensed Materials to

---

[5] *See also Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 246 (3d Cir. 2008) ("we must assume that the choice of different words was deliberate…. [w]hen a contract uses different language in proximate and similar provisions, we… assume that the parties' use of different language was intended to convey different meanings"); *Bonanno v. VTB Holdings, Inc.*, No. 10681, 2016 WL 614412, at *13 & n.122 (Del. Ch. Feb. 8, 2016) ("The use of different terms in the same agreement strongly implies that the terms are to be accorded different meanings.").

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

9

encompass general concepts overreaches, seeking a windfall the parties did not intend. Under this overbroad interpretation, use of **any** general concept—such as having an SDFEC in an ASIC core—would create a royalty obligation. Acacia then would have to pay ViaSat a royalty for any optical communication product that uses SDFEC, or an ASIC, or any other general concept associated with the SDFEC Core.

But both parties understood that the Agreement does not require that. There is no dispute that Acacia can make a new ASIC core that does SDFEC without making Licensed Products. ViaSat's Rule 30(b)(6) witness on the meaning of the Agreement (Dr. Russell Fuerst) acknowledged as much, admitting ██████████████ ████████████████████████████████████████████ ████████████████ (Ex. 30 at 270:14-21). Likewise, Acacia's Rule 30(b)(6) witness agreed that the parties' intent was to ████████████████████████ ████████████████████████ (Ex. 20 at 83:2-14). When faced with an unreasonable interpretation, the "the role of a court is to effectuate the parties' intent," *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006), and "a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions." *Axis Reins. Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010).

ViaSat seems to have identified its ATSs *ex post facto*, to try to cover whatever it believed Acacia's competing products do. ViaSat's position allows it to pick and choose effectively random parameters, call them "trade secrets," and wrest further payments from Acacia on pain of being frozen out of the optical communications space. In short, ViaSat seeks to turn an agreement to serve as Acacia's vendor into a non-competition agreement—barred by California law. Cal. Bus. & Prof. Code § 16600. Courts reject such attempts. "A claim of trade secret misappropriation should not act as an *ex post facto* covenant not to compete…. The protection given to trade secrets is a shield… for the preservation of trust in confidential relationships; it is not a sword." *IBM Corp. v. Seagate Tech., Inc.*, 941 F. Supp. 98, 101 (D. Minn. 1992); *see*

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

10

1    *also E.W. Bliss Co. v. Struthers-Dunn, Inc.*, 408 F.2d 1108, 1112-13 (8th Cir. 1969) (same).

2           In sum, no factual dispute exists that Acacia's Accused Products are not

3    "integrated circuits (ASIC and/or FPGA) … that incorporate all or any part of the

4    Licensed Materials." (Ag. § 1(l)).  Summary judgment should enter that the Accused

5    Products are not Licensed Products on which any royalty is owed under Section 4(b).

6    *See, e.g., Wilson*, 426 F. Supp. 2d at 1117-18, 1123 (granting summary judgment to

7    defendant); *Garneau v. City of Seattle*, 147 F.3d 802, 807 (9th Cir. 1998) (affirming same).

8    **III.   SECTION 3(B) OF THE AGREEMENT LICENSES
9            ACACIA TO MAKE PRODUCTS WITH BACKWARD COMPATIBLE
             MODES, WITHOUT FURTHER PAYMENT TO VIASAT**

10          While the above-discussed license in the Agreement **does not** apply to the

11   Accused Products, there is one that **does**: Section 3(b).  That section gives Acacia a

12   fully paid up, **royalty free** license to use any of ViaSat's "Background Information" to

13   in any way "exploit" Acacia's "Foreground Information." (Ag. § 3(b)).  Such

14   exploitation includes, at minimum, the ability to use Background Information in

15   connection with new products that are backward compatible with the SDFEC Core

16   and "DSP Core" built under the Agreement, i.e., the ones used in whole or in part in

17   the Everest and K2 products.  Otherwise, Acacia could not freely and fully use the

18   Foreground Information for which it paid ████████ (Ex. 5 at 3), Foreground

19   Information present in both the Everest and K2 products themselves, and in the Sky,

20   Denali, and Meru products that are compatible with them.

21          The § 3(b) license defeats all of ViaSat's claims.  It precludes any breach of

22   contract (including the covenant of good faith and fair dealing).  (D.I. 1, Ex. 1 Counts

23   I-II).  It also defeats ViaSat's trade secret claims.  (*Id.*, Count III).  *See* Cal. Civ. Code

24   § 3426.1(b)(2) (misappropriation requires acting "without express or implied

25   consent"); *Aktiebolaget Bofors v. United States*, 194 F.2d 145, 148 (D.C. Cir. 1951) ("ne

26   who has lawfully acquired a trade secret may use it in any manner without liability").

