FITZGERALD KNAIER LLP
 Kenneth M. Fitzgerald, Esq. (SBN: 142505)
 kfitzgerald@fitzgeraldknaier.com
 Keith M. Cochran, Esq. (SBN: 254346)
 kchochran@fitzgeraldknaier.com
402 West Broadway, Suite 1400
San Diego, California 92101
Tel: (619) 241-4810
Fax: (619) 955-5318

WARREN LEX LLP
 Matthew S. Warren, Esq. (SBN: 230565)
 16-463@cases.warrenlex.com
 Patrick M. Shields, Esq. (SBN: 204739)
 16-463@cases.warrenlex.com
2261 Market Street, No. 606
San Francisco, California 94114
Tel: (415) 895-2940
Fax: (415) 895-2964

Attorneys for Plaintiff and Counter Defendant
ViaSat, Inc.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ViaSat, Inc.,**<br>*a Delaware corporation*,<br><br><br>      Plaintiff<br>  and Counter Defendant,<br><br>  v.<br><br>**Acacia Communications, Inc.,**<br>*a Delaware corporation*,<br><br>      Defendant<br>  and Counter Claimant, | Case No.: 3:16-cv-00463-BEN-JMA<br><br>**[REDACTED] Plaintiff ViaSat, Inc.'s Memorandum of Points and Authorities In Support of Motion for Partial Summary Judgment**<br><br>**[SUBJECT TO MOTION TO FILE UNDER SEAL]**<br><br>Date:  March 5, 2018<br>Time:  10:30 a.m.<br>Place:  Courtroom 5A<br>    221 West Broadway<br>    San Diego, CA 92101<br>Dist. Judge: Hon. Roger T. Benitez<br>Hon. Magistrate Jan M. Adler<br>Case Initiated: January 21, 2016 |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................. 1

II.    FACTS ................................................................................................. 1

       A.   Overview and Summary of Events ........................................... 1

       B.   The Technology At Issue and The Parties' Confidential
            Relationship............................................................................. 5

       C.   The License Agreement ........................................................... 9

       D.   Acacia's Theft of ViaSat's SDFEC Technologies ................... 13

       E.   Acacia's Own Expert Admits That Acacia Uses ViaSat's
            Claimed SDFEC Trade Secrets 1-6 ......................................... 19

       F.   Acacia Knows It Is Liable to ViaSat ........................................ 21

III.   ARGUMENT ....................................................................................... 21

       A.   Applicable Law ........................................................................ 21

       B.   Acacia Breached the License Agreement By Using
            Background Information and Licensed Materials To
            Develop Non-Licensed Products .............................................. 23

       C.   Acacia Misappropriated ViaSat's Claimed Trade Secrets....... 23

IV.    CONCLUSION ................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Ajaxo, Inc. v. E\*Trade, Inc.*,
   135 Cal. App. 4th 21 (2006) ................................................................. 24

*AT&T Corp. v. Faraday Capital Ltd.*,
   918 A.2d 1104 (Del. 2007) ................................................................. 21

*Counsel of the Dorset Condo. Apartments v. Gordon*,
   801 A.2d 1 (Del. 2002) ........................................................................ 21

*Delta & Pine Land Co. v. Monsanto Co.*,
   2006 WL 1510417, at \*4 (Del. Ch. May 24, 2006) ............................ 23

*Elliott Associates, L.P. v. Avatex Corp.*,
   715 A.2d 843 (Del. 1998) .................................................................... 23

*Interim Healthcare, Inc. v. Spherion Corp.*,
   884 A.2d 513, 548 (Del. 2005) ............................................................ 21

*Mattern & Associates v. Seidel*,
   678 F. Supp. 2d 256 (D. Del. 2010) ................................................... 24

*PMC, Inc. v. Kadisha*,
   78 Cal. App. 4th 1368 (2000) .............................................................. 24

**STATUTES**

Cal. Civ. Code § 3426, *et seq.* .................................................................. 24

Cal. Civil Code § 3426.1 ............................................................................ 24

6 Del. Code § 2001, *et seq.* ........................................................................ 24

# I.   INTRODUCTION

Plaintiff and counterclaim defendant ViaSat, Inc. ("ViaSat") seeks partial summary judgment on its breach of contract and trade secret misappropriation claims against defendant and counterclaimant Acacia Communications, Inc. ("Acacia").  The undisputed facts show that Acacia breached its License Agreement with ViaSat, by using ViaSat's soft decision forward error correction ("SDFEC") technology, source code, and technical specifications for purposes expressly prohibited by the parties' contract.  The undisputed facts and the admissions of Acacia's own expert witness also prove that Acacia's backward-compatible products ("the Accused Products") make use of ViaSat's claimed trade secrets.[1]

# II.   FACTS

## A.   Overview and Summary of Events

ViaSat (or "ECC")[2] provided Acacia a license to use ViaSat's SDFEC (or "FEC" for "forward error correction") technology pursuant to a written license agreement between the parties ("the License Agreement").  Acacia praised ViaSat's technology as being without equal in the marketplace.  Exh. 27 ███████████ ██████████████████████████████"); Exh. 28 (Acacia president and co-founder: "████████████████████████████ █████████████████████████

---

[1] Acacia disputes whether ViaSat's claimed trade secrets qualify as such, but this motion is not directed at the issue of whether they are or are not trade secrets.  ViaSat only seeks partial summary judgment that Acacia made use of what ViaSat claims are its trade secrets.

[2] ViaSat's Cleveland office, which developed the technology at issue, is often referred to in the industry as "ECC" or "Efficient Channel Coding."  That was the name of a Cleveland-based company specializing in channel coding, which ViaSat acquired in the mid-2000's.  Although ECC became a division within ViaSat, Acacia personnel often referred to ViaSat and its SDFEC by the "ECC" name.  *See*, *e.g.*, Exh. 14 (Pellach) 248:2-6; Exh. 10 (Humblet) 69:15-70:2.

1  ████████████████████████████ ”).[3]  One of the lead designers of the

2  SDFEC in Acacia's Accused Products, Pierre Humblet, wrote that he was "█

3  ████████ " by the ViaSat SDFEC decoder that was provided under the License

4  Agreement, and acknowledged ViaSat ████████████████████ .  Exhs.

5  29; 27.  And Acacia's customers loved ViaSat's FEC too.  *See* Exh. 30 (Acacia's co-

6  founder: ████████████████████████████████

7  ████████ ”).

