# ATTACHMENT A

FITZGERALD KNAIER LLP
    Kenneth M. Fitzgerald (State Bar No. 142505)
    kfitzgerald@fitzgeraldknaier.com
    David Beckwith (State Bar No. 125130)
    dbeckwith@fitzgeraldknaier.com
    Keith M. Cochran (State Bar No. 254346)
    kcochran@fitzgeraldknaier.com
    402 West Broadway, Suite 1400
    San Diego, California, 92101
+1 (619) 241-4810
+1 (619) 955-5318 facsimile

WARREN LEX LLP
    Matthew S. Warren (State Bar No. 230565)
    Patrick M. Shields  (State Bar No. 204739)
    Erika H. Warren (State Bar No. 295570)
    16-463@cases.warrenlex.com
    2261 Market Street, No. 606
    San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile

Attorneys for Plaintiff and Counter-Defendant ViaSat, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIASAT, INC.<br>a Delaware corporation,<br>    Plaintiff and Counter-Defendant,<br><br>v.<br><br>ACACIA COMMUNICATIONS, INC.<br>a Delaware corporation,<br>    Defendant and Counter-Claimant. | Case No. 3:16-463-BEN-JMA<br><br>**VIASAT'S OPPOSITION TO ACACIA'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DAMAGES [REDACTED]**<br><br>Date:    February 20, 2018<br>Time:   10:30 a.m. PST<br>Place:   Courtroom 5A<br><br>Hon. Dist. Judge Roger T. Benitez<br>Hon. Magistrate Judge Jan M. Adler<br>Case Initiated:  January 21, 2016 |

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………….... 1

BACKGROUND……………………………………………………………… 2

I.  THE TECHNOLOGY AT ISSUE AND THE PARTIES' CONFIDENTIAL RELATIONSHIP…………………………………………….………………..2

II.  ACACIA'S THEFT OF VIASAT'S SDFEC TECHNOLOGY…………………….... 3

ARGUMENT………………………………………………………………....4

I.  SECTION 13 OF THE LICENSE AGREEMENT DOES NOT APPLY TO VIASAT'S CLAIMS…………………………………………………....4

    A.  Section 13 Expressly Excludes Breaches of Section 9 and the NDA…………5

        1.  Acacia Breached Section 9 and the NDA by Unauthorized Use of ViaSat's Confidential Information…………………………………....5

        2.  Acacia Breached Section 9 and the NDA by Unauthorized Disclosure of ViaSat's Confidential Information………………………………. 7

    B.  A Party Cannot Contractually Limit Liability for Intentional Torts………….8

    C.  Acacia's Interpretation of Section 13 Would Be Unreasonable and Therefore Unenforceable Under Delaware Law…………....………………10

    D.  Acacia's Interpretation of Section 13 Would Lead to Absurd Results…….... 12

II.  VIASAT IS ENTITLED TO UNJUST ENRICHMENT DAMAGES……………...13

    A.  The Uniform Trade Secret Act Specifically Authorizes Unjust Enrichment Damages for Misappropriation of Trade Secrets……………………………13

    B.  The License Agreement Cannot Limit Damages for Any Use of Confidential Information Outside the Scope of the License……………….. 16

        1.  ViaSat's Claim for Misappropriation of Trade Secrets Is Based on Unlicensed Products…………………………………………….. 16

        2.  The License Agreement Expressly Excludes ViaSat's Source Code from the License………………………………………………....17

3. Acacia Contends That All of ViaSat's Asserted Trade Secrets Are Outside the Scope of the License………………………………………19

III. THE TERMS OF THE NDA DO NOT LIMIT VIASAT'S CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS………………………………….. 20

    A. The License Agreement Creates an Independent Confidentiality Obligation that Acacia Has Breached………………………………………. 20

        1. The License Agreement and the NDA Contain Overlapping But Separate Confidentiality Provisions………………………………...20

        2. Acacia's Own Allegations Are Inconsistent with Its Interpretation of Section 9 and the NDA………………………………………….. 21

        3. ViaSat's Misappropriation Claim Is Based on Information Disclosed Under the License Agreement, Not Just the NDA………………..……....22

    B. ViaSat Took Reasonable Steps to Maintain the Secrecy of Its Trade Secrets……………………………………………………..22

CONCLUSION……………………………………………………………..25

# TABLE OF AUTHORITIES

**Cases**

*02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
  420 F. Supp. 2d 1070 (N.D. Cal. 2006)............................................................9

*AT&T Commc'ns of Cal., Inc. v. Pacific Bell,*
  No. 99-15668, 2000 WL 1277937 (9th Cir. Sept. 8, 2000)..............................23

*AgroFresh Inc. v. MirTech, Inc.*,
  257 F. Supp. 3d 643 (D. Del. 2017)................................................................14

*Agilent Techs., Inc. v. Kirkland*,
  No. 3512-VCS, 2010 WL 610725 (Del. Ch. Feb. 18, 2010)............................14

*B. Braun Med., Inc. v. Rogers*,
  163 Fed. Appx. 500 (9th Cir. 2006)................................................................14

*Beard Research, Inc. v. Kates*,
  8 A.3d 573 (Del. Ch. 2010)............................................................................23

*Chapman v. Skype Inc.*,
  220 Cal. App. 4th 217 (2013)........................................................................15

*Cheramie v. HBB, LLC*,
  545 Fed. App'x. 626 (9th Cir. 2013)..............................................................15

*Column Form Tech., Inc. v. Caraustar Indus., Inc.*,
  No. 12C-09-050, 2014 WL 2895507 (Del. Sup. Ct. June 10, 2014)................10

*Data Mgmt. Internationalé, Inc. v. Saraga*,
  No. 05C-05-108, 2007 WL 2142848 (Del. Sup. Ct. July 25, 2007)..................8

*Delphi Petroleum v. Magellan Terminals Holdings, L.P.*,
  No. N12C-02-302, 2015 WL 3885947 (Del. Sup. Ct. June 23, 2015)..............9

*Delmarva Power & Light Co. v. ABB Power T&D Co.*,
  No. 00C-02-17, 2002 WL 840564 (Del. Sup. Ct. Apr. 30, 2002)....................10

*Donegal Mut. Ins. Co. v. Tri-Plex Sec. Alarm Sys.*,
    622 A.2d 1086 (Del. Sup. Ct. 1992).................................................................10

*Digital Envoy, Inc. v. Google, Inc.*,
    No. 04-1497, 2005 WL 2999364 (N.D. Cal. Nov. 8, 2005).............................14

*eCommerce Indus., Inc. v. MWA Intelligence, Inc.*,
    No. 7471-VCP, 2013 WL 56216778 (Del. Ch. Oct. 4, 2013).........................10

*Embotelladora Electropura S.A. de C.V. v. Accutek Packaging Equip. Co.*,
    No. 16-00724, 2017 WL 3288492 (S.D. Cal. Aug. 2, 2017)............................9

*Health Net of Cal., Inc. v. Dept. of Health Servs.*,
    6 Cal. Rptr. 3d 235 (Cal. App. 2003)................................................................9

*Hilderman v. Enea TekSci, Inc.*,
    551 F. Supp. 2d 1183 (S.D. Cal. 2008)............................................................23

*HiRel Connectors, Inc. v. United States*,
    No. 01-11069, 2006 WL 3618011 (C.D. Cal. Jan. 25, 2006)..........................24

*InfoSpan, Inc. v. Emirates NBD Bank PJSC*
    551 F. Supp. 2d 1183 (S.D. Cal. 2008)............................................................23

*In re Providian Credit Card Cases*,
    116 Cal. Rptr. 3d 833 (Cal. Ct. App. 2002).....................................................24