27

28

**A.**     **Section 3(b)'s Fully Paid-Up License Covers Backward-Compatibility Modes.**

**1.     The License's Terms Are Broad.**

Section 3(b) provides a broad license to Acacia:

> If [1] any part of the Foreground Information is based on, incorporates or is an improvement or derivative of, or cannot be reasonably and fully made, used, reproduced, modified, distributed or ***otherwise exploited, without using any Background Information***,
>
> then [2] VIASAT hereby grants and agrees to grant to ACACIA a limited, nonexclusive, perpetual, irrevocable, worldwide, ***royalty-free, sublicensable right and license*** to make, have made, ***use*** and have used, sell, import, export, reproduce, modify and make derivative works of ***such Background Information*** for
>
> [3] the sole and exclusive purpose of design, simulation, implementation, manufacture and sale of Licensed Products (including any modifications, improvements and derivatives to Licensed Products)
>
> or [4] otherwise in connection with ***ACACIA's exploitation of the Foreground Information***.

(Ag. § 3(b)).  This sentence breaks down into four parts.

The first part deals with a situation where Acacia's Foreground Information interacts with ViaSat's Background Information.  The types of interaction are broad, including the Foreground Information being "based on," "incorporat[ing]," or being an "improvement or derivative of" the Background Information, or where Acacia cannot "reasonably and fully" make, use, reproduce, distribute, or "otherwise exploit" its Foreground Information without using the Background Information.  The parties' chosen words, like "otherwise exploit," have broad meanings.  *See, e.g., Oxford Living Dictionaries: "exploit"*, Oxford University Press, https://en.oxforddictionaries.com /definition/exploit ("exploit" is "to make full use of and derive benefit from") (Ex. 31); *Webster's 3d New Int'l Dictionary* (1993) ("exploit" is "to take advantage of: utilize") (Ex. 32).  *Bayer CropScience AG v. Dow AgroSciences LLC*, for example, held that the defendant had a "fully paid-up" license where the contract gave it "the broadly defined right to 'exploit'" the technology and "contemplate[d] full exploitation rights." No. 126, 2013 WL 5539410, at *7-9 (D. Del. Oct. 7, 2013) (granting licensee summary judgment), *aff'd*, 580 F. App'x 909 (Fed. Cir. 2014).

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

12

The second part provides Acacia with a license to the Background Information in that situation.  The license is perpetual, worldwide, irrevocable, and "royalty-free."  It allows Acacia to do almost anything with the Background Information, including the ability to "make," "have made," "use and have used," "modify," and "make derivative works" of the Background Information.

The third and fourth parts of Section 3(b) then explain the two purposes for which Acacia can use the license of the second part.  The third part allows Acacia to use the Background Information in relation to the Licensed Products., i.e. products sold under Section 4(b).  As discussed above, Section 4(b) only covers the portion of "Background Information" that is also a "Licensed Material."  This third part of Section 3(b) lets Acacia make Royalty-Bearing Products that use other aspects of Background Information, without paying ViaSat more than the set 4(b) royalty.

The fourth part gives Acacia a royalty-free license to the Background information "otherwise in connection with ACACIA's exploitation of the Foreground Information."  This is a separate context from that of the third part, as shown by the transitional phrase "or otherwise."  And it is again a broad right, giving Acacia this license for any "exploitation… in connection with" its Foreground Information.