8  But Acacia had a problem.  As Bhupen Shah, Acacia's Vice President of

9  Engineering candidly acknowledged in an internal email, "████████████████

10  ██████████████████████████████████████

11  ████████████████████████████████

12  ████████████████████ ” Exh. 31.  And Acacia's problem--██████████

13  ████████████████████████ --was compounded

14  because its customers loved the ViaSat-provided SDFEC so much that they insisted

15  that future Acacia products be designed to be fully interoperable (i.e., backward-

16  compatible) with the royalty-bearing products ViaSat had previously designed for

17  Acacia.  Exh. 32 (Acacia's founder and Chief Technology Officer: "████████

18  ████████████████████████████████████████

19  ████████████████████████████████████

20  ██ ”).  In order to create a backwards compatible product capable of interoperating

21  with the royalty-bearing products containing ViaSat's licensed FEC, Acacia had no

22  choice but to reuse large portions of the SDFEC technology ViaSat had licensed to

23  it.  As an Acacia Board Member aptly put it, ████████████████████

24

25  ───────────────

26  [3] All exhibit citations are to exhibits to the Declaration of Kenneth M. Fitzgerald.
    Deposition excerpts are cited by the exhibit number of the deponent's transcript

27  excerpts followed by the name of the deponent and the page and line cite, *e.g.*,
    "Exh. 11 (Martin) 163:13-164:14."

28

1    ████████████████████████████" Exh. 32.  Of course, ████████████

2    because it would mean paying ViaSat money for the use of its technologies.  *See, e.g.*,

3    Exh. 33 (Bhupen Shah noting that ██████████████████████████████

4    ████████████████████████ (emphasis added); Exh. 34

5    (internal email where Bhupen Shah ████████████████████████████

6    ████████████████████████████████████████████

7    ██████████████████████ But Acacia had a solution ████████████

8    ██████████████████████ It simply stole ViaSat's SDFEC technologies, and

9    then denied that it had done so.

The undisputed facts show that Acacia repeatedly breached its License

11    Agreement with ViaSat by copying ViaSat's SDFEC technology, source code, and

12    technical specifications to build backwards compatible products for which it refuses

13    to pay ViaSat royalties.  Indeed, in its own recently filed summary judgment motion,

14    Acacia effectively conceded that partial summary judgment on the misappropriation

15    element of ViaSat's trade secret claims should enter: "*There is no dispute* that

16    interoperability between the Accused Products and the Royalty-Bearing Products

17    *requires* at least the first six of ViaSat's seven [asserted trade secrets]," and "the

18    Accused Products *all* have such interoperability modes."  Dkt. No. 83-1 at 16:24-25

19    (emphases added).  Acacia's own expert recognizes that Acacia *couldn't build* its

20    backwards compatible products without using critical features of ViaSat's SDFEC

21    that were provided to Acacia under the License Agreement.  Acacia's fact witnesses

22    say the same, testifying that ██████████████████████████████

23    ████████████████████████████████████████████

24    ██████████████████" Exh. 11 (Martin) 163:13-164:14; *id.* at 158:17-159:20

25    (testifying that Acacia ████████████████████████████████

26    ████████████████████████████ *id.* at 160:23-161:10

27    (testifying that he ████████████████████████████████

28    ██████████████████████████████); Exh. 10 (Humblet) 155:22-

[Redacted] Plaintiff's Brief In Support of Motion for Partial Summary Judgment [Subject to Motion to File Under Seal]

156:21.

Before this action was filed, ViaSat confronted Acacia with its suspicions that Acacia was using ViaSat's proprietary SDFEC technologies to make its newest generation products interoperable with royalty bearing products.  Exh. 19.  Despite the fact that ViaSat asserted (as Acacia now admits) that it was *impossible* to design interoperable products without using significant amounts of ViaSat's SDFEC technology, Acacia denied liability, claiming that its products were developed "independently," without using any of ViaSat's proprietary information "or indeed any variant or derivative thereof."  Exh. 20 (Aug. 13, 2015 letter from Acacia's VP and General Counsel).  This was untrue.  So too is Acacia's assertion in its own summary judgment motion that "ViaSat should have dropped its case when it realized that Acacia independently developed the Accused Products."  Dkt. No. 83-1 at 5:17-18.

Acacia copied ViaSat's SDFEC technologies into the Accused Products, using ViaSat's SDFEC Technical specifications and source code.  Exhibit 1 demonstrates just a few of the many instances where significant portions of ViaSat's SDFEC specifications were lifted verbatim into Acacia's own specifications for the Accused Products.  *See* Fitzgerald Dec., ¶ 2.  Acacia's copying was so blatant that it even included ViaSat's typos.  *See, e.g.*:

The evidence of Acacia's copying, and its theft of ViaSat's SDFEC design, is

[Redacted] Plaintiff's Brief In Support of Motion for Partial Summary Judgment [Subject to Motion to File Under Seal]

1  undisputed, and overwhelming.  *See, e.g.*, Exh. 35 (Monsen e-mail to Humblet and

2  Martin entitled



4  (emphasis added);

5  Exh. 36

9  (emphasis added); Exh. 11 (Martin) 67:15-

10  69:21 (Acacia lead engineer

13       That is just an overview.  A more detailed factual narrative follows.

14  **B.    The Technology At Issue and The Parties' Confidential Relationship**

15       This case concerns routing equipment used in fiber optic communications

16  networks.  In 2009, Acacia -- a venture capital-backed start-up company -- set out to

17  develop 100 Gigabit per second fiber optic modems that can send large quantities of

18  data (e.g., numerous full movie files per second) over long distances.  A key

19  component of these modems are Application Specific Integrated Circuit ("ASIC")

20  chips, which contain "blocks" that perform both digital signal processing (or "DSP")

21  and SDFEC (or FEC) functions on the messages being sent.  In this context, DSP is

22  the process by which signals are converted to digital format for transmission over

23  optical fiber, and the process of removing certain impairments from the optical

24  signal that can occur during transmission.[4]  SDFEC is the process by which a digital

25  signal is encoded before transmission with extra (or redundant) bits of data.  When

---

[4] For instance, fiber optic cables are often laid near railroad tracks, where rumbling
trains cause distortions in the light signal.