*In re Ross & Son, Inc.*,
    95 A. 311, 312 (Del. Ch. 1915)........................................................................10

*J.A. Jones Constr. Co. v. Dover*,
    372 A.2d 540, 545 (Del. Sup. Ct. 1977)............................................................9

*Lee Builders, Inc. v. Wells*,
    103 A.2d 918 (Del. Ch. 1954)..........................................................................10

*Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*,
    No. 08-788, 2009 WL 10671420 (C.D. Cal. May 22, 2009)...........................23

*MIG Investments LLC v. Aetrex Worldwide, Inc.*,
    852 F. Supp. 2d 493 (D. Del. 2012).................................................................17

*Moon Express, Inc. v. Intuitive Machs., LLC*,
    No. 16-344, 2017 WL 4217335 (D. Del. Sept. 22, 2017)................................. 15

*Nelson Sports, Inc. v. Climb X Gear, LLC*,
    No. 10-6977, 2011 WL 13217554 (C.D. Cal. Aug. 25, 2011)......................... 23

*Nextdoor.com, Inc. v. Abhyanker*,
    No. 12-5667, 2014 WL 1648473 (N.D. Cal. Apr. 23, 2014)...........................24

*Osborn ex rel. Osborn v. Kemp*,
    991 A.2d 1153, 1160 (Del. 2010)...................................................... 12

*Paracor Fin., Inc. v. General Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996)...............................................................15

*Pedrick v. Roten*,
    70 F. Supp. 3d 638 (D. Del. 2014).......................................................15

*Pennwalt Corp. v. Akzona Inc.*,
    570 F. Supp. 1097 (D. Del. 1983)........................................................24

*RHA Constr., Inc. v. Scott Eng'g, Inc.*,
    No. N11C-03-013, 2013 WL 3884937 (Del. Sup. Ct. Jul. 24, 2013)...............10

*Rob-Win, Inc. v. Lydia Sec. Monitoring, Inc.*,
    No. 04C-11-276, 2007 WL 3360036 (Del. Sup. Ct. Apr. 30, 2007).................10

*Savor, Inc. v. FMR Corp.*,
    No. 10-149, 2004 WL 1965869 (Del. Sup. Ct. Jul. 15, 2004).........................23

*Tolliver v. Christina Sch. Dist.*,
    564 F. Supp. 2d 312 (D. Del. 2008).................................................15, 16

*Total Care Physicians, P.A. v. O'Hara*,
    798 A.2d 1043 (Del. Sup. Ct. 2001)...............................................14, 24

**Statutes**

Cal. Civ. Code § 1668.......................................................................9

Cal. Civ. Code § 3426.1(d)(2).............................................................23

Cal. Civ. Code § 3426.3(a)................................................................14

1

6 Del. Code § 2001(4)(b)..........................................................................23

2

6 Del. Code § 2003(a)..............................................................................14

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# INTRODUCTION

2 Acacia's Motion floats a variety of different contract-based theories to limit its

3 liability for unauthorized use of ViaSat's trade secrets and other confidential information.

4 Each of these theories fails because Acacia misstates the facts, misstates the law, and

5 misstates the terms of the contract.

6 Acacia first argues that the parties' license agreement limits its liability for

7 misappropriation of ViaSat's trade secrets in the accused, unlicensed products to the

8 amount of past royalties Acacia has paid for different, licensed products.  The limitation

9 of liability provision does not say that; it specifically excludes claims based on

10 unauthorized use or disclosure of ViaSat's trade secrets, which is the basis of ViaSat's

11 claims.  Moreover, Acacia's interpretation would result in a liability cap that bears no

12 reasonable relationship to actual harm, which would not be enforceable under Delaware

13 law.  Nor will Delaware law enforce a limitation of liability for intentional torts.

14 Acacia next argues that ViaSat should be limited to recovering royalties under the

15 license agreement, rather than unjust enrichment damages.  The argument is legally and

16 factually baseless.  The California Uniform Trade Secrets Act specifically authorizes

17 unjust enrichment damages.  Furthermore, the license agreement specifies the amount of

18 royalties only for use of licensed materials in licensed products.  ViaSat has alleged

19 misappropriation of unlicensed materials in unlicensed products, which the license

20 agreement's royalty structure, by definition, does not address.  Acacia itself vigorously

21 maintains that ViaSat's asserted trade secrets are outside the scope of the license—

22 otherwise it would have to admit liability, as it concedes it uses at least six of ViaSat's

23 seven trade secrets—so it cannot credibly claim the license agreement defines their value.

24 Finally, Acacia argues that ViaSat's trade secrets are no longer enforceable because

25 the parties' original non-disclosure agreement, which pre-dated the license agreement,

26 expired in ███.  Acacia overlooks the fact that the license agreement has its own term,

27 and its own independent confidentiality restrictions that protect ViaSat's trade secrets to

28 this day.

In the end, Acacia resorts to a naked plea, asking the Court to please help it settle this case by reducing its liability. Motion at 11. Injecting legal error will not help resolve this case. Holding Acacia responsible for the full harm its misappropriation of trade secrets has caused will.

## BACKGROUND

## I.   THE TECHNOLOGY AT ISSUE AND THE PARTIES' CONFIDENTIAL RELATIONSHIP

Plaintiff ViaSat, Inc. ("ViaSat") is a world leader in satellite communications and network services, infrastructure, and technology. Doc. 1-2 ¶ 6. This case concerns ViaSat's technology for providing secure communications over fiber optic networks.

In 2009, Defendant Acacia Communications, Inc. ("Acacia") commissioned ViaSat to develop an application-specific integrated circuit ("ASIC") intellectual property core for a 100-Gigabit-per-second fiber optic modem. *Id.* ¶ 8. Before entering into substantive discussions, ViaSat and Acacia executed a Non-Disclosure Agreement dated June 10, 2009 (the "NDA"). Ex. 1.[1] ███ ████████████████ ████ ████████████████████████████████ *Id.*, Recitals, ¶ 8.

After negotiating under the terms of the NDA, the parties ultimately entered into an IP Core Development and License Agreement dated November 20, 2009 (the "License Agreement"). Ex. 2. The License Agreement provided that ViaSat would develop a Digital Signal Processing IP core ("the DSP Core") and an IP core for Soft Decision Forward Error Correction Decoder and Encoder ("the SDFEC Core"). *Id.*, Recitals, § 2. DSP is the process by which analog signals are converted to digital format for transmission and use by digital networks and devices. Ex. 3 at 5–10. SDFEC is a process by which a digital signal is encoded with redundant bits of data, with encoding

---

[1] All cited exhibits are attached to the Declaration of Patrick M. Shields, filed concurrently.

and decoding algorithms for recovering errors in the data stream.  Ex. 4 at 7–12.  The parties referred to this project as "Project Everest."  Ex. 5 (Martin) at 31:14–20.

The License Agreement provided that ViaSat would retain all intellectual property rights in all "Background Information," which included the SDFEC Core, as well as all other design data, information, manuals, and other documentation owned or developed by ViaSat prior to the effective date of the License Agreement.  Ex. 2 §§ 1(b), 8(a).  Acacia would own intellectual property rights in "Foreground Information" relating to the DSP Core that were first developed during performance of the License Agreement.  *Id.* § 1(j).  The License Agreement granted Acacia a license to use the SDFEC Core in licensed products, in return for a specified royalty fee.  *Id.* §§ 1(k), 1(*l*), 4(a), 4(b).  The License Agreement prohibited Acacia from using ViaSat's intellectual property for any other purpose.  *Id.* § 4(a) ("Use of the Licensed Materials for any product other than the Licensed Product is strictly prohibited unless ACACIA has entered into a separate written Agreement with VIASAT for such use.").