## 2. The License's Terms Accord with the Rest of the Agreement.

Splitting up Acacia's license between Sections 3 and 4 makes sense in conjunction with the rest of the Agreement.  As discussed above, ViaSat retained rights in Background Information under the Agreement, but the license Acacia purchases by paying royalties under Section 4 is narrower.  (Ag. §§ 1(b), (k)-(l), 4(a)-(b)).  In exchange for the royalty payments, Acacia receives a license only to that portion of the Background Information that is part of the Licensed Materials, i.e., the SDFEC Core (and related materials).  (*Id.*).  Because Background Information is broader, Section 4 alone does not give Acacia the ability to sell its "Licensed Products" to the extent they need to use other Background Information.  Put differently, under Section 4 alone, Acacia would still owe ViaSat for those products.  Hence the third

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

13

part of Section 3(b) provides an additional, royalty-free license to Acacia.  (Ag. § 3(b)).
It lets Acacia sell Royalty-Bearing Products without fear of infringing any ViaSat
Background Information that is not part of the "Licensed Materials."

The fourth part of Section 3(b) addresses a separate and distinct issue: how
Acacia's ownership of Foreground Information interacts with Background
Information.  Foreground Information is the DSP work and the DSP Core built under
the Agreement.  (Ag. § 1(h)).  Acacia owns all rights to it, for which it paid ViaSat over
$3 million in milestone fees.  (*Id.* §§ 2(b), 3(a), Ex. 5).  ViaSat does not dispute that the
royalty payments under Section 4 do not relate to Foreground Information.  (*See* Ex. 6
at 2 (Dr. Fuerst stating that the royalty payments are for SDFEC work only)).

Yet in optical communications products, DSP and SDFEC often interact and
affect each other.  (Ex. 15 ¶¶ 83; Ex. 33 at 211:11-213:25).   Without an additional
license from ViaSat, Acacia could not fully exploit its Foreground Information without
risking straying into ViaSat's Background Information.  Hence Acacia added the fourth
part of Section 3(b).  (*Compare* Ex. 34 § 3(b), *with* Ex. 35 § 3(b)).  It uses broad language
to give Acacia a royalty-free license to use Background Information "in connection
with ACACIA's exploitation of the Foreground Information."  (Agreement, § 3(b)).
That language lets Acacia exploit its DSP Foreground Information, such as through
products with backward compatible modes, without infringing ViaSat's rights.

### 3.    The License's Terms Cover Products With Backward Compatible Modes.

While the Section 3(b) license is broad, at a minimum it allows products that
contain Foreground Information to interoperate with each other.  The list of permitted
activities is wide, and covers using the Background Information for all sorts of
"use[]"of the Foreground Information.  The word "exploit" appears twice, and the
section explicitly licenses Acacia "in connection with" any "exploitation of the
Foreground Information."  (Ag. § 3(b)).  Dictionaries and the courts confirm that
"exploit" is a broad term.  *See* Exs. 31-32; *Bayer*, 2013 WL 5539410, at *7-9.  Indeed,

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

14

1    Acacia added this language to protect its rights.  (Ex. 34).

2          The contract aligns with the case law.  For example, in *Chicago Lock Co. v.*
3    *Fanberg*, the Ninth Circuit reasons that a trade secrecy obligation preventing
4    disassembly to obtain interoperability information would impermissibly "convert [a]
5    trade secret into a state-conferred monopoly akin to the absolute protection that a
6    federal patent affords."  676 F.2d 400, 405 (9th Cir. 1982) (reversing and remanding
7    with instructions to enter judgment for defendants).[6]  Similarly, copyright allows
8    copying "solely in order to discover the functional requirements for compatibility."
9    *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522-23 (9th Cir. 1992).  Nor is a
10   defendant liable for using trademarks as needed for interoperability.  *Id.* at 1528-30.

11         For interoperability, exploiting Foreground Information works in two
12   directions.  First, the Royalty-Bearing Products (e.g. Everest) contain Foreground
13   Information as part of their DSPs.  (Ex. 20 at 62:22-68:10).  Allowing those products
14   to communicate with the Accused Products is part of the full "exploitation" or "use"
15   of the Foreground Information in the Everest product.  Second, as Acacia owns the
16   Foreground Information free and clear, the DSPs in the Accused Products also
17   incorporate it.  (*See* Ex. 15 ¶ 55, 83, 185, 274).  To fully exploit their Foreground
18   Information, Acacia has the right to make those later products interoperable with
19   Everest.  Indeed, that backward compatibility was important to Acacia early on, and
20   explains why it insisted on adding "or otherwise in connection with ACACIA's
21   exploitation of the Foreground Information" to the contract.  (Ex. 8 ¶¶ 69-72).