1   the signal is decoded at the receiver, the extra data is used to decipher the original

2   message, even if parts of the message were lost or corrupted during transmission.[5]

3   *See generally* Exh. 24 (Narayanan Opening Report) § 2; Vardy Opening Expert Report

4   ¶ 39 ███████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   　　　Importantly for the purposes of this motion, the technological heart of

7   SDFEC is coding.  *See generally* Exh. 24 (Narayanan Opening Report) at § 2.  Before a

8   message is sent using Acacia's modems, it must first be encoded in the SDFEC

9   encoder block within the transmitter.  When the message is received at the receiver,

10   it must then be decoded by the SDFEC decoder block.  Critically, an SDFEC

11   decoder must know *precisely* the coding being employed by the encoder.  *Id.*  If the

12   decoder does not know exactly what code is being used to transmit the message, it

13   will not be able to decode the encoded message, and transmission of the data will

14   fail.  *See id.*  To use a simple analogy, if a decoder only expects and is programmed to

15   decode signals sent in Mandarin, it will be unable to decode signals transmitted in a

16   French *i.e.*, using a different coding scheme. *See id.* at § 9.2; Exh. 25 (Vardy Report)

17   at ¶ 86 (doesn't disagree with the cited portion of § 9.2)  For this reason, it is

18   undisputed that for a backwards compatible decoder to be able to decode a signal

19   sent by the original encoder, it must " ████████████████████████████████████

20

21   _____

22   [5] For example, consider the word "Mother" being sent from one Acacia product in

23   San Diego to another Acacia product in Boston.  Due to errors that can occur
     during transit, the receiver may instead receive an invalid message, such as

24   "Motter."  Without additional information, and knowing only that one letter was
     wrong, the recipient would not be able to determine whether the original message

25   sent was "Matter," "Hotter," or "Mother."  If, however, the sender intentionally
     added more information to the transmission, such as "The Love of a," the receiver

26   could use that extra information to determine the message originally sent was

27   "Mother," and not "Matter" or "Hotter."  *See* Exh. 24 (Narayanan Opening Report)

28   at § 2.2.

1   ██████      Exh. 24 (Narayanan Report) at 48; *See* Exh. 10 (Humblet) 155:22-156:21

2   (in order to be backwards compatible, ████████████████████████████████

3   █████████████████████████████████████████████████████████████

4   ██████████████ (emphasis added).  Put differently, if Acacia's "independently

5   developed" decoders don't know the *precise* code being used by the original encoder,

6   then they won't be able to successfully decode messages sent by the earlier

7   generation product.  And similarly, if Acacia's "independently developed" new

8   products can't encode messages in the *exact same way* as they were originally encoded

9   in the earlier generation product, then the original decoder will not be able to decode

10   an encoded message sent by the newer product.  Exh. 25 (Vardy Expert Report) at ¶

11   83 (admitting that ██████████████████████████████████████████████

12   ████████████████████████████████████████); Exh. 24

13   (Narayanan Report); Exh. 10 (Humblet) 155:22-156:21.

14   ████████████████████████████████████████████████

15   █████████████████████████████████████████████████

16   ████████ Exh. 37. ████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████ *See* Exh. 38 (Rasmussen email asking

19   "██████████████████████████████████████; Exh. 16

20   (Rasmussen) 11:10-12:3; Exh. 11 (Martin) 23:22-31:12; Exh. 39; Exh. 17 (Shah) 10:9-

21   21; Exh. 10 (Humblet) 64:4-9.  As a result, Acacia looked to ViaSat for its

22   confidential information and insights into the best code type, code structure, and

23   secret techniques to optimize the SDFEC performance for 100 Gps transmission.

24         But before ViaSat shared any of this information, the parties signed a Non-

25   Disclosure Agreement effective June 10, 2009 ("the NDA"), through which Acacia

26   agreed to protect Confidential Information furnished by ECC/ViaSat, and to use

27   that information solely for the purpose of exploring a potential business relationship.

28   Exh. 23.  Two days later, on June 12, 2009, ViaSat sent Acacia a White Paper entitled

1  "100G Soft-Decision FEC Selection Analysis" marked "Proprietary and

2  Confidential." Exhs. 40, 41.  According to the email transmitting it, the White Paper

3  "describes the best selection for the Soft Decision FEC" for Acacia's proposed

4  product.  Exh. 40.  In the White Paper, ViaSat detailed █████████████████████

5  ███████████████████████████████████████████████████████████████████████████

6  for the 100 Gbps optical communications application that Acacia sought to bring to

7  market, and revealed parts of ViaSat's unique approach to SDFEC technology.  Exh.

8  41 at § 1.1.  After reviewing this White Paper, Acacia's founder Christian Rasmussen

9  emailed Acacia's Board Chair Eric Swanson saying, ██████████████████████████

10  ███████████████████████████████████████  Exh. 40.  ViaSat's analysis of

11  the optimal forward error correction code for Acacia, as discussed in the White

12  Paper, was expressly "intended for the sole use by Acacia Communications for the

13  purpose of technical evaluation."  *Id.*, Exh. 41 at § 1.1.  As ViaSat described in the

14  first paragraph of the White Paper, "[t]he information contained in this document is

15  proprietary and confidential.  It details ███████████████████████████████

16  ███████████████████████████████████████████████████████████████████████████

17  ██████████████████████████████████████████

18      In the White Paper, ViaSat recommended that Acacia ███████████████████

19  █████████████████████████████████████  Before receiving this

20  recommendation from ViaSat, █████████████████████████████████████████████

21  █████████████████████████████  ██████████████████████████████████

22  █████████████████████████████  *See* Exh. 38.  Follow-up questions

23  from Acacia show that ████████████████████████████████████████████████████

24  ███████████████ – as revealed in the White Paper - was all new to Acacia, and it was

25  important.  Exhs. 38, 42; Exh. 16 (Rasmussen) 21:8-22:11; 30:23-31:15 █████████████

26  ███████████████████████████████████████████████████████████████

27

28

████████████████████████████████████████████████████████

## C.     The License Agreement

The parties entered an interim development agreement, then negotiated and ultimately entered the License Agreement that is now at issue.  Exh. 22.  The License Agreement's effective date is November 20, 2009, and it expressly supersedes the Interim Agreement.  *Id.* §§ 1(f), 16.  It was signed by Acacia's founder and President Christian Rasmussen.  *Id.* at 13.  The License Agreement required ViaSat to develop intellectual property cores, specifically a DSP Core, and an SDFEC Core, for use in Acacia's 100 Gbps optical transport chip.  The SDFEC Core included an encoder and a decoder.  Exh. 11 (Martin) 92:18-25; Exh. 17 (Shah) 63:24-64:4; *see also* Exh. 43 at ACI039418 ████████████████████████████████████ ████████████████████████████   The parties referred to this project as "Project Everest."  Exh. 11 (Martin) 31:14-20.