The License Agreement also contained its own confidentiality provision:  "[e]ach Party shall maintain in strict confidence, and will use and disclose only as authorized by the disclosing party, in accordance with the provisions of [the NDA], all information that it receives from the other Party in connection with this Agreement . . . ."  *Id.* § 9.

Acacia started selling Everest products in 2011, and a related product called K2 in 2012.  Ex. 6 (Pellach) at 102:14 to 103:2.  Acacia has paid royalties on these products, under the terms of the License Agreement, totaling approximately ███████ through the second quarter of 2017.  Ex. 7.  The total amount of royalties continues to increase because Acacia still sells licensed Everest and K2 products to this day.  Motion at 3 n.3.

## II.   ACACIA'S THEFT OF VIASAT'S SDFEC TECHNOLOGY

In 2014, Acacia began selling new products that were backwards compatible with the licensed Everest products.  Ex. 8 (Shah) at 118:12–20; Ex. 9; Ex. 10 (Vardy) at 146:14–23.  These products were dubbed Sky, Denali, and Meru (collectively, "the Accused Products").  *Id.*  It is undisputed that, in order to be backwards compatible—that

1    is, to communicate—with Everest products, the Accused Products must necessarily use

2    technology described in ViaSat's asserted trade secrets ("the Trade Secrets").  Ex. 11

3    (ViaSat's Amended Trade Secret Disclosure); Ex. 12 ¶¶ 69, 90–91, 107 ███████████

4    ████████████████████████████████████████████████████████████████; *id.*

5    ¶¶ 131–32, 144–45, 155–56 █████████████████████████████████████████

6    █████████████████████████████████; *see also* Ex. 4 at 48–57.

The Trade Secrets all comprise ViaSat's confidential information that is protected by

7    the terms of the License Agreement.  Ex. 13 (Supp. Response to Interrogatory No. 19);

8    Ex. 14 (Second Supp. Response to Interrogatory No. 23).  Acacia, however, refuses to

9    pay royalties on Sky, Denali, or Meru, claiming they are not royalty-bearing products

10   under the License Agreement.  Ex. 8 (Shah) at 138:10–18; Doc. 83-1 at 6.

11

12   Through the second quarter of 2017 (the most recent period for which Acacia has

13   produced financial data), Acacia has earned revenues of over ██████████ on the

14   Accused Products.  Ex. 15 ¶¶ 60–62.  ViaSat's damages expert, Dr. Prowse, calculates

15   that approximately ███████ of that revenue is Acacia's profit attributable to the use

16   of ViaSat's Trade Secrets.  *Id.* ¶¶ 63–68.  This number will continue to increase as Acacia

17   sells more of the Accused Products.

## ARGUMENT

## I.   SECTION 13 OF THE LICENSE AGREEMENT DOES NOT APPLY TO VIASAT'S CLAIMS

Acacia's argument that Section 13 of the License Agreement limits its liability is a

misinterpretation of that provision.  Motion at 2–12.  By its plain language, Section 13

does not apply to damages arising from breach of the License Agreement's

confidentiality provisions, which is the basis of ViaSat's claims.  Furthermore, while

Section 13 limits damages arising from performance or nonperformance of other portions

of the License Agreement, it does not—and legally cannot—limit liability for intentional

torts, which are based on duties that exist independent of the contract.

**A.      Section 13 Expressly Excludes Breaches of Section 9 and the NDA**

Section 13 of the License Agreement does not apply to ViaSat's claims because it expressly excludes breaches of Section 9 and breaches of the NDA.  That is, in fact, the very first line of Section 13:  "**EXCEPT FOR BREACHES OF CLAUSE 9 (CONFIDENTIALITY) OR THE NDA . . . .**"  Ex. 2 § 13.  ViaSat has clearly alleged that Acacia violated both Section 9 and the NDA; Acacia's assertion to the contrary (Motion at 10) is simply false.

**1.      Acacia Breached Section 9 and the NDA by Unauthorized Use of ViaSat's Confidential Information**

Acacia's argument assumes that Section 9 and the NDA prohibit only unauthorized *disclosure* of ViaSat's confidential information, but not unauthorized *use* of that information.  Motion at 9–10.  That assumption is wrong.  Section 9 of the License Agreement and the NDA both expressly prohibit disclosure ***and*** unauthorized use.  Section 9 states, in relevant part:

> Each Party shall maintain in strict confidence, and will ***use*** and disclose only as authorized by the disclosing party . . . all information that it receives from the other Party in connection with the Agreement (including pursuant to a SOW), including, but not limited to, all information concerning trade secrets . . . .

Ex. 2 § 9 (emphasis added).  Similarly, the NDA provides:

Ex. 1 § 8 (emphasis added).

ViaSat's Complaint clearly alleges unauthorized use of ViaSat's confidential information.  Doc. 1-2 ¶¶ 21, 29.  And a veritable mountain of evidence proves that Acacia did, in fact, use ViaSat's confidential information to create the Accused Products.  For example:

- Two of ViaSat's technical experts, Dr. Narayanan and Dr. Hassoun, have provided detailed reports showing how Acacia's Accused Products use each of ViaSat's asserted Trade Secrets.[2]

- Acacia's own expert, Dr. Vardy, concedes that ███████████████ ██████████████████████████.[3]

- Acacia witnesses confirm █████████████████████████████████ ██████████████████████████████████.[4]

- Acacia witnesses also admit that ████████████████████████████ ███████████████████████.[5] Even a cursory comparison of ViaSat's Everest specifications and Acacia's Sky and Denali specifications reveals extensive copying. Ex. 26.

For ViaSat's Trade Secrets No. 1–6, which Acacia admits to using, all of this is undisputed, as discussed in ViaSat's pending Motion for Partial Summary Judgment (Doc. 98-1). Acacia does dispute using Trade Secret No. 7, but that is for the jury to decide. In sum, this evidence is more than sufficient to prove Acacia breached both Section 9 and the NDA.

---

[2] Ex. 4 at 77–183; Ex. 16 at 1–3; Ex. 17 at 52–156.

[3] Ex. 12 ¶¶ 69, 90–91, 107, 131–32, 144–45, 155–56; Ex. 10 (Vardy) at 145:8 to 147:24, 227:3 to 230:9, 231:22 to 232:12, 244:23 to 245:7.

[4] Ex. 18 (Humblet) at 38:22 to 39:14, 130:13–17, 155:22 to 158:10, 251:7 to 253:7, 253:15–24, 294:13–22, 332:18 to 336:17, 337:9–22; Ex. 19; Ex. 20 (Monsen) at 171:14 to 172:9; Ex. 21; Ex. 5 (Martin) at 156:15 to 157:6, 160:23 to 161:6, 163:14 to 164:14, 168:9 to 169:6, 185:20 to 187:13, 198:7–23, 199:13–25, 205:25 to 207:2, 170:7–12, 172:12 to 173:4; Ex. 22 (Rasmussen) at 182:10 to 183:2, 193:22 to 194:15, 195:11 to 196:5.

[5] Ex. 8 (Shah) at 85:25 to 86:20; Ex. 5 (Martin) at 56:12–25, 80:12–18, 125:3–20, 134:20 to 135:10; Ex. 18 (Humblet) at 34:2–16, 36:8 to 37:8, 157:16 to 158:10, 244:5 to 246:8, 254:10 to 255:17, 255:24 to 257:2, 257:4–12, 258:19 to 259:19, 260:14–23, 350:7–20, 262:10 to 263:16; Exs. 23–25. Two of these witnesses, Gary Martin and Pierre Humblet, were Acacia's lead designers for the SDFEC components of the Accused Products. *See* Ex. 8 (Shah) at 17:9 to 18:6; Ex. 18 (Humblet) at 15:9–21, 133:23 to 134:8, 164:22 to 165:8.