22         And this right extends to other, non-backward compatible modes on such
23   products.  Section 3(b) gives Acacia a license "in connection with" its exploitation of

24

25   ───────────────
     [6] See *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 891, 902 (2003) (Moreno,
26   J., concurring) ("the trade secret claim against Bunner is patently without merit….
     [T]he fact that the information at issue is being used for a decrypting purpose is not
27   significant from the standpoint of trade secret law."); *Omnitel v. Chubb Grp. of Ins. Cos.*,
     No. 151014, 1993 WL 438839, at *7 (Cal. Super. Ct. Mar. 26, 1993) (defendant
28   "needed only for the jury to believe that reverse engineering to allow use of the same
     instruction set was not the same as duplication of the product.").

1    Foreground Information.  (Ag. § 3(b)).  Such products have an interoperable mode

2    exploiting that Foreground Information, and other modes are "in connection with"

3    that exploitation.  They are part of the same chip.  Also, the design choices for the

4    backward compatible mode will impact the other modes.

5           ViaSat does not dispute any of these technical points.  (Ex. 15 ¶¶ 83-84; Ex.

6    33 at 211:11-213:25).  Instead, Ted Gammell, who signed the contract for ViaSat, said

7    that the fourth part of Section 3(b) is ███████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████ (Ex.

10   36 123:15-124:7; Ag. § 3(b)).  His position is that the fourth part of Section 3(b) does

11   not provide Acacia with any additional license.  But if this is ViaSat's position—which

12   its own 30(b)(6) witness denies[7]—it ignores that the third and fourth parts of Section

13   3(b) are different, use different words, and are linked by a transitional phrase "or

14   otherwise."  (*Id.*).  It ignores that the words "otherwise exploit" appear in both the first

15   and fourth parts of Section 3(b), rendering them redundant.  (*Id.*).  And it ignores that

16   the rights of part four would collapse into part three, and they would effectively have

17   the same meaning.  The law does not countenance such an illogical result.  "We will

18   read a contract as a whole and we will give each provision and term effect, so as not to

19   render any part of the contract mere surplusage.  We will not read a contract to render

20   a provision or term meaningless or illusory."  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d

21   1153, 1159 (Del. 2010) (affirming enforcement of unambiguous contract terms).

**B.    ViaSat's Alleged Trade Secrets Are Required for**
**Backward Compatibility, and Thus Are Licensed.**

24         There is no dispute that interoperability between the Accused Products and the

25   Royalty-Bearing Products requires at least the first six of ViaSat's seven ATSs.[8]  As the

---

26   [7] ViaSat's 30(b)(6) witness testified ████████████████████████████████

27   ████████ (See Ex. 30 at 164:23-165:9, 166:23-167:3, 262:10-17 ██████████
     ███████████)

28   [8] As discussed below, Acacia does not use ATS 7.

1    Accused Products all have such interoperability modes, they are all licensed.

2    █████████████████████████████████████████████████

3    ████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ██████████████████████████████████████████

7    ██████████████████████████████████████████████

8    ██████████████████████████████████████

9    To the extent that ViaSat also alleges that ████████████████

10   █████████████████████████████████ for the Sky, Denali, and Meru

11   products, those are not "Licensed Materials" as discussed above, and Acacia had a

12   royalty-free license to do so under Section 3(b).[10]

13   ## IV.   VIASAT HAS FAILED TO PRESENT EVIDENCE THAT ACACIA'S
14   ACCUSED PRODUCTS USE VIASAT'S ALLEGED TRADE SECRETS
     NOS. 1 AND 3 IN NON-BACKWARD COMPATIBLE MODES, OR
15   ALLEGED TRADE SECRET NOS. 2 AND 7 IN ANY MODE.

16   ### A.   ViaSat Has the Burden To Prove Acacia's
17   Accused Products Use Its Alleged Trade Secrets.

18   Where, as here, the plaintiff has not alleged improper **acquisition** or

19   **disclosure** of a trade secret, trade secret misappropriation requires "**use** of a trade

20   secret of another without express or implied consent…."  CAL. CIV. CODE § 3426.1.[11]

21   _____

22   [9] ████████████████████████████████████████████████
23   ████████████████████████████████████████████████████
24   ████████████████████████████████████████████████
25   ██████████████████████████████████████

26   [10] With regard to these "copying" allegations, it should be noted that ViaSat has not
     asserted any claim of copyright infringement.  (D.I. 1, Ex. 1 ¶¶ 19-33).