In the License Agreement for Everest, the parties defined three classes of information – "Background Information," "Foreground Information," and "Licensed Materials."  Foreground Information," which is owned by Acacia, means:

> all Intellectual Property rights, design data and information (a) directly related to the Digital Signal Processing (DSP blocks) for use in 100Gb Optical Systems described in Exhibit C hereof, entitled 'Mutually Agreed Upon Specification for 100 Gbps Coherent DWDM Demodulator' *to be delivered* as part of Deliverable 2V/3A in Exhibit A, the Statement of Work (SOW), that are *first developed or first created* by VIASAT or its personnel during the course of performing services for ACACIA under this Agreement, or (b) that are *first developed or first created* by VIASAT or its personnel in the performance of its services relating to Digital Signal Processing under this Agreement, and including all changes, additions, revisions, replacements, manuals and documentation thereto which

---

[6] TPC codes are serially concatenated BCH codes.  When Acacia engaged ViaSat to develop its IP cores, ███████████████████████████████████████ ████████  Exh. 16 (Rasmussen) 11:10-12:3; Exh. 11 (Martin) 23:22-31:12; Exh. 15 (Pendock) 16:19-17:2; 48:19-24; Exh. 12 (Mikkelsen) 14:18-15:8; Exh. 39.

VIASAT may provide under this Agreement. For the sake of clarity, and without limiting the foregoing, the DSP Core and all Deliverables relating thereto shall be deemed Foreground Information.

Exh. 22 at § 3(a) (emphases added).  As reflected in the emphasized language the parties agreed that Acacia would own all intellectual property rights in the DSP Core, meaning the specific implementation of ViaSat's pre-existing DSP technology that ViaSat would develop and deliver to Acacia under the contract.  Ex. 22 at § 3(a).

"Background Information," which is owned by ViaSat, means "*all* Intellectual Property Rights and other *design data and information* either owned or licensed by ViaSat prior to the effective date" of the License Agreement, or developed or licensed by ViaSat separate and apart from the parties' agreement.  *Id.* at 1 § 1(b) (emphases added).  "Background Information shall also include all technical data, manuals and other documentation and data related to any of the foregoing. For the sake of clarity, and without limiting the foregoing, the SDFEC Core shall be deemed Background Information."  *Id.*  Thus, ViaSat has exclusive ownership of the SDFEC Core, including all SDFEC design data, documentation and information furnished by ViaSat, and any SDFEC information jointly developed by the parties pursuant to the Agreement.  *Id.* at §§ 1(b); 1(k); 8(a).

Finally, the License Agreement provided that the SDFEC Core developed under the contract was a "Licensed Material."  *Id.* § 1(k).  "Licensed Materials" also includes "all changes, additions, revisions, replacements, *manuals and documentation*" for the SDFEC Core "which VIASAT may provide under this Agreement."  *Id.* (emphasis added); *see also* Exh. 17 (Shah) 69:21-70:5; 73:11-16 (Acacia's 30(b)(6) designee admits that under the License Agreement, ViaSat "owns the low-level specifications for the SDFEC").

All Acacia integrated circuits that incorporate all *or any part* of the "Licensed Materials" are deemed Licensed Products and Royalty Bearing Products, meaning Acacia must pay ViaSat a royalty on them.  Exh. 22 §§ 1(b), 1(k), 1(l), 1(m), 4(a), 4(b).  As communicated to Acacia during contract negotiations, Acacia's royalty

1   obligation on any products incorporating any part of ViaSat's SDFEC was important

2   to ViaSat, because that technology was extremely valuable.  Exh. 44 (Russell Fuerst

3   email refusing to lower royalty numbers: "[I] feel that this particular piece of IP (soft

4   decision FEC) has a lot of value to us . . . Given the fact that we are providing the IP

5   with no NRE required up front, and have removed any guaranteed quantities, the

6   risk is squarely on us.  In this sense, we will only make money if you are

7   successful.").

8          Acacia recognized the novelty and value of the Everest SDFEC, describing it

9   in glowing terms to investors and in internal emails.  *See*, *e.g.*, Exh. 28 at 1 ██████

10  ███████████████████████████████████████████████

11  ████████████████████████████████████████

12  ██████████████████████████████████████

13  ████     Exh. 45 at 5 ██████████████████████████

14  ████████████████████████████████████████  Exh. 59 at

15  MATRIX0000239 ████████████████████████████████

16  ███████████  Exh. 46 █████████████████

17  ████████████████████████████████████

18  ███████████████████████████████████████

19  ████     Exh. 47 at 2; Exh. 48 ███████████████████████

20  ████████████████

21          Acacia also agreed that "all Intellectual Property Rights in the Background

22  Information and the Licensed Materials are and will remain the sole property of

23  VIASAT, including all modifications, improvements, and derivative works relating to

24  the Background Information and Licensed Materials, including but not limited to all

25  modifications, improvements, and derivative works requested or suggested by

26  ACACIA."  *Id.* § 8(a).  Consistent with this, Acacia agreed it would not:

27          decompile, reverse engineer, disassemble, or otherwise reduce any
        Background Information and/or Licensed Materials it receives from
28          VIASAT under this Agreement to a human-perceivable form . . . Acacia

may not modify or prepare derivative works of any Background Information and/or Licensed Materials it receives from VIASAT under this Agreement in whole or in part, except with respect to the purposes of the Licensed Products. . . . ACACIA acknowledges that any Background Information and/or Licensed Materials it receives from VIASAT under this Agreement represents valuable property of VIASAT, and may be protected by copyright law.