1

2

      **2.**      **Acacia Breached Section 9 and the NDA by Unauthorized Disclosure of ViaSat's Confidential Information**

3

4

5

6

7

8

Acacia also breached Section 9 and the NDA by unauthorized disclosure of ViaSat's confidential information.  The NDA ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

9

10

Ex. 1 § 4(b).  Section 9 of the License Agreement incorporates this restriction from the NDA.  Ex. 2 § 9.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Incorporating ViaSat's Trade Secrets in Acacia's Accused Products necessarily entailed unauthorized disclosure of those Trade Secrets within Acacia.  For example, the lead designer of the Sky decoder, Pierre Humblet, ███████████████████████████

████████████████████████████████████████  Ex. 18 (Humblet) at 18:17 to 19:17, 164:22 to 165:8.  █████████████████████████████████████████

███████████████████████████████████████████████████████.  *Id.* at 34:2–16, 36:8 to 37:8, 51:2–13, 157:16 to 158:10, 244:5 to 246:8, 254:10 to 255:17, 255:24 to 257:2, 257:4–12, 258:19 to 259:19, 260:14–23, 350:7–20; Exs. 23, 24.  Similarly, Peter Monsen, ████████████████████████████████████████████████

████████  Ex. 21 (Monsen) at 18:3–10.  ██████████████████████████████

█████████████████████████████████████████████████  Ex. 25 ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████  (emphasis added)).  Acacia admits ███████████████████████████

███████████████████████████████████████  Ex. 8 (Shah) at 21:8–16, 33:2–6, 36:15 to 37:23, 41:2–17, 42:22 to 44:6; Ex. 5 (Martin) at 136:2–8, 221:12–25.  Disclosure of ViaSat's confidential information to Acacia employees

28

1  working on the Accused Products, for purposes of incorporating that information into the

2  Accused Products, is necessarily unauthorized and a violation of Section 9 and the NDA.

3      Acacia also disclosed ViaSat's confidential information to unauthorized third parties.

4  For example, ███████████████████████████████████████████████████████

5  ████████  Ex. 8 (Shah) at 305:3–19.  As Acacia's expert, Dr. Koralek, explains,

6  █████████████████████████████████████████████████████████  Ex. 27

7  ¶¶ 109–11.  Thus, to the extent the design of Acacia's Accused Products incorporated

8  ViaSat's confidential information, ██████████████████████████████████████

9  ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████

12 ████████  Ex. 22 (Rasmussen) at 171:4 to 172:13, 176:2 to 178:12, 181:2 to 184:6; Exs.

13 28–30.  ██████████████████████████████████████████  *Id.*

14     The evidence therefore shows that Acacia blatantly and repeatedly violated Section 9

15 and the NDA.  Because all of ViaSat's claims arise from these violations, the License

16 Agreement's limitation of liability provision, which specifically exempts breaches of

17 Section 9 and the NDA, does not apply.[6]

18  **B.    A Party Cannot Contractually Limit Liability for Intentional Torts**

19     Acacia's interpretation of Section 13 is also contrary to law.  Under Delaware law, a

20 party cannot contractually limit liability for intentional torts.  *Data Mgmt. Internationalé,*

21 *Inc. v. Saraga*, No. 05C-05-108, 2007 WL 2142848, at *4 (Del. Sup. Ct. July 25, 2007)

22

23 ――――――――――――――――――

24     [6] Acacia argues that misappropriation of trade secrets cannot trigger the Section 9
   exception in Section 13 because otherwise that exception would "subsume the entire

25 limitation of liability clause."  Motion at 10.  Not so.  Section 13 would still apply in the

26 circumstances for which it was designed:  claims arising out of performance of the

27 agreement.  For example, it would bar consequential damages on a claim for breach of
   contract.  Ex. 2 § 13(A).  It would also limit liability on claims like breach of warranty,

28 negligence, and strict liability (all of which are specifically enumerated in the License
   Agreement).  *Id.* § 13(B).

1  ("[T]he exculpatory clause will not eliminate liability for an intentional tort."  (citing

2  Restatement (Second) of Contracts § 195 ("A term exempting a party from tort liability

3  for harm caused intentionally or recklessly is unenforceable on grounds of public

4  policy."))); *J.A. Jones Constr. Co. v. Dover*, 372 A.2d 540, 545 (Del. Sup. Ct. 1977) ("A

5  party may not protect itself against liability for its own fraudulent act or bad faith.");

6  *Delphi Petroleum v. Magellan Terminals Holdings, L.P.*, No. N12C-02-302, 2015 WL

7  3885947, at *24 (Del. Sup. Ct. June 23, 2015) ("It is undisputed that parties cannot

8  absolve themselves for their own conduct amounting to fraud.  However, as to claims that

9  fall somewhere short of fraud, such as claims for bad faith [breach of contract], the Court

10  must undergo a factual analysis that is premature on summary judgment.").[7]

11      Misappropriation of trade secrets is an intentional tort.  *See 02 Micro Int'l Ltd. v.*

12  *Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1091 (N.D. Cal. 2006).  Section 13 of

13  the License Agreement therefore cannot limit Acacia's liability for misappropriation.

14  Indeed, such a limit would be particularly inappropriate here, given the substantial

15  evidence that Acacia's misappropriation was willful.[8]

16      None of the cases on which Acacia relies applies a contractual limitation of liability

17  to intentional torts.  They all address limitations of liability or liquidated damages applied

18  to claims for breach of contract or negligence in performance of a contract.  *See*

19

20      [7] The parties agree that Delaware law governs interpretation of the License

21  Agreement.  However, California law also will not enforce a limitation of liability for
   intentional torts.  *See Embotelladora Electropura S.A. de C.V. v. Accutek Packaging*

22  *Equip. Co.*, No. 3:16-cv-00724, 2017 WL 3288492, at *4–*6 (S.D. Cal. Aug. 2, 2017);

23  *Health Net of Cal., Inc. v. Dept. of Health Servs.*, 6 Cal. Rptr. 3d 235, 242–44 (Cal. App.
   2003); Cal. Civ. Code § 1668.

24      [8] *See generally supra*, Section I.A.1.  As but one example of Acacia's consciousness

25  of guilt, ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████

Ex. 40.

1  *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, No. 7471-VCP, 2013 WL 56216778,

2  at *44–*45 (Del. Ch. Oct. 4, 2013) (breach of contract); *Lee Builders, Inc. v. Wells*, 103

3  A.2d 918, 918–19 (Del. Ch. 1954) (breach of contract); *In re Ross & Son, Inc.*, 95 A. 311,

4  312 (Del. Ch. 1915) (breach of contract); *Column Form Tech., Inc. v. Caraustar Indus.,*

5  *Inc.*, No. 12C-09-050, 2014 WL 2895507, at *1 (Del. Sup. Ct. June 10, 2014) (breach of

6  contract); *RHA Constr., Inc. v. Scott Eng'g, Inc.*, No. N11C-03-013, 2013 WL 3884937,

7  at *8 (Del. Sup. Ct. July 24, 2013) (breach of contract); *Delmarva Power & Light Co. v.*

8  *ABB Power T&D Co.*, No. Civ.A.00C-02-175, 2002 WL 840564, at *6–*7 (Del. Sup. Ct.

9  Apr. 30, 2002) (negligence in performance of contract); *Rob-Win, Inc. v. Lydia Sec.*

10  *Monitoring, Inc.*, No. 04C-11-276, 2007 WL 3360036, at *1 (Del. Sup. Ct. Apr. 30,

11  2007) (gross negligence in performance of contract); *Donegal Mut. Ins. Co. v. Tri-Plex*

12  *Sec. Alarm Sys.*, 622 A.2d 1086, 1086–87 (Del. Sup. Ct. 1992) (breach of contract and

13  negligence).  These cases have no application to ViaSat's misappropriation claim.