27   [11] *Accord* 6 Del. C. § 2001(2)(b) ("**use** of a trade secret of another without express or
     implied consent…); Mass. Gen. Laws Ann. ch. 93, § 42 ("…with intent to convert [the
     trade secret] to his own **use**…"); Ohio R.C. Sec. 1333.61 (B)(2) ("**use** of a trade secret
28   of another without the express or implied consent of the other person.").



Because ViaSat bears the burden of proof on trade secret misappropriation it, must point to evidence "to establish the existence of an element essential to [its] case." *Celotex*, 477 U.S. at 323. As ViaSat failed to meet this burden for several ATSs, the Court should grant Acacia summary judgment. *See Garneau*, 147 F.3d at 807 (affirming summary judgment for defendant where plaintiff had not come forth with sufficient evidence on element of its claim); *Wilson*, 426 F. Supp. 2d at 1117-18, 1123 (same).[12]

**B.     The Accused Products Do Not Use Alleged Trade Secret No. 1 in Non-Backward Compatible Modes.**

**1.     Sky and Meru Products Undisputedly Do Not ████████ ██████████████ in Non-Backward Compatible Modes.**

ViaSat's ATS 1 requires █████████████████████████████████ (Ex. 21 at No. 1). Acacia's Sky and Meru products undisputedly ████████████ ██████████████, in their non-backward compatible modes. (Ex. 16 at 89, 92-93; Ex. 26 at 56-57, 154-156). Hence they do not use ATS 1 in those modes.

**2.     Denali and Meru Products Do Not ████████ ██████████████ in Non-Backward Compatible Modes.**

ViaSat's ATS 1 requires ████████████████████████████████ ███████████████████████████████████████████ (Ex. 21 at No. 1). In other words, it requires ██████████████████████ █████████████████ (Ex. 15 ¶¶ 189-190 (citing Ex. 21 at No. 1; Ex. 16 at 81-83)). Denali and Meru undisputedly do not ██████████████████ in their non-backward compatible modes, but rather practice █████████████████████ ████████████████████████████ (Ex. 15 ¶¶ 192-199; Ex. 26 at 61-62, 155). So they do not use ATS 1 in those modes.

**C.     The Accused Products Do Not Use Alleged Trade Secret No. 2.**

ViaSat's ATS 2 includes a ████████████████████████████████ ████████████████████ (Ex. 21 at No. 2). To the extent ATS 2 requires ████

---

[12] Even if ViaSat showed that any Accused Products use any ATSs in any modes, such uses are licensed under Section 3(b), as discussed above.

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

18

1    ██████████████████████ the Accused Products have ██████████████ Ex. 26 at

2    69-70, 78; *see also* Ex. 24 ¶¶ 31-38).  Accordingly, they do not use ATS 2.

3         **D.    The Accused Products Do Not Use Alleged Trade**
         **Secret No. 3 in Certain Non-Backward Compatible Modes.**

4

5         ViaSat's ATS 3 ████████████████████████████████████████████

6    █████████████████ (Ex. 21 at No. 3).  Denali does not use ████████████████ in

7    its 25% overhead, non-backward compatible modes.  (Ex. 15 ¶ 273; *see also* Ex. 16 at

8    129-130; Ex. 26 at 92-93).  Thus Denali does not use ATS 3 in those modes.[13]

9         **E.    ViaSat Failed To Present Evidence that Acacia's Accused**
         **Products Use ViaSat's Alleged Trade Secret No. 7.**

10        **1.    Acacia's Expert's Unrebutted Evidence Establishes that One**
              **Must Examine Netlists or ASICS To Determine If the**
11             **Accused Products Use Alleged Trade Secret No. 7.**

12

13        ViaSat's ATS 7 requires a ██████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████ and then appends a table

16   showing ████████████████████████████████ (Ex. 21 No. 7).

17   While the parties' experts disagree on certain aspects of this trade secret irrelevant to

18   this motion,[14] it is undisputed that it requires a ████████████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████████████████████ (*Id.*).