*Id.* § 8(b).

To summarize, the parties agreed that Acacia would not use any of the Everest SDFEC design, including any documentation thereof, regardless of whether it was initially provided by ViaSat or developed jointly between ViaSat and Acacia, except in royalty-bearing products. *Id.* at § 4(a). Acacia also agreed not to use any information furnished by ViaSat prior to execution of the License Agreement ("Background Information"), except for the purpose of developing royalty-bearing products. *Id.* at § 8(b).

ViaSat's SDFEC White Paper and the code parameters discussed therein were clearly Background Information, as they had been created by ViaSat and sent to Acacia under NDA over five months before the effective date of the License Agreement. As Acacia's 30(b)(6) witness admitted in deposition, ██████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████ Exh. 17 (Shah) 69:21-70:5, 73:17-74:19, 81:6-13; 89:20-25. Under the License Agreement, Acacia could use the Licensed Materials, including those technical specifications "*solely* for the design, simulation, implementation and manufacture of Licensed Products," that is products on which Acacia paid ViaSat royalties. Exh. 22 at 5 § 4(a) (emphasis added). Section 4(a) of the License Agreement also provided that: "*Use of the Licensed Materials for any product other than the Licensed Product is strictly prohibited* unless ACACIA has entered into a separate written Agreement with VIASAT for such use." *Id.* (emphasis added). Moreover, Acacia agreed to maintain in strict confidence and use only as authorized by ViaSat "all information" it received from ViaSat, in accordance

1    with the NDA.  *Id.* § 9.

2    **D.    Acacia's Theft of ViaSat's SDFEC Technologies**

3         The Everest product with ViaSat's SDFEC quickly achieved huge success, due

4    in part to ViaSat's FEC technology.  *See, e.g.*, Exh. 17 (Shah) 146:4-9; Exh. 31

5    ████████████████████████████████████████████████████████████

6    ██████████████████████████████████; Exhs. 27, 28, 30.  In 2013, ViaSat wrote to

7    Acacia expressing concern about Acacia's possible misuse of ViaSat's Background

8    Information and rumors ViaSat heard in the market about Acacia's claims that it

9    owned *all* the intellectual property in the DSP and SDFEC cores in the Everest

10   product.  Exh. 49.  In response, Acacia's Vice President of Engineering, Bhupen

11   Shah, wrote back saying that Acacia fully respected ViaSat's intellectual property

12   rights and that Acacia was honoring all of its contractual confidentiality obligations.

13   Exh. 50.  Mr. Shah also represented that "Acacia stores the Background Information

14   in a restricted directory, where it accessible by personnel with a need to know for

15   purposes permitted under the Agreement."  *Id.*

16        In 2015, ViaSat learned that Acacia was planning to release new "backward

17   compatible" products, which could interoperate with the ViaSat-developed Everest

18   product.  Acacia calls these backwards compatible products "Sky," "Denali," and

19   "Meru."  *See* Exh. 3.  ViaSat believed that in order to be interoperable, Acacia would

20   necessarily need to use exact copies of various parts of the SDFEC it developed

21   under the License Agreement, along with the "proprietary design specifications

22   provided to Acacia by ViaSat."  Exh. 19.  Accordingly, ViaSat wrote to Acacia

23   expressing concern about Acacia's potential breach of the License Agreement.  *Id.*

24    In response, Acacia wrote that it had "independently developed its own distinct

25   product," and that Acacia's new product did not contain or utilize the Everest

26   SDFEC Core "or any variant or derivative thereof."  Exh. 20.  Acacia's General

27   Counsel even asserted that Acacia couldn't be using ViaSat's Background

28   Information or Licensed Materials because "Acacia did not have access to the details

1   or coding of the SDFEC Core." Exh. 21.  These assertions were intended to lead

2   ViaSat to believe that Acacia's new products had been developed without any use of

3   ViaSat's Background Information or Licensed Materials.  *See* Exh. 51 (Bhupen Shah

4   email to Acacia's senior executives: █████████████████████████████████

5   ██████████████████████████████████████████████████████████

6   ███████████████████

7       The evidence conclusively establishes that Acacia lied.  First, Acacia's

8   engineers clearly had unfettered access to copious proprietary details about ViaSat's

9   SDFEC Core, including the low-level specifications for the Everest SDFEC

10  Encoder and Decoder, ViaSat's FEC White Paper, and even the source code for the

11  Everest encoder itself.  *See, e.g.*, Exh. 11 (Martin) 56:12-16; 61:19-62:6; 67:4-25; 69:8-

12  16; 80:12-18; Exh. 10 (Humblet) 34:2-9.  Indeed, Gary Martin, one of the lead FEC

13  engineers on the Sky, Denali and Meru projects testified that ████████████████

14  ██████████████████████████████████████████████████████████

15  ███████████████████████ Exh. 11 (Martin) 62:23-63:17 (emphasis added).

16  Pierre Humblet testified that ██████████████████████████████████████

17  ██████████████████████████████████████████████████████████████

18  Exh. 10 (Humblet) 36:24-37:8.  He ██████████████████████████████████

19  ███████████████ Exh. 52 ████████████████████████████████████████

20  ██████████████████████████████████████████████████████████

21      Second, ViaSat's Background Information was not stored in any restricted

22  directories, as Bhupen Shah had asserted in his March 18, 2013 letter.  Exh. 17

23  (Shah) 37:3-12 ██████████████████████████████████████████████

24  ██████████████████████████████████████████████████████ the

25  ███████████████████████████ (emphasis added); *id.* at 19:25-20:8; 21:8-16; 42:7-44:6;

26  Exh. 11 (Martin) 136:2-8; 137:4-15; Exh. 16 (Rasmussen) 58:9-59:25; 61:22-62:14;

27  Exh. 12 (Mikkelsen) 37:25-38:7; 46:18-48:5; Exh. 9 (Aydinlik) 61:8-62:7; Exh. 15

28  (Pendock) 19:22-20:6; 21:23-22:6; Exh. 13 (Monsen) 26:2-20; 33:9-13.  To the

1  contrary, Shah himself had told Pierre Humblet that ███████████████

2  ████████████████████████████████████████████

3  ██████  Exh. 10 (Humblet) 204:6-19, 209:10-17.  Gary Martin, the other engineer

4  primarily responsible for Acacia's "independently developed" FEC modules,

5  admitted ████████████████████.  *See, e.g.*, Exh. 11 (Martin) 136:2-8

6  ████████████████████████████████████████████

7  ████████████████████████████  *id.* at 137:4-23.