### C.   Acacia's Interpretation of Section 13 Would Be Unreasonable and Therefore Unenforceable Under Delaware Law

16  As Acacia concedes, Delaware courts will not enforce a limitation of liability, even

17  for contract claims, unless it is both "reasonable" and "crystal clear."  *Column Form*

18  *Tech., Inc.*, 2014 WL 2895507, at *5.  Acacia's interpretation of Section 13 would be

19  unreasonable, and therefore unenforceable, as applied to ViaSat's claims.

20  According to Acacia, Section 13 limits damages on any contract or tort claim to

21  royalties already paid on Acacia's authorized sales of licensed products.  Motion at 2–3.

22  ViaSat's claims are based on Acacia's *unauthorized* use of ViaSat's confidential

23  information in *different*, *unlicensed* products.  The products are different, the quantity of

24  products is different, and the value of ViaSat's technology to those products is different.

25  There is no reason to believe that royalties paid on a finite quantity of past products

26  would bear any relation to actual damages from Acacia's sale of unbounded quantities of

27  unlicensed products.  There is simply no nexus between the amount of the liability cap

28  (under Acacia's interpretation) and ViaSat's actual damages.

The facts here prove the point admirably.  As shown in Dr. Prowse's expert report, Acacia has earned over ████████ in revenue from sales of the Accused Products.  Ex. 15 ¶ 61.  Dr. Prowse estimates that ████████ of that revenue represents Acacia's profits that are directly attributable to misappropriation of ViaSat's Trade Secrets.  *Id.* ¶ 68.  Acacia's Motion does not challenge these numbers, so for purposes of summary judgment they are undisputed.  Applying Section 13 in the way Acacia urges would therefore limit ViaSat to only a tiny fraction of its actual damages, based on a metric that bears no relationship to the scope of Acacia's wrongdoing.  This is not "reasonable."

Acacia's interpretation of Section 13 also directly contradicts the express royalty provisions of the License Agreement.  Acacia's license to use ViaSat's technology is contingent on full payment of specified royalties.  Ex. 2 § 4(b).  Acacia contends the Accused Products should, for damages purposes, be treated as royalty-bearing products under the License Agreement, Motion at 12 & n.7, and ViaSat has asserted a contract claim, in the alternative, for such royalties.  Doc. 1-2 ¶¶ 19–23.  It is undisputed that the amount of royalties for Acacia's Accused Products would be approximately ████████ through the second quarter of 2017 (and rising as Acacia sells more products).  Ex. 15 ¶ 94; Ex. 31 ¶ 9; Motion at 12 n.7.  Acacia's interpretation of Section 13, however, would cap royalties for the Accused Products at only ████████, far less than the actual royalty provisions of the License Agreement would dictate.  It is not "reasonable" to interpret the License Agreement in such a self-contradictory manner.  Nor is it "crystal clear" that the parties intended such an absurd result.

Acacia argues that a limit of ████████ is reasonable in relation to the amount of development fees Acacia paid for Everest.  Motion at 4, 7.  That is both legally and factually irrelevant.  ViaSat's Trade Secrets are its intellectual property.  The value of that property to ViaSat (or to Acacia), and the harm caused by its misappropriation, is not limited to the actual engineering expenses incurred on any single project.  Ex. 32 (Dave) at 299:4 to 300:22 (explaining that the ████████████████████████████████████████████████████████████████████

1  ██████ .  Applying Section 13 in the manner Acacia urges would prevent ViaSat from

2  recovering the full value of its misappropriated technology; indeed, it would ensure

3  ViaSat's recovery had no relation to its actual damages.  The License Agreement should

4  not be construed to require this unreasonable result.

5      **D.**    **Acacia's Interpretation of Section 13 Would Lead to Absurd Results**

6      Basic principles of contract interpretation disfavor any interpretation that would

7  produce absurd results.  *See AgroFresh Inc. v. MirTech, Inc.*, 257 F. Supp. 3d 643, 657

8  (D. Del. 2017) (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010)

9  ("An unreasonable interpretation produces an absurd result or one that no reasonable

10  person would have accepted when entering the contract.")).

11      Acacia's interpretation of Section 13 makes no economic sense and would lead to

12  absurdity.  Under Acacia's view, Acacia could have stopped paying royalties on Licensed

13  Products at any time—after $1 even—and thereby cap its own liability for any future use

14  of ViaSat's Trade Secrets.[9]  This notwithstanding all of the other provisions of the

15  License Agreement stating royalty terms and restrictions on Acacia's use of ViaSat's

16  technology, all of which Acacia could effectively render moot by simply not paying.

17      Moreover, under Acacia's view, the liability cap would be a moving target.  As

18  Acacia concedes, Acacia is still paying royalties on Everest products.  Motion at 3 n.3.

19  As long as that is true, the amount of the cap is constantly changing—though, again,

20  based on factors that have no relation to ViaSat's actual damages in this case.[10]

---

22      [9] Acacia argues the minimum cap level is $3.2 million because that was the agreed

23  development fee.  Motion at 7.  That would still be an absurdly low cap, relative to the

24  value of ViaSat's intellectual property.  But Acacia's argument also misses the point:

Section 13 refers to the aggregate amount "paid" by Acacia.  Under its interpretation,

25  Acacia could lower the cap by unilaterally choosing not to pay the full development fee.

26      [10] Acacia argues that damages were uncertain at the time of contracting because "the

parties could not know at the time of contracting if Acacia would manage to launch any

27  Royalty Bearing Products, let alone how many it might ultimately sell."  Motion at 6.

But that does not make ViaSat's damages for misappropriation uncertain; it makes the

28  amount of the purported liability cap uncertain.

Acacia's interpretation of Section 13 would thus allow Acacia to set the limit on its own liability for any wrongdoing. It would mean, in effect, that ViaSat sold all of its technology for a small but indeterminate price that would ultimately be whatever Acacia felt like paying. No one would ever agree to a contract written that way.

Acacia's own damages expert, Mr. Bersin, refused to answer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 33 (Bersin) at 73:11 to 77:16. But when estimating Acacia's alleged damages on its counterclaims, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, even though Section 13 by its terms applies to both parties. Ex. 36 ¶ 6; Ex. 33 (Bersin) at 90:10 to 91:20.[11] Thus, not only is Acacia's interpretation of Section 13 irrational, it also contradicts Acacia's own counterclaim allegations.

## II.   VIASAT IS ENTITLED TO UNJUST ENRICHMENT DAMAGES

### A.   The Uniform Trade Secret Act Specifically Authorizes Unjust Enrichment Damages for Misappropriation of Trade Secrets

Acacia's argument that a license agreement precludes recovery for unjust enrichment damages is a misstatement of the law. Motion at 12–14. ViaSat's claim for misappropriation of trade secrets arises under the Uniform Trade Secrets Act ("UTSA"), which both California and Delaware have adopted.[12] Doc. 1-2 ¶¶ 28–33. The UTSA

---

[11] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 34. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 39; Ex. 33 (Bersin) at 214:22 to 219:20.

[12] The Court need not decide whether ViaSat's claim for misappropriation of trade secrets is governed by California or Delaware law, because they are the same in all respects relevant to Acacia's Motion. However, if the Court is inclined to reach that issue, California law should govern. ViaSat's misappropriation claim is pleaded under the California Uniform Trade Secret Act ("CUTSA") because ViaSat's principal place of business is in California, meaning the harm caused by Acacia's misappropriation accrues primarily here. Doc. 1-2 ¶¶ 1, 28–33. Acacia has previously acknowledged that California law applies, both by pleading its own misappropriation counterclaim under

specifically authorizes unjust enrichment damages, in addition to any actual loss.  Cal. Civ. Code § 3426.3(a) ("A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss."); 6 Del. Code § 2003(a) (same).  The existence of a contract may give rise to a separate cause of action and separate remedies for breach of contract, but it cannot eviscerate the statutory remedy of unjust enrichment under the UTSA.