21        Acacia's expert Dr. Koralek explains that in order to show that Acacia's

22   products actually implement ViaSat's ATS 7, ViaSat would have to examine not only

23   _____

24   [13] ViaSat does not appear to accuse Sky or Meru of using ATS 3 in non-backward
     compatible modes, as ViaSat agrees that ████████████████████████████
25   ███████████ (Ex. 26 at 87; *see also id.* at 154-156).  Because Meru is materially the same as
     Sky in this respect (*id.*), Sky and Meru also do not use ATS 3 in these modes.

26   [14] The disagreement centers on whether the trade secret requires █████████████
27   ████████████████████████████
     ████████████████████████.  But that issue is irrelevant to whether the Accused Products
28   practice that which is expressly set forth in the first sentence of ATS 7.  They do not.

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

19

1    the RTL source code for Acacia's products, but would have to analyze the "netlists"

2    and/or the physical computer chips for the Accused Products.  (Ex. 24 ¶¶107-115).

3    An ASIC is usually constructed from the netlist and a "standard cell library" used to

4    implement the netlist's functions.  (*Id.*).  Therefore, the RTL source code cannot be

5    directly implemented into a final product.  (*Id.* ¶ 109).  Rather, one must use a

6    synthesis tool to synthesize the RTL and generate a netlist.  (*Id.*).  The netlist often

7    shows "standard cells," which are hardware constructions used for different basic

8    functions.  (*Id.*).  Different circuit manufacturers use different sets of standard cells to

9    implement RTL functionality, so the physical implementation in a chip is not precisely

10   defined by the RTL, but will vary depending upon the synthesis tool and standard cell

11   library chosen.  (*Id.* ¶¶ 110-111).  Identical source code will lead to different physical

12   implementations if ones uses different synthesis tools or cell libraries.  (*Id.* ¶¶ 110-111).

13          Synthesis tools are used to design the circuitry which will implement the

14   functionality specified by the RTL, by generating a netlist used to create physical

15   circuitry.  (*Id.* ¶ 112).  In doing so, the synthesis tool takes into consideration the

16   available standard cells—which themselves may depend on the fabrication "process"

17   being used to form the physical structures of the ASIC chip—and can perform

18   "optimization" or modification of the functionality specified by the RTL such that the

19   physical implementation may perform a function differing from that appearing in the

20   RTL.  (*Id.* ¶ 113).  ████████████████████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ███████████████████████████  (*Id.* ¶ 115).  In other words, ██████████

25   ████████████████████████████████████████████

26   ████████████████████████████████████████████

27   ████████████████████████████████████████████████

28   ████████████████████████████████████████████████

1   ██████████████████████████████ (*Id*.).  Hence even identical RTL can lead to

2   different physical implementations, if the RTL is directed to a sufficiently detailed

3   feature ██████████████████████████████).  More specifically,███

4   ███████████████████████████████████████████████████████████

5   ████████████████████████████ (*Id*. ¶ 117).  So Acacia did not

6   implement ATS 7 in the Accused Products, as its witness Gary Martin testified. (*Id*. at

7   ¶ 116 (citing Ex. 17 at 217:20-218:7)).

2.   **ViaSat's Experts Agree That One Must Examine the Netlists and ASICS To Show Use, But They Failed To Do So.**

10      ViaSat's technical experts failed to establish that Acacia's products actually use

11   ViaSat's ATS 7.  (Ex. 24 ¶¶ 107-117).  While Drs. Hassoun and Narayanan reviewed

12   Acacia RTL source code, *they did not review any netlists or ASICs* that would

13   enable them to determine whether Acacia's products actually implement ATS 7.

14      ViaSat's first expert, Dr. Hassoun, reviewed ████ (a type of RTL) for some of

15   the Accused Products.  (*See* Ex. 26 at 147-156).  However, he undisputedly did not

16   review any netlists, the synthesis tool used to fabricate the chips, or the physical chips

17   themselves for any Accused Products.  (*See id*.; Ex. 38 at 240:19-241:7 ███████

18   ███████████████████████████████████████████████████████

19   ██████████████████████████████████████████████

20   ██████████ 241:9-13 ███████████████████████████████

21   ███████████████████████████████████████████████████

22   ████████████████████████████████████████.