8       Moreover, when Pierre Humblet was working on the FEC for Sky and/or

9  Denali, Christian Rasmussen (who had signed the License Agreement on behalf of

10  Acacia) █████████████████████████████

11  █████████████  Exh. 10 (Humblet) 18:24-19:9.  Specifically, on October 24,

12  2012, ████████████████████████████████████████

13  ████████████████████████████████████  Exh.

14  36; Exh. 16 (Rasmussen) 109:12-113:12.  Having signed the License Agreement,

15  Rasmussen ██████████████████████████████████

16  ████████████████████████████████████████████

17  ████████████████████████████████████████████

18  ██████████████████████████  Exh. 36.  During

19  the Sky development effort, according to Rasmussen's email, Humblet ████████

20  ████████████████████████████████████████████

21  ██████████████████  *Id.* (emphasis added).  Confronted with ███

22  ████████████████████████████████████████████

23  ████████████████████  Exh. 16 (Rasmussen) 120:17-121:14; 113:13-116:19;

24  124:15-125:21.

25       Acacia ultimately employed in its Sky, Denali and Meru products ████████

26  ███  ██████████████  first introduced to it in ViaSat's confidential White Paper.  Exh.

27  11 (Martin) 105:11-106:23 (explaining that ██████████████████████

28  ████████████████████████████████████████

1 ███████████; *id.* at 246:16-247:14 (A: ". . .██████████████████

2 ███████████████████████████████████████████████████████

3 ██████████████████████████████).  Contrary to

4 Bhupen Shah's representation, the White Paper had never been placed in a restricted

5 directory or made inaccessible to engineers developing non-royalty bearing products.

6 *Id.* at 156:10-157:4.  No Background Information had been.  *See, e.g.*, Exh. 13

7 (Monsen) 33:3-13; Exh. 17 (Shah) 41:2-7.

8         Remarkably, none of the engineers actually building Acacia's new products

9 were aware of the contractual restrictions on Acacia's use of Everest SDFEC

10 information and specifications.  *See, e.g.*, Exh. 13 (Monsen) 135:19-23████████

11 ████████████████████████████████████████████████████

12 █████████████████████████); *id.* at 26:15-20; Exh. 14 (Pellach)

13 71:6-23 (Bhupen Shah told him ████████████████████████

14 ██████████████████████; Humblet 199:8-200:5 (Bhupen Shah told Humblet

15 ████████████████████████████████████████

16 ██████████████████; Exh. 15 (Pendock) 19:22-20:6.  Gary Martin

17 had never read the Acacia-ViaSat contract, so as far as he was concerned, he was free

18 to use any ViaSat-furnished SDFEC information in developing non-royalty-bearing

19 products, other than encrypted source code.  Exh. 11 (Martin) 44:15-45:9 ("████

20 █████████████████████████████████████████

21 ██████████"); 143:10-144:11.  Acacia's founder and CTO Benny Mikkelsen told an

22 Acacia Director that ███████████████████████████████████

23 ███████████████████████████████ Exh. 32 ████

24 ████████████████████████████████████████

25 ████████████████████████████████████████

26 ████████████████████████████████████

27 ████████████ (emphasis added).  There is no language in the contract

28 permitting Acacia to use the encoder's source code, merely because it was

1    unencrypted.  Exh. 22; Exh. 12 (Mikkelsen) 94:23-100:11.

2          Because Acacia's engineers didn't know about the restrictions on using

3    Background Information or Licensed Materials, it is no surprise that they used those

4    materials to develop Acacia's backwards compatible products, rather than

5    developing Acacia's new products "independently," or "from scratch."  Exh. 11

6    (Martin) 56:12-25; 123:21-124:7; 125:3-20; 128:20-130:22, 133:2-17, Exh. 8.  As

7    shown in Exhibit 1, Acacia repeatedly copied wholesale the key aspects of Everest's

8    SDFEC design, as reflected in the numerous identical figures and technical

9    descriptions of the encoding and decoding techniques for ███████████. *See*

10   *also* Exh. 11 (Martin) 134:23-135:10.  This was all in breach of the parties' contract.

11         Moreover, Acacia employees had access to, accessed, and copied portions of

12   the ViaSat delivered source code for the Everest encoder.  Exh. 11 (Martin) 67:4-

13   73:18; 75:19-79:10.  For example:

14
15
16   ████████████████████████████████████████
17
18
19   *Id.* at 69:8-69:21.

20         Acacia's use of ViaSat's Background Information and the Licensed Materials

21   for purposes other than developing royalty-bearing products (and hence breach of

22   contract) cannot be disputed.  When creating the Sky encoder specification, for

23   example, Acacia's engineer Peter Monsen admitted ███████████████

24   █████████████████████ Exh. 35 (Monsen e-mail to Humblet and Martin

25   entitled ████████████████████████████████████

26   ████████████████████████████████████

27   ███████████████████████████ (emphasis added).  This

28   copying even included the typos from ViaSat's Licensed Materials.  Monsen also

1

2

3



Exh. 35 at 4.  Monsen also

Compare Exh. 8 (

) with Exh. 35 ); Exh. 13

(Monsen) 176:11-179:10.

   Ultimately, numerous proprietary designs, figures, and technical descriptions were copied verbatim from the Everest specifications and encoder source code into the Sky and Denali products, and further carried over into the Meru product.[7]  Exh. 13 (Monsen) 101:21-111:13; Exh. 16 (Rasmussen) 196:13-215:5, 219:12-221:19; Exhs. 7, 6, 5.

   Acacia engineers also used ViaSat/ECC specifications in their effort to design their "new" "Acacia SDFEC," in breach of the contractual restriction on using those specifications solely for royalty-bearing products.  Exh. 53 (Martin March 14, 2012 email re "

---

[7] The Meru specifications just indicate that certain technologies are the same as in Sky or Denali.  Exh. 55 at 3.