Courts applying the UTSA in both California and Delaware have permitted unjust enrichment damages for misappropriation in cases where the parties also had a contract. For example, in *Digital Envoy, Inc. v. Google, Inc.*, No. 5:04-CV-1497, 2005 WL 2999364 (N.D. Cal. Nov. 8, 2005), the plaintiff's claims included both breach of a license agreement and misappropriation of trade secrets under the UTSA.  *See id.* at *1.  The defendant (like Acacia here) moved for partial summary judgment on damages, arguing that the license agreement limited plaintiff's damages and that plaintiff could not recover for unjust enrichment.  *See id.*  The court rejected this argument, holding that although the license agreement governed the parties' *contractual* rights, the UTSA nevertheless authorized recovery of unjust enrichment on the misappropriation claim.  *See id.* at *5 ("[P]ursuant to the CUTSA, [plaintiff] may attempt to prove an entitlement to unjust enrichment recovery arising from the misappropriation of its trade secrets . . . ."); *see also B. Braun Med., Inc. v. Rogers*, 163 Fed. Appx. 500, 502, 506 (9th Cir. 2006) (holding district court erred as a matter of law in ruling plaintiff was not entitled to unjust enrichment damages under the UTSA, in case arising out a written licensing agreement); *Agilent Techs., Inc. v. Kirkland*, C.A. No. 3512-VCS, 2010 WL 610725, at *25 (Del. Ch. Feb. 18, 2010) (awarding both compensatory damages and unjust enrichment on claims of breach of contract and misappropriation of trade secrets under the UTSA); *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1056 (Del. Sup. Ct. 2001) (denying summary judgment on claim for unjust enrichment based on misappropriation of trade secrets).

CUTSA, Doc. 3, Counterclaims ¶¶ 79–84, and by refusing to provide discovery until ViaSat had complied with the "reasonable particularity" requirements of CUTSA, Ex. 35.

Acacia's own claims in this case are again inconsistent with the position it now advocates at summary judgment.  Acacia has asserted counterclaims for breach of contract based on the License Agreement, Doc. 3, Counterclaims ¶¶ 48–74, and for misappropriation of trade secrets under California's UTSA, *id.* ¶¶ 79–84.  Yet Acacia's asserted damages are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 36 ¶¶ 5–10.  Acacia's own conduct shows its Motion's description of the law is simply false.

None of the cases on which Acacia's Motion relies are UTSA cases.  They all address a completely different issue:  whether a party can recover unjust enrichment under a *quasi-contract theory* where the parties also have an express written contract.  *See Pedrick v. Roten*, 70 F. Supp. 3d 638, 652–53 (D. Del. 2014) (plaintiff could not recover under both quasi-contract and express contract theories); *Moon Express, Inc. v. Intuitive Machs., LLC*, No. 16-344, 2017 WL 4217335, at *8–*10 (D. Del. Sept. 22, 2017) (plaintiff *could* plead separate claim for quasi-contract unjust enrichment, to the extent there was a dispute regarding the applicability of express contract);[13] *Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315–16 (D. Del. 2008) (plaintiff could not pursue claim for quasi-contract where express, enforceable contract governed the issue in dispute); *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 233–34 (2013) (restitution of benefits conferred under a contract may not be awarded unless the contract is rescinded or unenforceable); *Cheramie v. HBB, LLC*, 545 Fed. Appx. 626, 628 (9th Cir. 2013) (plaintiff could not state a claim for quasi-contract unless express contract was unenforceable or ineffective); *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1166–67 (9th Cir. 1996) (claim for quasi-contract does not lie when an enforceable, binding agreement defines the rights of the parties).  That case law has no application where, as here, the claim for misappropriation of trade secrets arises under a statute that specifically authorizes unjust enrichment damages.

---

[13] The Court in *Moon Express* explicitly did not address plaintiff's claims for misappropriation of trade secrets.  *See Moon Express*, 2017 WL 4217335, at *1 n.1.

**B.     The License Agreement Cannot Limit Damages for Any Use of Confidential Information Outside the Scope of the License**

     **1.     ViaSat's Claim for Misappropriation of Trade Secrets Is Based on Unlicensed Products**

The factual premise of Acacia's Motion is also false.  Acacia's argument that ViaSat's damages are limited to contract royalties assumes that the Accused Products are Licensed Products within the scope of the License Agreement.  The License Agreement governs the parties' relationship only with respect to certain Licensed Materials for use in certain Licensed Products.  Ex. 2 §§ 1(k), 1(*l*), 4(a).  Any other use of ViaSat's Trade Secrets is strictly prohibited.  *Id.* § 4(a) ("Use of the Licensed Materials for any product other than the Licensed Product is strictly prohibited unless ACACIA has entered into a separate written Agreement with VIASAT for such use.").  The License Agreement does not establish a royalty rate for unlicensed products, because they are unlicensed.  The License Agreement therefore cannot control the measure of damages for products outside of its scope.  *See Tolliver*, 564 F. Supp. 2d at 315–16 ("Delaware law permits a claim for unjust enrichment where an express contract exists that does not govern exclusively the obligations or rights of the parties at issue.").

ViaSat's misappropriation claim is based on *unlicensed* use of ViaSat's Trade Secrets.  Acacia took portions of the Background Information it received as part of the License Agreement, copied it, and used it without permission in other, unlicensed products.  *See supra*, Section I.A.1.  Damages for unlicensed use of ViaSat's Trade Secrets are not set by the License Agreement; they are governed by the UTSA.

If Acacia wants to concede liability for breach of contract, it can argue as a defense to the misappropriation claim that the Accused Products are licensed, so long as it agrees to pay royalties under the License Agreement.  Ex. 2 § 4(b) ("The foregoing license is granted to ACACIA under this Agreement subject to . . . payment of a per unit Recurring Royalty Fee in accordance with the following table per each Royalty Bearing Product sold by or on behalf of ACACIA . . . .").  But so far Acacia has vociferously denied the

Accused Products are licensed products within the scope of the License Agreement.  Doc. 83-1 at 6 ("THE ACCUSED PRODUCTS ARE NOT 'LICENSED PRODUCTS,' SO ACACIA DOES NOT OWE VIASAT FURTHER PAYMENT UNDER SECTION 4(b) OF THE AGREEMENT").  Acacia cannot reasonably argue that ViaSat is limited to contract damages on the Accused Products, while simultaneously claiming that the Accused Products are not subject to contractual royalties.  *Cf. MIG Investments LLC v. Aetrex Worldwide, Inc.*, 852 F. Supp. 2d 493, 512–13 (D. Del. 2012) (holding plaintiff could pursue alternative claims for breach of express contract and unjust enrichment, where there was some dispute concerning the applicability of the contract).

## 2.    The License Agreement Expressly Excludes ViaSat's Source Code from the License

Acacia's argument that damages are limited to license royalties also suffers from another, more specific problem:  the License Agreement specifically excludes ViaSat source code from the scope of the license.  In the definition of "Licensed Materials," the License Agreement states:

> For the avoidance of doubt, *source code for Licensed Materials* shall not be delivered to ACACIA under this Agreement and *shall not be a Licensed Material*.

Ex. 2 § 1(k) (emphasis added).  Thus, to the extent Acacia used ViaSat's source code to create the Accused Products, that use was outside the scope of the license and not governed by the License Agreement's royalty provisions.