23      Dr. Hassoun also did not dispute Dr. Koralek's explanation of why one must

24   review the netlists generated by the synthesis tool to understand whether the chip

25   *actually* implements the "██████████████████████████████████

26   ███████████████████████████████████████████████

27   ████████████████████████████ (Ex. 21 No. 7).  In fact, Dr. Hassoun

28   *confirmed* Dr. Koralek's description of the process of proceeding from RTL source

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

21

1   code to a physical chip, and acknowledged that different manufacturers use different

2   libraries of standard cells in their fabrication process which could lead to different

3   physical implementations of the same RTL.  (Ex. 38 at 240:1-5, 242:19-20, 245:21-

4   246:1, 246:9-11, 246:19-24, 247:21-248:5, 252:21-253:2).  Dr. Hassoun admitted that

5   █████████████████████████████████████████████████████████████

6   █████████████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████

9   (*Id.* at 254:21-255:13).

10        Dr. Narayanan similarly failed to present any evidence demonstrating Acacia

11   practices ViaSat's ATS 7.  In his initial report, Dr. Narayanan explicitly stated that ███

12   ███████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████████

15   ███████████████████████████████████  (Ex. 16 at 182-83).  Then

16   in his untimely[15] supplemental report, Dr. Narayanan said only that ██████████████

17   ██████████████████████████████████████████████████████████████████

18   ████████  (Ex. 39 at 3).  Dr. Narayanan testified that he has no separate opinion as to

19   alleged use of ATS 7.  (Ex. 33 at 42:10-20 █████████████████████████████

20   ██████████████████████████████████████████████████████████

21   █████████████████████████████████, 43:20-22 ███████████████████████████

22   ███████████████████████████████████████████████████████████████

23        To the extent he does not just ██████████████████████, Dr. Narayanan's

24   supplemental report asserts that the Accused Products practice ATS 7 because he says

25   so.  (Ex. 39 at 3).  This is improper *ipse dixit* testimony that the Court should disregard.

26

27   _____

28   [15] Expert reports were due on October 27, 2017 (D.I. 68 at 2). His Supplemental
     Report was not served until November 8, 2017.  (Ex. 39)

1    A court should not "admit opinion evidence that is connected to existing data only by

2    the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

3         In sum, ViaSat has not established that Acacia's products implement ViaSat's

4    ATS 7.  Accordingly, summary judgment in favor of Acacia on the trade secrets claim

5    is proper. *See Celotex*, 477 U.S. at 323.

6    **V.    ACACIA DID NOT REVERSE ENGINEER THE "SDFEC CORE"**

7         ViaSat claims that Acacia reversed engineered the "SDFEC Core."  (*E.g.*, D.I.

8    42 at 1).  ViaSat's only evidence is that Acacia ████████████████████████████

9    ████████████  (Ex. 16 at 58-66).  That evidence does not show that Acacia

10   breached the Agreement's prohibition on "reverse engineer[ing]."  (Ag. § 8(b)).

11        ***First***, Acacia is licensed to make backward compatible products, such as the Sky

12   products, under Agreement Section 3(b), as discussed in Section III above.  ViaSat

13   cites no evidence of Acacia testing the Everest decoder while developing any non-

14   backwards compatible product.  Since the license in Section 3(b) includes rights to

15   "use," Acacia's testing—even if found to be reverse engineering—is licensed.

16        ***Second***, regardless of whether that conduct was reverse engineering or whether

17   Acacia is licensed, ViaSat has no evidence of any damages caused by the alleged

18   reverse engineering.  A breach of contract claim requires proof that the breach caused

19   the plaintiff injury. *Laifail, Inc. v. Learning 2000, Inc.*, No. 01-599, 2002 WL 31667861,

20   at *3 (D. Del. Nov. 25, 2002).  However, all of ViaSat's contract damage analysis

21   concerns the measure of royalties under Section 4(b)—i.e., the injury cause by Acacia's

22   purported failure to pay royalties under the assumption that Acacia "should have paid

23   royalties to ViaSat under the license agreement."  (*E.g.*, Ex. 2 ¶ 79).  That evidence of

24   Section 4(b) damages cannot show that the purported reverse engineering caused any

25   injury, or what the measure of the damage would be, because reverse engineering at

26   most breaches Section 8(b).  That section provides for no royalty payment.  ViaSat has

27   not shown it "suffered a legally cognizable injury and that this injury was proximately

28   caused by [Acacia]'s alleged conduct." *Laifail, Inc.*, 2002 WL 31667861, at *3 (granting

summary judgment).