1    [REDACTED]

2    sequence].”); Exh. 54 (March 14, 2012 email from Rasmussen to Humblet,

3    [REDACTED]

4    [REDACTED]); Exh. 56 (Humblet March 13,

5    2012 email to Rasmussen & Martin: [REDACTED]

6    [REDACTED]

7    [REDACTED]

8    [REDACTED]; Exh. 16 (Rasmussen) 287:10-292:3 [REDACTED]

9    [REDACTED]

10   [REDACTED];

11   Exh. 57 (Humblet May 10, 2012 email: “[REDACTED]

12   [REDACTED]. As will be discussed more fully

13   below, all of this conduct breached Acacia's contractual obligation to use such

14   information solely for the purpose of developing royalty-bearing products. *See, e.g.,*

15   Exh. 22 at § 4(a) (“Use of the Licensed Materials for any product other than the

16   Licensed Product is strictly prohibited unless ACACIA has entered into a separate

17   written Agreement with VIASAT for such use.”).  Indeed, as Acacia engineer

18   Graeme Pendock admitted, [REDACTED]

19   [REDACTED]

20   [REDACTED] as Acacia claimed when first accused by ViaSat of breaching its agreement.

21   Exh. 15 (Pendock) 30:2-19.

22   **E.    Acacia's Own Expert Admits That Acacia Uses ViaSat's Claimed**

23   **SDFEC Trade Secrets 1-6**

24          Acacia products operating in backwards compatible mode require, or

25   effectively require, use of ViaSat trade secrets 1-6.[8]  Acacia's own technical expert,

26   _____

27   [8] ViaSat is not seeking summary judgment on the misappropriation element as to
       Trade Secret 7.

28

1   Dr. Vardy, explained that █████████████████████████████

2   ████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14      Acacia's engineers agree with Dr. Vardy's conclusions. *See* Exh. 10 (Humblet)

15  251:7-253:24 ██████████████████████████████████████████

16  ████████████████████████████████████████████████████████;

17  *id.* at 350:7-20 (████████████████████████████████████████

18  ████████████████████████████████████████████); Exh. 14

19  (Pellach) 212:22-214:2 █████████████████████████████████

20  █████████████████████████████████; Exh. 16 (Rasmussen)

21  195:11-196:12 ████████████████████████████████████████████

22  ███████████████████████████████████████████████████████

23  █████████████████████████████████████████████████████).

24  Exh. 11 (Martin) 185:20-187:13 ████████████████████████████

25  ████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████

27  █████████████████████████████████████████. *Id.* 198:7-199:25 (Sky, Denali

28  and Meru backwards compatible mode all ███████████████████████

1  ████████

2  **F.      Acacia Knows It Is Liable to ViaSat**

3  　　Acacia's internal documents show that Acacia recognized its liability to ViaSat

4  for unpaid royalties on those products.  Acacia even ████████████████

5  ████████████████████████████████

6  Exh. 58 (emphasis added).  ████████████████████████

7  ████████████████████████████████████████

8  ████████████████████  *Id.* (emphasis added).

9  Those unpaid royalties ████████████████████████

10  ████████████████████████████████

11  ████   Acacia's theft proved lucrative to its founders and key employees, because

12  they took the company public on the strength of ViaSat's technology, quickly

13  attaining a $4 billion market capitalization.  ViaSat will prove its damages at trial.  At

14  this juncture, partial summary judgment is warranted.

15  **III.      ARGUMENT**

16  **A.      Applicable Law**

17  　　Delaware law governs the License Agreement.  "Under Delaware law, the

18  elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach

19  of that obligation; and (3) resulting damages."  *Interim Healthcare, Inc. v. Spherion Corp.*,

20  884 A.2d 513, 548 (Del. 2005).  "Where the contract language is clear and

21  unambiguous, the parties' intent is ascertained by giving the language its ordinary

22  and usual meaning."  *AT&T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104, 1108 (Del.

23  2007).  When interpreting a contract, the court should give effect to every provision

24  in a contract, choosing an interpretation that harmonizes each provision, rather than

25  one in which contradictions result.  *See Counsel of the Dorset Condo. Apartments v.*

26  *Gordon*, 801 A.2d 1, 7 (Del. 2002) ("A court must interpret contractual provisions in

27  a way that gives effect to every term of the instrument, and that, if possible

28  reconciles all of the provisions of the instrument when read as a whole.").

The only reasonable interpretation of the License Agreement is that Acacia was prohibited from using the Everest SDFEC and related SDFEC documentation -- including unencrypted encoder source code, encoder and decoder specifications, and information from the White Paper – to develop non-royalty bearing products. Indeed, the contract says as much in at least 6 places:

- Acacia received a "limited . . . license (i) to make, have made, use, reproduce and make derivative works of the Licensed Materials, *solely* for the design, simulation, implementation and manufacture of Licensed Products, and (ii) to . . . sell . . . Licensed Products incorporating the Licensed Materials on a worldwide basis. *Use of the Licensed Materials for any product other than the Licensed Product is strictly prohibited unless ACACIA has entered into a separate written Agreement with VIASAT for such use.*" § 4(a) (emphases added).

- "'Permitted Use'" means use by Acacia of the Licensed Materials in accordance with Clause 4." § 1(n).

- Acacia's license was expressly conditioned on Acacia's "payment of a per unit Recurring Royalty Fee." § 4(b).

- Acacia agreed that "all Intellectual Property Rights in the Background Information and the Licensed Materials" remain ViaSat's property, including any "modifications, improvements, and derivative works requested or suggested by ACACIA." § 8(a).

- "ACACIA may not modify or prepare derivative works of any Background Information and/or Licensed Materials it receives from VIASAT under this Agreement in whole or in part, except with respect to the purposes of Licensed Products." § 8(b).

- "Licensed Products" is defined to include "*any* integrated circuits . . . that incorporate all *or any part* of the Licensed Materials (regardless of whether or not the Licensed Materials are enabled or disabled in such Licensed Product). § 1(l).