The evidence shows that Acacia did exactly that.  As detailed in the expert report of Dr. Hassoun,  Ex. 17 at 1, 52–156. *Id.* at 87.

1   ████████████████████████████████████. *Id.* ████████████████

2   ████████████████████████████ *Id.*  As Dr. Hassoun concludes, ████████████

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████ *Id.*; *see also id.*

5   at 92 ████████████████████████ *id.* at 99 ██████████████████

6   ████████████████████████████████████████████████

7       Dr. Koralek, Acacia's rebuttal expert, ██████████████████████

8   ████████████████████████ Ex. 27 at ¶¶ 21–24 ██████████████

9   ████████████████████████████  ████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████████████ *Id.* ██████████████████████ That,

12  however, is an issue of fact for the jury.

13      There is also other direct evidence of copying.  Acacia's Gary Martin, one of the

14  lead designers of the Accused Products' SDFEC components, admitted at deposition that

15  ████████████████████████████████████████████

16  ██  ██████████████████████████████████

17  ██

18  ██

19  ██  ██████████████████████████████

20  ██  ██████████

21  ██  ████████████████████████████

22  ████████████████████████

23  Ex. 5 (Martin) at 69:8–21; *see also id.* at 78:18 to 79:10 ██████████████

24  ████████████████████████████████████

25  ████████████████████████████████████

26      ██████████ Pierre Humblet, who designed the decoder for Denali, said at the time ██

27  ██████████████████████████ Ex. 18 (Humblet) at 231:18 to

28  232:19; Ex. 37 ██████████████████████████ Martin said

██████████████████████████████████████████████████

██████. Ex. 5 (Martin) at 116:23 to 117:5, 143:10 to 144:11.  As shown above, the

License Agreement specifically forbade this.

Given this (largely undisputed) evidence that Acacia used ViaSat's unlicensed source

code, there is no basis in law or in fact to limit ViaSat's damages to the terms of the

License Agreement.

### 3. Acacia Contends That *All* of ViaSat's Asserted Trade Secrets Are Outside the Scope of the License

Acacia's argument is not only inconsistent with ViaSat's contentions in this case, it is

also inconsistent with Acacia's own contentions.  Acacia has filed a motion for partial

summary judgment asserting that none of the Accused Products are royalty-bearing

products under the License Agreement, even if they use ViaSat's asserted Trade Secrets.

Doc. 83-1 at 6–11 ("THE ACCUSED PRODUCTS ARE NOT 'LICENSED

PRODUCTS,' SO ACACIA DOES NOT OWE VIASAT FURTHER PAYMENT

UNDER SECTION 4(b) OF THE AGREEMENT").  Acacia bases this argument on the

premise that none of ViaSat's asserted Trade Secrets are part of the "SDFEC Core" that

ViaSat licensed to Acacia in the License Agreement.  *Id.*; *see also* Ex. 12 ¶¶ 28–34,

56–60; Ex. 27 ¶ 119.

To be sure, these issues are contested.  But that is precisely why summary judgment

is inappropriate.  The jury could find that ViaSat's Trade Secrets No. 1–7 are protectable

trade secrets that were not licensed to Acacia under the License Agreement.  In that case,

Acacia would have no right to use them in the Accused Products, and the License

Agreement would have nothing to say about what the royalty for those Trade Secrets

should be.  In any event, Acacia cannot get summary judgment based on a theory that

contradicts its own position.

## III. THE TERMS OF THE NDA DO NOT LIMIT VIASAT'S CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS

### A.    The License Agreement Creates an Independent Confidentiality Obligation that Acacia Has Breached

Acacia's argument that ViaSat's trade secret protection expired in ▮▮▮▮▮▮ is based on another blatant misreading of the License Agreement.  Motion at 14–20.  The License Agreement creates an independent confidentiality obligation that survives expiration of either the NDA or even the License Agreement itself.

#### 1.    The License Agreement and the NDA Contain Overlapping But Separate Confidentiality Provisions

The NDA, by its terms, was designed to cover only information provided as part of the contract negotiations.  Ex. 1, Recitals, § 2.  While negotiation of the License Agreement necessarily required some exchange of confidential information, that information could be somewhat high-level and did not necessarily need to include all of the details of ViaSat's Trade Secrets.  Thus, a limited-term NDA ▮▮▮▮▮▮ was reasonable protection at that stage.  However, once the parties executed the License Agreement, completing Everest required ViaSat to share much more detailed trade secret information.  For that reason, the License Agreement itself imposes confidentiality obligations that overlap with but are stricter than those of the NDA.

Section 9 of the License Agreement states:

> Each Party shall maintain in strict confidence, and will use and disclose only as authorized by the disclosing party, in accordance with the Non-Disclosure Agreement #NDATG06102009 executed between them on June 10, 2009 (the "NDA"), all information that it receives from the other Party in connection with the Agreement . . . .

Ex. 2 § 9.  Although this Section incorporates the substantive restrictions of the NDA, it explicitly supersedes the temporal scope of the NDA:  "The terms of this Clause 9 shall survive the termination of this Agreement."  *Id.*; *see also* § 7(d) (providing that Section 9 "will survive the termination of this Agreement").  Section 9 therefore imposes a

1    confidentiality restriction that lasts for the entire duration of the License Agreement

2    (which is still in effect), survives termination of the License Agreement, and continues

3    until the end of time.  Acacia's argument that Section 9 incorporates the ████ term of

4    the NDA thus contradicts the language of Section 9 itself.  And without that premise,

5    Acacia's Motion must fail because ViaSat's Trade Secrets remain subject to

6    confidentiality restrictions.

7          Reading the License Agreement as a whole confirms that Section 9 and the NDA

8    impose separate obligations.  For example, Section 13 (the very provision on which

9    Acacia relies elsewhere in its Motion) states:  "EXCEPT FOR BREACHES OF

10   CLAUSE 9 (CONFIDENTIALITY) *OR* THE NDA . . . ."  Ex. 2 § 13 (emphasis added).

11   The disjunctive "or" clearly indicates that Section 9 imposes obligations separate from

12   and in addition to those of the NDA.

13         Other provisions of the License Agreement impose further confidentiality

14   restrictions that do not depend in any way on the NDA.  Section 8 provides that all

15   intellectual property rights in the Background Information "are and will remain the sole

16   property of VIASAT" (§ 8(a)), and that Acacia may not use (§ 8(b)) or copy (§ 8(c)) any

17   Background Information or other Licensed Materials for any purpose except the

18   manufacture and sale of Licensed Products under the License Agreement.  The License

19   Agreement also requires Acacia to destroy all Licensed Materials within ten days after

20   termination of the agreement.  *Id.* § 7(d).  Like Section 9, these provisions survive

21   termination of the License Agreement and have no expiration date.  *Id.*

22         **2.      Acacia's Own Allegations Are Inconsistent with Its Interpretation**

23                   **of Section 9 and the NDA**

24         Acacia's own actions are further evidence that the expiration of the NDA does not

25   extinguish trade secret claims.  The terms of both the NDA and Section 9 are bilateral.