*Third*, Acacia's ███████████████████ is not reverse engineering. ViaSat relies exclusively on Dr. Narayanan, whose opinion relies on his definition of that term. (*See* Ex. 16 at 58-66). But his definition, ███████████████ ████████████████████ is utterly unsupported. (Ex. 16 at 58).

Dr. Narayanan *provides no basis for his definition*. (*Id.*). At deposition, he ████████████████████████████████ ████████████████ (Ex. 33 at 208:12-209:9). He stated, ███████ ████████████████████████████████ ████████████████████████████████████ (*Id.* at 184:25-186:18). ██████████████████████████ (*Id.* at 186:5-8).

Dr. Narayanan's definition is unmoored from reality. Using a tape measure to build a house is reverse engineering the tape measure, according to that definition. (*See* Ex. 15 ¶¶ 66-69 (other examples)). He claims that ████████████████████ ████████████████████████ (Ex. 33 at 196:11-22). ██ ███████████████████████████ (*Id.* at 191:22-192:7). Faced with such farcical consequences, Dr. Narayana disavowed his definition, stating that it was ██████████████ (*id.* at 186:9-15), and added caveats (e.g., ███████████████ ██████████ *id.* at 194:24-195:24).

Unsurprisingly, *every* other expert who has addressed the issue *disagrees* with Dr. Narayanan. Dr. Vardy explained that Dr. Narayanan's definition lacks, among other things, ████████████████████████████ ███████████████ (Ex. 15 ¶ 65). Dr. Prucnal, another Acacia expert, confirmed that reverse engineering ██████████████████ █████████████ (Ex. 40 at 112:5-22). Even *ViaSat's own expert*, Dr. Djordjevic, explained that for reverse engineering, ██

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

24

1 ████████████████████████████████████████████████████

2 ████████████████████████ (Ex. 41 at 258:4-261:4).

3        There is no factual dispute that Acacia did not reverse engineer under the

4 definitions that Dr. Vardy, Dr. Prucnal, and Dr. Djordjevic stated.  Acacia merely

5 ████████████████████████████████████████████████████

6 ████████████████████████ (*See* Ex. 16 at 58-66).  Rather,

7 Acacia's purpose was to make the Sky product different, and indeed better.  (*See, e.g.*,

8 Ex. 18 at 89:18-90:15).  As ViaSat's Dr. Djordjevic explained, reverse engineering

9 requires ████████████████████████ (Ex. 41 at 258:4-13).  Of the four

10 experts' opinions on this topic, Dr. Narayanan's unsupported and disavowed

11 definition stands alone.  "Conclusory expert assertions cannot raise triable issues of

12 material fact on summary judgment."  *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001

13 (Fed. Cir. 2008); *see also Gen. Elec. Co.*, 522 U.S. at 146.

14                                      **<u>CONCLUSION</u>**

15        For the above reasons, Acacia respectfully requests that the Court grant

16 summary judgment dismissing ViaSat's claims.

17

18 Date:   January 26, 2018                         Respectfully Submitted,

19                                                 WOLF, GREENFIELD & SACKS, P.C.

20

21                                                 By: */s/ Michael A. Albert*
                                                  Michael A. Albert

22                                                 Hunter D. Keeton
                                                  Stuart V. C. Duncan Smith

23

24                                                 Attorneys for Defendant and Counter

25                                                 Claimant Acacia Communications, Inc.

26

27

28

Memorandum of Points and Authorities in Support of Acacia
Communications, Inc.'s Motion for Summary Judgment Regarding No Liability

Case No. 3:16-CV-00463-BEN-JMA

25

## **CERTIFICATE OF SERVICE**

I certify that today I am causing to be served the redacted version of the foregoing document by CM/ECF notice of electronic filing upon the parties and counsel registered as CM/ECF Users.  I further certify that am causing the redacted and unredacted versions of the foregoing document to be served by electronic means via email upon counsel for ViaSat, Inc., per the agreement of counsel.


Date:  January 26, 2018                                    /s/ Michael A. Albert
                                                                         Michael A. Albert