In its summary judgment motion, Acacia isolates one phrase from Section 3(b), ignores the rest of the sentence it is in, and argues this single snippet grants Acacia a royalty-free license to all of ViaSat's Background Information and trade secrets. This opportunistic reading of one isolated phrase would negate *all* of the above provisions restricting Acacia's right to use the Everest SDFEC "solely" for royalty-bearing products. Courts reject such unreasonable interpretations. *Delta & Pine Land Co. v. Monsanto Co.*, 2006 WL 1510417, at *4 (Del. Ch. May 24, 2006)

("contracts must be interpreted in a manner that does not render any provision 'illusory or meaningless.'").  "It is well established that a court interpreting any contractual provision… must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all of the provisions of the instrument." *Elliott Associates, L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998) (rejecting defendants' contract interpretation because "the term *consolidation* cannot be ignored or wished away as surplusage").  Indeed, Acacia's interpretation would effectively negate the entire purpose and premise of the contract – to allow ViaSat to earn a royalty for Acacia's use of ViaSat's SDFEC technology, while giving ownership of the jointly developed DSP technology to Acacia.

**B.    Acacia Breached the License Agreement By Using Background Information and Licensed Materials To Develop Non-Licensed Products.**

Acacia paid royalties on its Everest product and its K2 products.  Exh. 11 (Martin) 32:19-22.  However, Acacia has failed to pay any royalties on its Sky, Denali, or Meru products.  Exh. 11 (Martin) 32:23-33:16, 34:25-35:7.  *See* Exh. 3.  The undisputed facts are that all three backwards compatible products were developed using "Licensed Materials" under the License Agreement.  Acacia also used ViaSat's Background Information and encoder source code in developing these products, without paying royalties to ViaSat as the contract requires.  These were material breaches, as Acacia apparently recognized when it chose to mislead ViaSat by falsely claiming independent creation and lying about how ViaSat's Background Information was stored.  The evidence of Acacia's breach of the License Agreement is undisputed and overwhelming, and Acacia's disregard of its contractual obligations was brazen.  ViaSat is entitled to partial summary judgment, on liability for breach of contract.

**C.    Acacia Misappropriated ViaSat's Claimed Trade Secrets**

ViaSat provided Acacia confidential low-level specifications for the Everest encoder and decoder, pursuant to the License Agreement with Acacia to develop the

1  SDFEC for the Acacia Everest product.  The ViaSat low-level specifications

2  disclosed, among other things, ViaSat's claimed trade secrets, which are identified in

3  ViaSat's Amended Trade Secret Identification.  Exh. 26.

4      As detailed above, Acacia's own expert and its fact witnesses concede that use

5  of Trade Secrets 1-6 is required, or "effectively required" to be backwards

6  compatible with Everest.  Partial summary judgment on the use element of ViaSat's

7  trade secret misappropriation claim is therefore warranted.

8      While ViaSat believes California law should apply to its tort claim for trade

9  secret misappropriation, both California and Delaware law adopted the Uniform

10  Trade Secrets Act ("UTSA").  *See* Cal. Civ. Code § 3426, *et seq.*; 6 Del. Code § 2001,

11  *et seq.*  Cal. Civil Code section 3426.1 defines misappropriation in relevant part as

12  follows:

13      (2) Disclosure or use of a trade secret of another without express or
        implied consent by a person who:
14      (B) At the time of disclosure or use, knew or had reason to know that
        his or her knowledge of the trade secret was:
15
16      (ii) Acquired under circumstances giving rise to a duty to maintain its
        secrecy or limit its use.

17  "Employing the confidential information in manufacturing, production, research or

18  development, marketing goods that embody the trade secret, or soliciting customers

19  through the use of trade secret information, all constitute use."  *PMC, Inc. v. Kadisha*,

20  78 Cal. App. 4th 1368, 1383 (2000) (citing with approval Rest.3d Unfair

21  Competition, § 40, comment c); *see also Ajaxo, Inc. v. E*Trade, Inc.*, 135 Cal. App. 4th

22  21 (2006) (misuse of trade secrets regarding software programming details).

23  Delaware law is consistent.  *Mattern & Associates v. Seidel*, 678 F. Supp. 2d 256 (D.

24  Del. 2010) (applying DUTSA).

25      The parties contractually agreed that 1) the Everest SDFEC Core was

26  "Background Information;" 2) SDFEC information and documentation for Everest

27  were Licensed Materials; and 3) Acacia could not make use of any Background

28  Information or Licensed Materials except for the purpose of making Licensed

1   Products (that is, royalty-bearing products).  There is no dispute that ViaSat's trade

2   secrets are all part of the Background Information.  Therefore, Acacia was limited by

3   contract to only use those trade secrets in products for which Acacia paid ViaSat a

4   royalty.  Acacia's unauthorized use of ViaSat trade secrets in non-royalty bearing

5   products is a "use" under the UTSA, satisfying the misappropriation element of

6   ViaSat's trade secret claim.

7        Because there is no genuine dispute that Acacia uses ViaSat claimed trade

8   secrets 1-6 in Acacia's Sky, Denali and Meru products, ViaSat is entitled to partial

9   summary judgment on the element of misappropriation on ViaSat's trade secret

10  misappropriation claim.

11              **IV.      CONCLUSION**

12       For the foregoing reasons, ViaSat respectfully request the Court to enter

13  partial summary judgment in ViaSat's favor, with findings that 1) Acacia is liable to

14  ViaSat for breach of contract (damages to be determined at trial), and 2) Acacia

15  misappropriated ViaSat's claimed trade secrets 1-6 (trade secret status and damages

16  to be determined at trial).

17  Dated:   February 2, 2018                   FITZGERALD KNAIER LLP

18                                         By: s/ *Kenneth M. Fitzgerald*

19                                             Kenneth M. Fitzgerald, Esq.
20                                             Keith M. Cochran, Esq.

21                                             -and-

22                                             WARREN LEX LLP
23                                             Matthew S. Warren, Esq.
                                               Patrick M. Shields, Esq.
24
25                                             Attorneys for Plaintiff and Counter
                                               Defendant ViaSat, Inc.
26

27

28

## CERTIFICATE OF SERVICE

I certify that today I am causing to be served the foregoing document by CM/ECF notice of electronic filing upon the parties and counsel registered as CM/ECF Users.  I further certify that am causing the foregoing document to be served by electronic means via email upon counsel for Acacia Communications, Inc., per the agreement of counsel.

Dated:   February 2, 2018

s/ *Kenneth M. Fitzgerald*

Kenneth M. Fitzgerald, Esq.