26   Section 9 explicitly states that "[a]ll Foreground Information shall be deemed ACACIA's

27   Confidential Information for purposes of the NDA."  Ex. 2 § 9.  Thus, if the NDA's

28   ████ term governed disclosures under the License Agreement, it would apply to

1  Acacia's alleged trade secrets as well.  Acacia's own allegations show this is not so.

2  Acacia concedes it disclosed its asserted trade secrets to ViaSat by no later than ███████

3  ████████  Ex. 38, Acacia's Responses to Interrogatories No. 9, 10.  Under the logic of

4  Acacia's Motion, those trade secrets would have become unprotected by ██████████;

5  yet the vast majority of Acacia's claimed damages are based on ViaSat projects that did

6  not even begin until ████.  Ex. 36 ¶¶ 46–60, 69; Exs. 34, 39.  Clearly, expiration of the

7  NDA does not have the effect that Acacia now claims.

8          **3.**     **ViaSat's Misappropriation Claim Is Based on Information**

9                **Disclosed Under the License Agreement, Not Just the NDA**

10       The undisputed evidence shows that ViaSat did not disclose the full details of its

11  Trade Secrets to Acacia until after signing the License Agreement.  Ex. 14, ViaSat's

12  Second Supplemental Response to Interrogatory No. 23.  While ViaSat disclosed some of

13  the high-level concepts to Acacia during the contract negotiations (i.e., under the NDA),

14  it did not disclose the complete implementation of any of those Trade Secrets until 2010

15  (i.e., under the more restrictive terms of the License Agreement).  *Id.*  For example,

16  ViaSat disclosed ████████████████████████████████████████████████

17  ████████████████████████████████████████████████████; but

18  it did not disclose ████████████████████████████████████

19  ████████████████████████████████████████ *Id.*

20  Because ViaSat did not disclose any of the asserted Trade Secrets in full until after the

21  parties signed the License Agreement, the term of the NDA has no impact on ViaSat's

22  misappropriation claim.

23      **B.**     **ViaSat Took Reasonable Steps to Maintain the Secrecy of Its Trade**

24            **Secrets**

25       Acacia's Motion also fails because expiration of a confidentiality agreement does not

26  automatically extinguish a trade secret.  The premise of Acacia's argument is that, once

27  the NDA expired, any information covered by the NDA was no longer "secret" and thus

28  *per se* lost trade secret protection.  Motion at 15–18.  But that premise is legally wrong.

The UTSA does not require absolute secrecy, only "efforts that are *reasonable under the circumstances* to maintain [] secrecy." Cal. Civ. Code § 3426.1(d)(2) (emphasis added).[14] What is "reasonable under the circumstances" is a fact-intensive inquiry that is rarely appropriate on summary judgment. *See Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*, No. 08-788, 2009 WL 10671420, at *4 (C.D. Cal. May 22, 2009) (citing *AT&T Commc'ns of Cal., Inc. v. Pacific Bell*, No. 99-15668, 2000 WL 1277937, at *2 (9th Cir. Sept. 8, 2000)).

In particular, the absence of a confidentiality agreement is not dispositive on the issue of "reasonable efforts"; it is only one factor. *See Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1202 (S.D. Cal. 2008) ("[T]he lack of confidentiality agreements is not dispositive on the issue of secrecy. Enea may have taken other precautions to keep its information secret . . . ."); *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, No. 11-1062, 2015 WL 13357646, at *4 (C.D. Cal. May 6, 2015) (same); *see also Nelson Sports, Inc. v. Climb X Gear, LLC*, No. 10-06977, 2011 WL 13217554, at *2 (C.D. Cal. Aug. 25, 2011) (denying motion for summary judgment because "the absence of a written confidentiality agreement [does not] preclude[] the finding of trade secret protection" (alterations in original)).[15] Without considering all the relevant facts and circumstances, the Court (or the jury) cannot determine what "reasonable" efforts are required to maintain secrecy.

*Medtronic* is directly on point. Defendant there argued that plaintiff's trade secret claim failed as a matter of law because the parties' non-disclosure agreement expired before release of the accused product. *See Medtronic*, 2009 WL 10671420, at *4. The court rejected this argument, noting that "other courts have held that time-limited non-disclosure agreements do constitute reasonable measures to protect trade secrets."

---

[14] Delaware law is the same. *See* 6 Del. Code § 2001(4)(b).

[15] Again, Delaware law is the same. *See, e.g.*, *Beard Research, Inc. v. Kates*, 8 A.3d 573, 596 n.147 (Del. Ch. 2010); *Savor, Inc. v. FMR Corp.*, No. 10-149, 2004 WL 1965869, at *7 (Del. Sup. Ct. July 15, 2004).

*Id.* at *5.  The court concluded that "[w]hether the time-limited Non-Disclosure Agreement, combined with the CDA [another confidentiality agreement], constitute reasonable measures to maintain secrecy are factual issues for the jury to decide." *Id.*

Acacia does not cite a single California or Delaware case where expiration of an NDA was deemed sufficient to destroy trade secret protection.  In the cases it cites, there was either widespread public disclosure, or disclosure with no indication of confidentiality whatsoever.  *See, e.g.*, *In re Providian Credit Card Cases*, 116 Cal. Rptr. 3d 833, 843 (Cal. Ct. App. 2002) (scripts disclosed to the public by telemarketers); *Nextdoor.com, Inc. v. Abhyanker*, No. 12-5667, 2014 WL 1648473, at *8 (N.D. Cal. Apr. 23, 2014) (no reasonable efforts to keep bidding information sent to bid recipients confidential); *HiRel Connectors, Inc. v. United States*, No. 01-11069, 2006 WL 3618011, at *8–*9 (C.D. Cal. Jan. 25, 2006) (materials submitted with RFP response and distributed at industry working group meetings with no confidentiality designation); *Total Care Physicians, P.A.*, 798 A.2d at 1055–56 (no efforts to keep compilation of publicly-available contact information confidential); *Pennwalt Corp. v. Akzona Inc.*, 570 F. Supp. 1097, 1114–15 (D. Del. 1983) (no confidential relationship or indication that information provided was confidential).[16]

In this case, ViaSat made substantial efforts to protect the confidentiality of its Trade Secrets, in addition to the NDA with Acacia.  Ex. 13, Supplemental Response to Interrogatory No. 19.  These include ██████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ██████████ *Id.*  Finally, as already discussed, ViaSat put additional confidentiality restrictions in the License Agreement itself.  Ex. 2 §§ 8, 9.  Taken together, these efforts

---

[16] Acacia also cites a handful of cases from other jurisdictions.  Motion at 17–18.  To the extent these cases suggest a confidentiality agreement of finite duration is sufficient, by itself, to extinguish trade secret protection, they are inconsistent with the laws of California and Delaware.

OPPOSITION TO ACACIA'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DAMAGES
3:16-463-BEN-JMA

are more than reasonable under the circumstances.  Because Acacia's Motion does not challenge any of these other steps ViaSat took to protect its confidential information, summary judgment on the issue of secrecy is not appropriate.

## CONCLUSION

For the foregoing reasons, Acacia has failed to meet its burden of proving it is entitled to summary judgment on the issue of damages.  Acacia's Motion should be denied in all respects.

Dated:  February 6, 2018                          Respectfully Submitted,


                                                  /s/ Kenneth M. Fitzgerald
                                                  Kenneth M. Fitzgerald
                                                  David Beckwith
                                                  Keith M. Cochran
                                                  FITZGERALD KNAIER LLP
                                                  402 West Broadway, Suite 1400
                                                  San Diego, California, 92101

                                                  Matthew S. Warren
                                                  Patrick M. Shields
                                                  Erika H. Warren
                                                  WARREN LEX LLP
                                                  2261 Market Street, No. 606
                                                  San Francisco, California, 94114

                                                  *Attorneys for Plaintiff and*
                                                  *Counter-Defendant ViaSat, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that today I am causing to be served the foregoing document by CM/ECF notice of electronic filing upon the parties and counsel registered as CM/ECF Users.  I further certify that, to the extent they are not registered CM/ECF Users, I am causing the foregoing document to be served by electronic means via email upon counsel for Acacia Communications, Inc., per the agreement of counsel.

Dated:  February 6, 2018

s/ *Kenneth M. Fitzgerald*

Kenneth M. Fitzgerald, Esq.