1  FITZGERALD KNAIER LLP
2        Kenneth M. Fitzgerald, Esq. (SBN: 142505)
         kfitzgerald@fitzgeraldknaier.com
3        David M. Beckwith, Esq. (SBN: 125130)
         dbeckwith@fitzgeraldknaier.com
4        Keith M. Cochran, Esq. (SBN: 254346)
5        kcochran@fitzgeraldknaier.com
6  402 West Broadway, Suite 1400
   San Diego, California  92101
7  Tel:  (619) 241-4810
   Fax:  (619) 955-5318
8

9  WARREN LEX LLP
10       Matthew S. Warren, Esq. (SBN: 230565)
         16-463@cases.warrenlex.com
11       Patrick M. Shields, Esq. (SBN: 204739)
         16-463@cases.warrenlex.com
12 2261 Market Street, No. 606
13 San Francisco, California  94114
   Tel:  (415) 895-2940
14 Fax:  (415) 895-2964

15 Attorneys for Plaintiff and Counter Defendant
16 ViaSat, Inc.

17                    **UNITED STATES DISTRICT COURT**

18                   **SOUTHERN DISTRICT OF CALIFORNIA**

19 **ViaSat, Inc.,**                    ) Case No.: 3:16-cv-00463-BEN-JMA
20 *a Delaware corporation,*            ) **[REDACTED] ViaSat, Inc.'s**
                                        ) **Opposition to Acacia**
21                                      ) **Communications, Inc.'s Motion for**
                            Plaintiff   ) **Summary Judgment Regarding No**
22              and Counter Defendant,  ) **Liability**
                                        )
23              v.                      )
                                        ) **[SUBJECT TO MOTION TO FILE**
24                                      ) **UNDER SEAL]**
25 **Acacia Communications, Inc.,**     )
   *a Delaware corporation,*            ) Date:      February 26, 2018
26                                      ) Time:      10:30 a.m.
                            Defendant   ) Place:     Courtroom 5A
27              and Counter Claimant,   )            221 West Broadway
28                                      )

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

)          San Diego, CA 92101
)
)   Dist. Judge:  Hon. Roger T. Benitez
)   Hon. Magistrate Jan M. Adler
)   Case Initiated: January 21, 2016

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

II.     FACTS ............................................................................................ 4

        A.     ViaSat's SDFEC Technology and Background Information .................. 4

        B.     The License Agreement ................................................................ 6

III.    ARGUMENT ................................................................................... 8

        A.     Section 3(b) Does Not Excuse Acacia's Theft of ViaSat's
               SDFEC ........................................................................................ 8

        B.     Acacia's "Incorporation" Argument Is Specious ......................... 15

        C.     Acacia's SDFEC Core Definition Is Wrong ................................. 17

        D.     The Accused Products Indisputably Use ViaSat's Trade
               Secrets 1-6 ............................................................................... 19

        E.     Triable Issues of Fact Exist as to Trade Secrets 1 and 3 In
               Non-Backwards Compatible Modes .......................................... 19

        F.     The Accused Products Used Trade Secret 2 ................................ 20

        G.     The Accused Products Use Trade Secret No. 7 ............................ 20

        H.     Acacia's Use of the CORD Simulator Breached Section
               8(b) ......................................................................................... 23

IV.     CONCLUSION ............................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Ajaxo, Inc. v. E\*Trade, Inc.,*
  135 Cal. App. 4th 21 (2006) ....................................................................17, 19

*Benay v. Warner Bros. Entertainment, Inc.,*
  607 F.3d 620 (9th Cir. 2010) ........................................................................ 17

*Bowers v. Baystate Technologies, Inc.,*
  320 F. 3d 1317 (Fed. Cir. 2003) ................................................................... 24

*Counsel of the Dorset Condo. Apartments v. Gordon,*
  801 A.2d 1(Del. 2002) ....................................................................................9

*DCV Holdings, Inc. v. ConAgra, Inc.,*
  889 A.2d 954 (Del. 2005)............................................................................. 11

*Delta & Pine Land Co. v. Monsanto Co., 2006,*
  WL 1510417, at \*4 (Del. Ch. May 24, 2006) .............................................. 11

*Elliott Associates, L.P. v. Avatex Corp.,*
  715 A.2d 843 (Del. 1998)............................................................................. 13

*Fink v. Goodson-Todman Enterprises, Ltd.,*
  9 Cal. App. 3d 996 (1970) ............................................................................ 17

*General Atomic Co. v. Exxon Nuclear Co., Inc.,*
  90 F.R.D. 290 (S.D. Cal. 1981) .................................................................... 21

*GMG Capital Investments, LLC v. Athenian Venture Partners I,*
  36 A.3d 776 (2012) .................................................................................11, 23

*Gunther-Wahl v. Mattel,*
  104 Cal. App. 4th 27 (2002) ......................................................................... 17

*HiRel Connectors, Inc. v. U.S.,*
  2006 WL 361008 \*1 (C.D. Cal. July 18, 2006) ............................................ 17

*Mattern & Associates v. Seidel,*
  678 F. Supp. 2d 256 (D. Del. 2010) ............................................................. 19

*Mrs. Fields Brand, Inc. v. Interbake Foods LLC,*
  2017 WL 2729860, at \*17 (Del. Ch. June 26, 2017) .................................... 13

*Pacific Far East Line, Inc. v. R.J. Reynolds Industries, Inc.,*
1981 WL 2517, at *13 (N.D. Cal. Sep. 14, 1981) ........................................................ 21

*PharmAthene, Inc. v. SIGA Technologies, Inc.,*
2014 WL 3974167 at *8 (Del. Ch. Aug. 8, 2014) ....................................................... 25

*PMC, Inc. v. Kadisha,*
78 Cal. App. 4th 1368 (2000) ........................................................................................ 19

*Radio Corp. of Am. v. Philadelphia Storage Battery Co.,*
6 A.2d 329 (Del. 1939) .................................................................................................. 13

*Twin City Fire Ins. Co. v. Delaware Racing Ass'n,*
840 A.2d 624 (Del. 2003) .............................................................................................. 15

*White v. Metropolitan Merchandise Mart,*
107 A. 2d 892 (1954) ..................................................................................................... 25

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

In 2015, plaintiff ViaSat, Inc. ("ViaSat") accused defendant Acacia Communications, Inc. ("Acacia") of breaching the License Agreement by making backwards compatible products (i.e., products capable of interoperating with royalty bearing products using ViaSat's soft decision forward error correction ("SDFEC") methods).  Acacia responded by flatly denying that it made *any* use of ViaSat's SDFEC technology, ViaSat's SDFEC Core, or "any variant or derivative thereof." Rather, Acacia claimed it "independently developed its own distinct product[s]." After this suit was filed, Acacia doubled down on its "independent development" story, stating in pleadings, discovery responses and in sworn testimony that it did not copy or use ViaSat's SDFEC specifications or *any* Licensed Material in developing Acacia's backwards compatible products.

Acacia made those statements because it knows that the License Agreement prohibits Acacia from using ViaSat's SDFEC design information, or ViaSat's SDFEC encoder and decoder specifications in non-royalty bearing products.  Acacia understood that under the License Agreement, it can develop its own non-royalty bearing SDFEC modules only if it actually does so "independently," "from scratch," and without using any of ViaSat's Background Information or Licensed Materials.

As detailed in ViaSat's Motion For Partial Summary Judgment (Dkt. No. 98-1), the evidence overwhelmingly shows that Acacia lied about "independently developing" the Accused Products.  Acacia made extensive use of ViaSat's SDFEC technology in its development of backwards compatible products.  *See, e.g.*, Dkt. No. 98-2 (Fitzgerald Dec., Exh. 1).  Now that its factual claim of "independent development" has been exposed as fraudulent, Acacia is changing tactics.  In this motion, Acacia now admits its Accused Products use six of ViaSat's seven trade secrets.  Acacia effectively admits that it copied from ViaSat's SDFEC module specifications, which are specifically identified as "Licensed Materials" under the contract.  Acacia also effectively admits that it copied ViaSat's source code from the

SDFEC encoder, which is part of the licensed SDFEC Core.  Having been forced to abandon its previous defense of "independent development," Acacia now contends that it was entitled to use these materials all along, without paying a royalty.  Acacia bases this new position on three wholly new legal arguments, each based on a tortured misinterpretation of the parties' License Agreement.  These last ditch legal arguments fail.

First, Acacia argues that Section 3(b) of the License Agreement gives it a royalty-free license to use any of ViaSat's technology it wants in conjunction with its own DSP technology.  Acacia takes an isolated snippet from Section 3(b) entirely out of context, and urges the Court to construe those eleven words in a way that would flatly contradict at least four other contract provisions that unambiguously prohibit such use.  *See, e.g.*, Exh. 1 § 4(a)[1] ("Use of the Licensed Materials for any product other than the Licensed Products is strictly prohibited . . .").  Acacia's after-the-fact distortion of Section 3(b) would defeat the Agreement's very purpose—to ensure that ViaSat receives royalties for Acacia's use of ViaSat's SDFEC technologies.  While this Court can easily reject Acacia's 3(b) argument by considering just the text of the contract itself, it is telling that Acacia spent years denying that it was making *any* use of ViaSat's Licensed Materials or Background Information.  If Acacia's legal argument about having a license pursuant to Section 3(b) had any merit, Acacia would have made that assertion when it was first accused of breaching the contract.

Second, Acacia argues the Accused Products are not royalty bearing because, despite copying ViaSat's specifications right down to the typos,[2] they did not

---

[1] All exhibit citations are to exhibits to the Declaration of Kenneth M. Fitzgerald In Support Of ViaSat's Opposition.  Deposition excerpts are cited by the exhibit number of the deponent's transcript excerpts followed by the name of the deponent and the page and line cite, e.g., "Exh. 5 (Martin) 163:13-164:14."

[2] *See* Dkt. No. 98-2 (Fitzgerald Dec., Exh. 1)

physically "incorporate" the specifications or other Licensed Materials into the Accused Products. According to Acacia, even if the *substance* of its SDFEC Core is the same as Everest, the *form* of it is different than ViaSat's low level specifications detailing that substance. This is sophistry. By copying ViaSat's design documents verbatim, Acacia built products with a nearly identical design, using the same SDFEC technology. It was not necessary for Acacia to physically engraft the English language specification documents (in Microsoft Word) into the hardware of its Accused Products to wrongfully "incorporate" ViaSat's Licensed Materials. Acacia's incredibly narrow interpretation of the word "incorporate" is simply unreasonable, and must be rejected.

Third, Acacia argues the materials it copied are not part of the "SDFEC Core" as that term is defined under the contract. The License Agreement does not define SDFEC Core as meaning only encrypted source code and "ASIC netlists," as Acacia asserts in its motion. Acacia cites no extrinsic evidence to support this opportunistically narrow definition, and its attempt to use a Statement of Work to create that definition fails. And even if Acacia did not cut and paste portions of ViaSat's encrypted source code or ASIC netlists, the evidence shows that Acacia misused pretty much every other category of SDFEC information it received from ViaSat under the Agreement—including Viasat's SDFEC design, ViaSat's proprietary TPC structure, its unencrypted source code, many pages of low-level technical specifications, and SDFEC software simulation tools. All of these are Licensed Materials, and the contract requires royalties to be paid on any products "that incorporate all or any part of the Licensed Materials," including all "manuals and documentation" provided by ViaSat for the SDFEC Core. Exh. 1 §§ 1(k), 1(l).

Acacia's defenses against ViaSat's trade secret misappropriation claim fares no better. Acacia admits it uses ViaSat's Trade Secrets 1-6 in the backwards compatible modes of the Accused Products. This alone sinks Acacia's motion. To the extent Acacia argues it uses the trade secrets in only *part* of the Accused Products, that is

1   irrelevant.  To the extent Acacia's argument is based on its Section 3(b) license

2   contention, it fails for the reasons stated above.  And to the extent Acacia bases its

3   argument on the contentions of the parties' expert witnesses, those experts disagree,

4   raising genuine issues of material fact.  In sum, Acacia's motion should be denied in

5   its entirety.

6               **II.      FACTS**

7         In support of its own motion for summary judgment, ViaSat presented a

8   detailed factual account that conclusively proves Acacia's liability for both breach of

9   contract and the misappropriation element of ViaSat's trade secret claims.  *See* Dkt.

10  No. 98-1 and supporting exhibits.  In its present motion, Acacia does not deny

11  copying and using Background Information and Licensed Materials.  Acacia

12  nevertheless states in passing that "ViaSat should have dropped its case when it

13  realized that Acacia independently developed the Accused Products."  Dkt. No. 83-1

14  at 5:17-18.  This gratuitous swipe is blatantly false.  The evidence of Acacia's use of

15  ViaSat's specifications and code is overwhelming and undisputed.  Dkt. No. 98-1.

16  But the facts most pertinent to Acacia's pending motion are set forth below.

17  **A.     ViaSat's SDFEC Technology and Background Information**

18        In 2009, Acacia set out to develop 100 Gigabit per second fiber optic

19  modems that can send large quantities of data over long distances.  A key

20  component of these modems are Application Specific Integrated Circuit ("ASIC")

21  chips, which contain "blocks" or "modules" that perform both digital signal

22  processing (or "DSP") and SDFEC (or FEC) functions on the messages being sent.

23  After Acacia signed a Non-Disclosure Agreement, and before the License

24  Agreement was signed, ViaSat provided Acacia with confidential details about its

25  proprietary SDFEC design.  For instance, on June 12, 2009, ViaSat sent Acacia a

26  White Paper recommending that Acacia use a specific FEC type ███████████

27  ████████████████████████████████████████.  Exh. 27.

28  Before receiving this recommendation from ViaSat, Acacia had been contemplating

1  using ███████████████████████████████████████████████

2  ████████████████████████████████████████.  *See* Exh. 26.

3        After the Agreement was signed, ViaSat provided further details of its FEC

4  technologies to Acacia, including in detailed low-level design specification

5  documents.[3]  For example, ViaSat provided Acacia with over 20 different versions of

6  a document entitled "Low Level Design Specification SDFEC Encoder for the

7  Coherent Optical Receiver Demodulator", which contained pages of technical

8  details regarding just the design of ViaSat's SDFEC encoder module.  Gary Martin, a

9  lead FEC engineer on the Sky, Denali and Meru projects, testified that ████████

10 ████████████████████████████████████████████████████

11 █████████████████████████████████████ Exh. 5 (Martin)

12 62:23-63:17 (emphasis added).  Pierre Humblet testified similarly that ███████

13 ███████████████████████████████████████████████████

14 ████████████████████████████████████████ Exh. 6

15 (Humblet) 36:24-37:8.

16        As Acacia's motion implicitly concedes, and as the undisputed facts show (*see*

17 Dkt. No. 98-1, 98-2) Acacia copied ViaSat's SDFEC technology, source code, and

18 technical specifications to build backwards compatible products on which it refuses

19 to pay ViaSat royalties.  Acacia copied wholesale the key aspects of ViaSat's SDFEC

20 design (referred to by the parties as "Everest"), as reflected in the numerous identical

21 figures and technical descriptions of the encoding and decoding techniques for

22 ViaSat's TPC code.[4]  *See also* Exh. 5 (Martin) 134:23-135:10; Exh. 7 (Monsen) 101:21-

23

24 ───────────────────────────
   3 ViaSat's low-level specifications contained enough detail to enable Acacia to fully
25 design its backwards compatible FEC for the Accused Products.  Dave Dec. ¶¶ 5-6.
   4 Acacia's copying necessarily extended to even the allegedly undesirable features of
26 ViaSat's SDFEC.  *See* Exh. 35 [Depo. 128] ████████████████████████
27 ████████████████████████████████████████████████████
28

111:13; Exh. 8 (Rasmussen) 196:13-215:5, 219:12-221:19; Exhs. 5, 7 8.[5]  Indeed, Acacia concedes that it uses ViaSat's claimed secrets in its backwards compatible products: "*There is no dispute* that interoperability between the Accused Products and the Royalty bearing Products *requires* at least the first six of ViaSat's seven [asserted trade secrets]," and "the Accused Products *all* have such interoperability modes." Dkt. No. 83-1 at 16:24-25 (emphases added).[6]

Previously, however, Acacia repeatedly denied using ViaSat's SDFEC intellectual property in developing the backwards compatible products.  Exhs. 29, 30, 2, 3, 4, 31.  Indeed, in its discovery responses served under Rule 11, Acacia denied using any ViaSat supplied SDFEC information whatsoever.  Exh. 22 (Acacia Supplemental Responses to ViaSat Request For Admission) at 5-6.  *Cf.*  Exh. 21 (ViaSat's Amended Trade Secret Designation), Exh. 22 at 6 (Acacia's Supplemental Response to Request For Admission Nos. 19 (Trade Secret 1), 23 (Part of Trade Secret 2), 24 (Trade Secret 3): "Acacia specifically denies the requested admission.") with Dkt. No. 83-1 at 16:22-23 ("ViaSat's Alleged Trade Secrets Are Required For Backward Compatibility, and Thus Are Licensed.").  By arguing in its motion that it has a license to use these materials under Section 3(b), Acacia now seems to finally concede the truth—that it used ViaSat's Licensed Materials and trade secrets.  But the contract language shows that Acacia had no right to do so.

**B.    The License Agreement**

The License Agreement required ViaSat to develop intellectual property cores, specifically a "DSP Core," and an "SDFEC Core," for use in Acacia's 100 Gbps optical transport chip.  The "SDFEC Core" included both an encoder and a

---

[5] The Meru specifications just indicate ████████████████████████ ████████████  Exh. 32 at 3.

[6] Dkt. No. 83-1 is a redacted version of Acacia's brief; the unredacted version was lodged under seal by Acacia.  *See* Dkt. Nos. 81-82.

1    decoder.  Exh. 5 (Martin) 92:18-25; Exh. 11 (Shah) 63:24-64:4; *see also* Exh. 28 at

2    ACI039418 (Acacia-created block diagram showing ████████████████████

3    ████████████████    The parties defined three classes of information –

4    "Background Information," "Foreground Information," and "Licensed Materials."

5    The parties agreed that Acacia would own intellectual property rights in the DSP

6    Core, meaning the specific implementation of ViaSat's pre-existing DSP technology

7    that ViaSat would develop and deliver to Acacia under the contract.  Ex. 1 § 3(a).

8        "Background Information," which is owned by ViaSat, means "*all* Intellectual

9    Property Rights *and other design data and information* either (a) owned or licensed by

10   VIASAT prior to the Effective Date" of the License Agreement, or developed or

11   licensed by ViaSat separate and apart from the parties' agreement.  *Id.* § 1(b)

12   (emphases added).  "Background Information shall also include all technical data,

13   manuals and other documentation and data related to any of the foregoing. For the

14   sake of clarity, and without limiting the foregoing, the SDFEC Core shall be deemed

15   Background Information."  *Id.*  Thus, ViaSat has exclusive ownership of the SDFEC

16   Core, including all SDFEC design data, documentation and information furnished

17   by ViaSat, and any SDFEC information jointly developed by the parties pursuant to

18   the Agreement.  *Id.* at §§ 1(b); 1(k); 8(a).

19       The License Agreement also provided that the "SDFEC Core" developed

20   under the contract was a "Licensed Material."  *Id.* § 1(k).  "Licensed Materials" also

21   include "all changes, additions, revisions, replacements, *manuals and documentation*" for

22   the SDFEC Core "which VIASAT may provide under this Agreement."  *Id.*

23   (emphasis added).  The parties agreed that Acacia would not use any of the Everest

24   SDFEC *design*, including any documentation thereof, regardless of whether it was

25   initially provided by ViaSat or developed jointly between ViaSat and Acacia, except

26   in royalty-bearing products.  *Id.* at § 4(a).

27       All Acacia integrated circuits that incorporate "all *or any part* of the Licensed

28   Materials" are deemed Licensed Products and Royalty Bearing Products, meaning

Acacia must pay ViaSat a royalty on them.  Exh. 1 at §§ 1(b), 1(k), 1(l), 1(m), 4(a), 4(b).  Acacia also agreed that "all Intellectual Property Rights in the Background Information and the Licensed Materials are and will remain the sole property of VIASAT, including all modifications, improvements, and derivative works relating to the Background Information and Licensed Materials, including but not limited to all modifications, improvements, and derivative works requested or suggested by ACACIA."  *Id.* § 8(a).  Consistent with this, Acacia agreed it would not "reverse engineer" or "prepare derivative works of any Background Information and/or Licensed Materials . . . *except with respect to the purposes of the Licensed Products*."  *Id.* § 8(b) (emphasis added).

As Acacia's 30(b)(6) witness admitted in deposition, ███████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████ Exh. 11 (Shah) 69:21-70:5, 73:17-74:19, 81:6-13; 89:20-25.  Under the License Agreement, Acacia could use the Licensed Materials, including those technical specifications "*solely* for the design, simulation, implementation and manufacture of Licensed Products," that is products on which Acacia paid ViaSat royalties.  Exh. 1 at 5 § 4(a) (emphasis added).  Section 4(a) of the License Agreement also provided that: "*Use of the Licensed Materials for any product other than the Licensed Product is strictly prohibited* unless ACACIA has entered into a separate written Agreement with VIASAT for such use."  *Id.* (emphasis added).

## III.   ARGUMENT

### A.   Section 3(b) Does Not Excuse Acacia's Theft of ViaSat's SDFEC

When interpreting a contract, the court should give effect to every provision in a contract, choosing an interpretation that harmonizes each provision, rather than one in which contradictions result.  *Counsel of the Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del. 2002).  That basic rule of contract interpretation defeats Acacia's

1    argument about Section 3(b), the linchpin on which most of Acacia's motion rests.

2           Rather than furnishing the Court up-front with the full language of the

3    operative provision of the License Agreement, Acacia first resorts to badly abridged

4    quotes from the excerpts of Section 3(b) to argue that it had a license to use ViaSat's

5    SDFEC technology however it wanted.  Dkt. No. 83-1 at 1:17-19 ("This fully paid-

6    up license allows Acacia to use ViaSat's technology in any way necessary to 'fully . . .

7    use[]' or 'otherwise exploit[]' the Foreground Information."); *id.* at 1:19-22 (Section

8    3(b) "allows Acacia to make and sell products compatible (sometimes called

9    'backward compatible') with earlier, royalty bearing products, so as to allow the 'full[]

10   . . . exploit[ation]' and 'use[]' of the Foreground Information.").  In these passages

11   and elsewhere, Acacia lifts a few words from the full text in which they appear,

12   rather than disclosing the context in which those cherry-picked words appear.

13   Section 3(b), states in full:

14          If any part of the Foreground Information is based on, incorporates or
            is an improvement or derivative of, or cannot be reasonably and fully
15          made, used, reproduced, modified, distributed or otherwise exploited,
            without using any Background Information, then VIASAT hereby
16          grants and agrees to grant to ACACIA a limited, nonexclusive,
            perpetual, irrevocable, worldwide, royalty-free, sublicensable right and
17          license to make, have made, use and have used, sell, import, export,
            reproduce, modify and make derivative works of such Background
18          Information ***for the sole and exclusive purpose of design,
19          simulation, implementation, manufacture, and sale of Licensed
            Products*** (including any modification, improvements and derivatives to
20          Licensed Products) or otherwise in connection with ACACIA's
21          exploitation of the Foreground Information.
22

23   Exh. 1 (emphasis added).  Acacia omits the italicized language "for the sole and

24   exclusive purpose of design, simulation, implementation, manufacture and sale of

25   Licensed Products" through most of its discussion of Section 3(b), for the obvious

26   reason that this language defeats Acacia's argument.

27          There are two possible interpretations of the phrase "or otherwise in

28   connection with ACACIA's exploitation of the Foreground Information."  One is

that the phrase further expands how Acacia may make *restricted use* of the Background Information, "for the sole and exclusive purpose" of Licensed Products.  Under this interpretation, so long as Acacia is using the Background Information for Licensed Products, it may go beyond the enumerated activities of "design, simulation, implementation, manufacture, or sale of Licensed Products."  It may, for example, test Licensed Products incorporating Background Information, market them, advertise them, communicate with customers about them, prepare specifications and product sheets about them, display them at trade shows, or otherwise do things attendant to selling Licensed Products incorporating ViaSat's Background Information.  This "or otherwise" catch-all permits additional activities that are not encompassed within the specifically enumerated activities of "design, simulation, implementation, manufacture, and sale," but nevertheless remain subject to the restriction that such Background Information may be used "sole[ly] and exlusive[ly]" in connection with Licensed Products.

The other interpretation is that the "or otherwise" phrase creates a broad, royalty-free license for Acacia to use any of ViaSat's Background Information however it wants, as long as that use also exploits the Foreground Information, i.e., the DSP Core.  This is Acacia's interpretation, but it makes no sense.  If read this way, the "or otherwise" exception would render meaningless the numerous other restrictions appearing throughout the contract that limit Acacia's use of Background Information and Licensed Materials to Licensed Products.  These provisions include:

- Acacia received a "limited . . . license (i) to make, have made, use, reproduce and make derivative works of the Licensed Materials, *solely* for the design, simulation, implementation and manufacture of Licensed Products, and (ii) to . . . sell . . . Licensed Products incorporating the Licensed Materials on a worldwide basis.  *Use of the Licensed Materials for any product other than the Licensed Product is strictly prohibited unless ACACIA has entered into a separate written Agreement with VIASAT for such use.*" § 4(a) (emphases added).
- "'Permitted Use'" means use by Acacia of the Licensed Materials in accordance with Clause 4." § 1(n).

- Acacia's license was expressly conditioned on Acacia's "payment of a per unit Recurring Royalty Fee." § 4(b).
- Acacia agreed that "all Intellectual Property Rights in the Background Information and the Licensed Materials" remain ViaSat's property, including any "modifications, improvements, and derivative works requested or suggested by ACACIA." § 8(a).
- "ACACIA may not modify or prepare derivative works of any Background Information and/or Licensed Materials it receives from VIASAT under this Agreement in whole or in part, except with respect to the purposes of Licensed Products." § 8(b).
- "Licensed Products" is defined to include "*any* integrated circuits . . . that incorporate all *or any part* of the Licensed Materials (regardless of whether or not the Licensed Materials are enabled or disabled in such Licensed Product). § 1(l).

If Acacia were correct, the Court would have to read all of these restrictive provisions out of the License Agreement. Courts reject such unreasonable interpretations. *Delta & Pine Land Co. v. Monsanto Co.*, 2006 WL 1510417, at *4 (Del. Ch. May 24, 2006) ("contracts must be interpreted in a manner that does not render any provision 'illusory or meaningless.'"). The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan. *GMG Capital Investments, LLC v. Athenian Venture Partners I*, 36 A.3d 776, 779 (2012). Acacia's interpretation would counteract the entire scheme of the License Agreement, and it is the less reasonable of the two competing interpretations. Moreover, "specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). The specific provisions cited above control here, even if the Court questions whether the more general "or otherwise" phrase in Section 3(b) presents a conflict.[7]

---

[7] While ViaSat's 30(b)(6) witness was unclear on the phrase "or otherwise in connection with Acacia's exploitation of the Foreground Information," he did testify clearly that Acacia had the right under Section 3(b) to use ViaSat's Background

If Acacia were correct about Section 3(b) standing alone, it would simply say that Acacia has a license to use the Background Information in order to exploit the Foreground Information.  Period.  Or, if re-written to have the meaning Acacia would give it, Section 3(b) would appear as follows:

> If any part of the Foreground Information is based on, incorporates or is an improvement or derivative of~~, or cannot be reasonably and fully made, used, reproduced, modified, distributed or otherwise exploited, without using any~~ Background Information, then VIASAT hereby grants and agrees to grant to ACACIA a limited, nonexclusive, perpetual, irrevocable, worldwide, royalty-free, sublicensable right and license to make, have made, use and have used, sell, import, export, reproduce, modify and make derivative works of such Background Information ~~for the sole and exclusive purpose of design, simulation, implementation, manufacture, and sale of Licensed Products (including any modification, improvements and derivatives to Licensed Products) or otherwise~~ in connection with ACACIA's exploitation of the Foreground Information.

Acacia's interpretation would also re-write the phrase in 3(b) limiting Acacia's right to use Background Information for one purpose - Licensed Products, by changing "for the sole and exclusive *purpose*," which is singular, to "for the *purposes* of design, simulation . . . and sale of Licensed Products and otherwise in connection with ACACIA's exploitation of the Foreground Information."

The sophistry in Acacia's argument is evident in the manner in which Acacia finally presents the complete text of Section 3(b).  Rather than setting forth the text of Section 3(b) as written, Acacia employs the artifice of inserting "part numbers" before each of the phrases it would have the Court separate out from one another.  Dkt. No. 83-1 at 12:4-13.  Those part numbers do not appear in the actual language of the Agreement.  Only by artificially separating Acacia's manufactured parts 3 and 4 can Acacia even make its argument sound plausible.  Acacia is advocating that the

---

Information for a licensed product, but did not have a right to use Background Information for unlicensed products.  Exh. 12 (Fuerst) 166:2-22.

1    Court separate part [4] from part [3], and indeed from the entire Agreement as a

2    whole.  This is not how contracts are interpreted.

3         In sum, ViaSat's interpretation is consistent with the entirety of Section 3(b)

4    as written, and with the rest of the Agreement.  Acacia's interpretation - would

5    render all of the restrictive provisions meaningless.  It would effectively negate the

6    entire purpose and premise of the contract – to allow ViaSat to earn a royalty for

7    Acacia's use of ViaSat's SDFEC technology, while giving ownership of the jointly

8    developed DSP technology to Acacia.  Where one interpretation of an ambiguous

9    provision gives effect to the remaining language in a contract and the other does not,

10   the Court must adopt the former, and reject the latter.  *Elliott Associates, L.P. v.*

11   *Auatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

12        "In giving effect to the parties' intentions, it is generally accepted that the

13   parties' conduct before any controversy has arisen is given great weight."  *Mrs. Fields*

14   *Brand, Inc. v. Interbake Foods LLC*, 2017 WL 2729860, at *17 (Del. Ch. June 26, 2017);

15   *Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 6 A.2d 329, 340 (Del. 1939).

16   When ViaSat confronted Acacia about its backwards compatible products, there was

17   no controversy over what the License Agreement meant.  Acacia knew that it was

18   prohibited from using ViaSat's Background Information and specifications, so

19   Acacia denied that it did so.  Acacia never claimed, either to ViaSat, or in its own

20   internal emails, that it had a royalty-free license to use Background Information

21   however it wished.  *See* Exh. 31.  That argument is a contrivance of litigation, belied

22   by Acacia's own conduct.

23        The right to use Background Information under Section 3(b) is also limited,

24   by its plain language, to information without which the Foreground Information

25   cannot be "reasonably and fully" used.  Citing no evidence, Acacia claims that it

26   "could not freely and fully use the Foreground Information" without a royalty-free

27   license to ViaSat's Background Information.  Dkt. No. 83-1 at 11:17-18.  This is

28   obviously false.

1    Acacia was fully able to use the Foreground Information and DSP Core

2 without backwards compatibility.  **By its own admission, Acacia did so.**  Dkt. No.

3 83-1 at 3:13-15 ("Acacia later realized that backward compatibility with Everest

4 provided little actual value, and dropped it from products after Meru.").  Indeed, in

5 its zeal to downplay the value of ViaSat's SDFEC technology, Acacia's witnesses

6 ██████████████████████████████████████████████████████████████

7 ████████  Exh. 9 (Mikkelson) 71:23-73:5; 78:12-80:17; 116:18-120:25; 127:6-24;

8 Exh. 5 (Martin) 189:16-190:22; 118:7-12; 160:9-17; 158:7-18; Exh. 8 (Rasmussen)

9 78:14-79:11; Exh 10 (Pellach) 176:10-17; 263:5-8; Exh. 6 (Humblet) 184:20-185:19.

10 That customers valued backwards compatibility does not mean Acacia cannot

11 exploit the Foreground Information without it.  Acacia was and is fully able to use

12 the Foreground Information and DSP Core without using ViaSat's SDFEC Core or

13 Background Information.  Dave Dec. ¶ 7.  Acacia did exactly that ███████████

14 ████████████████████████████████████████████████

15    Acacia attempts to mislead the Court when asserting that the parties

16 specifically negotiated a license in Section 3(b) to allow Acacia to develop backwards

17 compatible products.  Dkt. No. 83-1 at 15: "Indeed, that backwards compatibility

18 was important to Acacia early on, and explains why it insisted on adding 'or

19 otherwise in connection with ACACIA's exploitation of the Foreground

20 Information' to the contract.  (Ex. 8 ¶¶ 69-72)."  There is no evidence that Acacia

21 ever raised backwards compatibility as an issue in the contract negotiations, much

22 less any evidence that it insisted on the "or otherwise" language because "backwards

23 compatibility was important to Acacia early on."  Exhibit 8, the "evidence" cited to

24 support this assertion, is not any negotiating history of the License Agreement.  It is

25 Acacia's expert's report on damages, and paragraphs 69-72 discuss ███████████

26 ████████████████████████████████████████████████████████████████

27 ████████████████████████████████  Acacia's assertion about the

28 origin of the "or otherwise" language is a fabrication.

Acacia's assertion that it added the "or otherwise" language also works against it. Acacia provides no evidence of any communications between the parties over this phrase, which arguably contradicts other provisions of the agreement. The resulting ambiguity must be construed against Acacia, the party which created it. *See Twin City Fire Ins. Co. v. Delaware Racing Ass'n,* 840 A.2d 624, 630 (Del. 2003) (Under the "contra proferentem principle of construction," ambiguities in a contract should be construed against the drafter.).

Finally, Acacia argues that because a draft definition of Licensed Products once included products that "were designed using any of the Licensed Materials," and because that language is omitted from the final version of the definition, Acacia was free to use Licensed Materials to design the Accused Products. Dkt. No. 83-1 at 8-9. This argument ignores that the final contract already *directly and expressly prohibits* Acacia from using Licensed Materials for any activity other than creating royalty bearing, Licensed Products. Exh. 1 § 4(a) (Licensed Materials may be used "<u>solely</u> for the design, simulation, implementation and manufacture of Licensed Products . . . ."); *id.* § 8(b) ("ACACIA may not modify or prepare derivative works of any Background Information and/or Licensed Materials . . . in whole or in part, except with respect to the purposes of the Licensed Products."). Because of these and other provisions, it was not necessary to also enshrine the very same prohibition in the definition of Licensed Products, as this would have been surplusage.

## B. Acacia's "Incorporation" Argument Is Specious

Acacia argues that the Accused Products do not "incorporate" the manuals and documentation provided by ViaSat with the Everest SDFEC. Remarkably, Acacia seems to contend it can only be liable if ViaSat's specifications (Word documents printed on paper) were physically placed into the ASIC chips in the Accused Products. This bizarre contention defies common sense, ignores the substance of the contract, and misapprehends the nature of the protected information in ViaSat's specifications. If an architect's blueprints were protected by

1   contract, and a developer copied those blueprints and constructed an identical

2   structure, it would be no defense that the new building was not made out of

3   blueprint paper.  And if a novel in English were reprinted without permission in

4   French, one could not credibly argue that the French version did not incorporate the

5   original because the language was different.

6        ViaSat provided Acacia with a *design*, based on a unique and proprietary TPC

7   code, first described in the confidential (Background Information) White Paper.

8   ViaSat's design – intangible intellectual property - is further reflected in the many

9   pages of low level design specifications ViaSat delivered to Acacia for the SDFEC

10  Core components.  Indeed, Acacia admits that ███████████████████████

11  ████████████████████████████████████████████████████████████

12  ██████████████████████████████ Exh. 5 (Martin) 62:23-63:17; *see also* Dave

13  Dec. ¶¶ 5-6.  While Acacia may have written its own RTL code for the decoder

14  (having copied source code from the encoder), it did so by using ViaSat's low-level

15  specifications as a manual.  Virtually all the information necessary to write RTL code

16  to match ViaSat's proprietary SDFEC Core design can be found in ViaSat's low-level

17  specifications (i.e., the Licensed Materials).  *See id.*

18       Acacia provides no evidence supporting its argument that the specifications

19  contained only "general concepts."  As their very name demonstrates, these were

20  "low level specifications" with detailed design information.  They were not "high-

21  level" overviews with only general concepts.  Acacia's representations to the Court

22  about the proprietary nature of its own specifications make this clear.  *See* Dkt. No.

23  42-2 ¶¶ 8-10; Dkt. No. 49 at 6.  Acacia's witnesses also confirm that ████████████

24  ████████████████████████████████████ *See* Exh. 8 (Rasmussen) 69:2-8;

25  Exh. 6 (Humblet) 239:16-25, 241:20-242:11 ████████████████████████

26  ████████████████████████); Exh. 39 (████████████████████████████

27  ████████████████████████████████████ (Exh. 33 at

28  ACI034087): ████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████”).

3      Amplifying its meritless "general concepts" argument, Acacia suggests the

4 License Agreement is an unenforceable agreement not to compete, but the law

5 enforces contractual agreement to refrain from using specified information,

6 regardless of whether the information rises to the level of a trade secret. *HiRel*

7 *Connectors, Inc. v. U.S.*, 2006 WL 361008 *1 (C.D. Cal. July 18, 2006) ("Plaintiff's

8 claim for breach of contract survives even if it is based solely on disclosure of the

9 information …. [that] the Court has already determined are not protectable as trade

10 secrets."); *Ajaxo Inc. v. E\*Trade Group, Inc.*, 135 Cal. App. 4th 21, 62 n.38 (2005); *see*

11 *also Fink v. Goodson-Todman Enterprises, Ltd.*, 9 Cal. App. 3d 996, 1008 (1970); *Gunther-*

12 *Wahl v. Mattel*, 104 Cal. App. 4th 27, 41-42 (2002); *Benay v. Warner Bros. Entertainment,*

13 *Inc.*, 607 F.3d 620, 631 (9th Cir. 2010).

14      Moreover, it is undisputed that ████████████████████████████████

15 Exh. 5 (Martin) 69:19-21 ████████████████████████████████████████

16 ████████████████████████████████████████████████████████████

17 ████████████). Acacia had no license to do so, under any theory.

18 **C.    Acacia's SDFEC Core Definition Is Wrong**

19      Despite admitting that it uses at least six of ViaSat's SDFEC trade secrets, and

20 although Acacia copied large swaths of information from ViaSat's low-level SDFEC

21 design specifications, Acacia argues it has no liability because any information that it

22 took from ViaSat is not part of the "SDFEC Core." Acacia's argument depends

23 entirely on just one sentence in its brief: "Thus, the SDFEC Core that constitutes

24 Licensed Materials consists of (1) an ASIC netlist, and (2) encrypted RTL provided

25 under the Agreement." Dkt. No. 83-1 at 6:18-20. Acacia's definition is inconsistent

26 with the body and substance of the Agreement.

27      SDFEC Core is not specifically defined in the Agreement, but it appears in

28 the third recital, where Acacia states it wishes to commission ViaSat to undertake the

1   development of "an IP core for Soft Decision Forward Error Correction Decoder

2   and Encoder (the 'SDFEC Core') . . . ."  Exh. 1 at 1.  SDFEC Core is thus defined

3   here as "an IP core."  It is not limited to synthesized netlists or RTL code.

4   Elsewhere in the Agreement, the SDFEC Core is included within the definition of

5   Licensed Materials, and Licensed Materials are defined to mean the SDFEC Core "in

6   whatever form provided," and including all "manuals and documentation thereto

7   which VIASAT may provide under this Agreement."  *Id.* § 1(k).

8         Acacia cites the Agreement's Exhibit A as alleged support for its definition,

9   but Exhibit A does not even purport to define "SDFEC Core."  It is a Statement of

10  Work, specifying what ViaSat must do and deliver to complete its obligations.

11  Acacia cites § 3(b) of the Statement of Work, but fails to mention this additional

12  language from that section: "Design documentation . . . will be delivered to Acacia

13  by ViaSat, as indicated below, as part of the complete design effort."  Exh. 1.  The

14  table below that text includes ViaSat's "Architecture Specification," and "Design

15  Specifications," which "detail[] micro architecture design of each IP block.  It

16  contains block descriptions, implementation details, interfaces, register map, control

17  mechanism and any other details required."  *Id.*  Put simply, Acacia's definition of

18  SDFEC Core is not proven by Exhibit A.

19        Moreover, while Acacia now claims that *Exhibit A* defines SDFEC Core, its

20  own expert opined that ███████████████████████████████

21  ████  Vardy Report 56-57 ███████████████████████

22  ████████████████████████████  Testimony about usage of "IP

23  core" in the industry is that it includes the "design, the verification, the

24  documentation, the code itself, performance specification requirements."  Exh. 12

25  (Fuerst) 256:22-257:5.  In sum, based on the broad definition of SDFEC Core in the

26  actual Agreement and in the understanding of the parties, Acacia's narrow definition

27

28

cannot be accepted.[8]

**D.      The Accused Products Indisputably Use ViaSat's Trade Secrets 1-6**

Acacia concedes that its Accused Products necessarily use Trade Secrets 1-6 to make them backwards compatible with Everest.  Acacia's use of these trade secrets in violation of the contract constitutes misappropriation.  *See PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1383 (2000); *Ajaxo, Inc. v. E*Trade, Inc.*, 135 Cal. App. 4th 21 (2006); *Mattern & Associates v. Seidel*, 678 F. Supp. 2d 256 (D. Del. 2010) (applying DUTSA).  It is no defense that ViaSat's trade secrets are only used in the backwards compatible mode of Acacia's Accused Products (a fact issue that is also disputed).  Those products incorporate ViaSat's trade secrets, because those products have backwards compatible modes.  Acacia's arguments about not using the trade secrets "in non-backward compatible modes" are therefore irrelevant, and do not warrant dismissal of ViaSat's claim.

**E.      Triable Issues of Fact Exist as to Trade Secrets 1 and 3 In Non-Backwards Compatible Modes**

ViaSat's expert Dr. Houssoun determined that ██████████████████ ██████████████████████ Exh. 16 (Hassoun) 115:10-116:21; Exh. 19 (Hassoun Report) at p. 53, 56-58.  He also determined that ████████████ ██████████████ Exh. 19 (Hassoun Report) at p. 58, 61-62.  Finally, he concluded that ████████████████████████████████.  *Id.* (Hassoun Report) at p. 84, 87-88, 92-93.  This evidence is sufficient to raise a triable issue of

---

[8] Acacia also argues that ViaSat's experts did not identify "a single instance where Acacia used any part of the 'ASIC netlist' or 'encrypted RTL' provided under the Agreement."  Dkt. No. 83-1 at 7:1-2.  This argument obfuscates the scope of ViaSat's expert reports.  They concluded, ███████████████████████████ ████████████████████████████████████████ ████████ Exh. 19 (Hassoun Report) at 4, 48-153; Exh. 17 (Narayanan Report) at 77-183.  Since those trade secrets come from the Licensed Materials and Background Information, nothing more is required to establish Acacia's liability.

1    fact as to the non-backwards compatible modes of these Accused Products and

2    these trade secrets.

3    **F.    The Accused Products Used Trade Secret 2**

4          Acacia admits Trade Secret 2 is required for the backwards compatibility in

5    the Accused Products.  Exh. 18 (Vardy Report) ¶ 84, 214.  But contradicting itself,

6    Acacia also argues those products do not use it, because ████████████████

7    ████████████████████.  Acacia's expert was unwilling to render any such

8    opinion.  Exh. 14 (Vardy) 214:19-215:19.  ViaSat's expert Dr. Hassoun specifically

9    determined that ████████████████████████████████

10   ████████████████████████████████  Exh. 19 (Hassoun Report)

11   at 63-83.  As Dr. Hassoun explained, ████████████████████████████

12   ████████████████████████████████

13   ████████████  Exh. 16 (Hassoun Depo.) 125:20-126:13, 128:25-129:8.  Thus, the

14   evidence shows Acacia's products utilize ViaSat Trade Secret 2.

15   **G.    The Accused Products Use Trade Secret No. 7**

16         ViaSat's expert ████████████████████████████████

17   ████████████████  Exh. 19 (Hassoun Report) at 146-156.  He explains that

18   ████████████████████████████████████████████

19   ██████  Exh. 16 (Hassoun Depo.) 246:15-18 ("████████████████████

20   ████████████); *id* at 247:9-11 ████████████████████████████

21   ████████████████████████████████[9]  Acacia's

22   speculation about possible changes during synthesis does not change this conclusion.

23         Acacia argues that perhaps the infringing algorithm in the RTL code was not

24   actually implemented in the Accused Products, or perhaps the synthesis tool used to

25   manufacture the ASIC chip changed the algorithm in some unspecified way.  Dkt.

26   _____

27   [9] Even Acacia's expert █████████████████████████████████████

28   ████████████  Exh. 13 (Koralek) at 159:3-13.

1    83-1 at 20-21.  Omitted from Acacia's brief is the testimony of ViaSat's expert

2    ████████████████████████████████████████████████████████

3    █████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████

5    Exh. 16 (Hassoun) 246:14-18.  Dr. Hassoun explained █████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ██████████████████████████████████████████ *Id.* at 246:19-

9    247:11; *see also* 248:15-25 ("███████████████████████████████████████

10   ██████ [10]   Acacia's expert ████████████████████████████████

11   █████████████████████████████████████████████████████

12   ████████████████████████████████████. Exh. 13

13   (Koralek) 160:11-161:5; 164:2-165:9.  Acacia's speculation, at best, creates an issue of

14   fact.

15        Acacia asserts: ████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   █ (emphasis in original)." ████████████████████████████

19   ██████████████████████████████████████████████████████

20   ████████ Acacia also offers highly edited testimony to claim that ████████████

21   ████████████████████████████████████████

22

23   _____

24   [10] Acacia did not actually produce its synthesized netlists in discovery.  *See* Exh. 16
     Hassoun 240:19-241:7; 242:7-11.  As a result, Acacia is foreclosed from arguing that

25   ViaSat cannot prove its case because its experts did not review these netlists.  *See*
     *General Atomic Co. v. Exxon Nuclear Co., Inc.*, 90 F.R.D. 290, 308 (S.D. Cal. 1981) ("It

26   is fundamental that a party that does not provided discovery cannot profit from its

27   own failure."); *Pacific Far East Line, Inc. v. R.J. Reynolds Industries, Inc.*, 1981 WL 2517,
     at *13 (N.D. Cal. Sep. 14, 1981).

28



Exh. 16 (Hassoun) 254:21-255:7.  As the complete question and answer and

surrounding testimony indicate, Dr. Hassoun

.[11]

Acacia also relies on the testimony of its own engineer Gary Martin, but

Acacia overstates this evidence.  The cited Martin testimony

Exh. 5

(Martin) 217:11-23.  Martin

*Id.* at

_____

[11]Acacia also argues tha

Dkt. No. 83-1 at 21.

136:12-137:2; 138:20-139:14.

**H.    Acacia's Use of the CORD Simulator Breached Section 8(b)**

It is undisputed that Acacia used ████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████ Exh. 17 (Narayanan Report) at 58-66; *see also* Exh. 6 (Humblet) 82:20-83:9 ("█████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████"); Exh. 10 (Pellach) 150:2-151:3 (████████████████████████████████████████████████████████████ ███████████████████████████████████); *id.* at 154:19-22 ███████████ ██████████████████████████████. The CORD simulator falls within the contractual definition of Background Information and Licensed Materials under the parties' License Agreement.  It was therefore a breach of the License Agreement to use ████████████████████████████████████████████████ ████████████████████ *See* Exh. 17 (Narayanan Report) at 58-66.

Acacia's argument that such use does not constitute reverse engineering ignores the text of the contract and established case law.  First, the surrounding text of § 8(b) of the License Agreement makes clear the parties' intent to prohibit far more than just simple copying.  Acacia may only use the Background Information or Licensed Materials for purposes of Licensed Products.  This restriction prohibits modifications to the SDFEC or derivative works -- not just outright copies.

The court must construe the provisions of an agreement as a whole, giving effect to all provisions.  *GMG Capital Investments, LLC v. Athenian Venture Partners I*, 36 A.3d 776, 779 (2012).  The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan.  *Id.*  The overall scheme of the License Agreement was to prevent the use of ViaSat's SDFEC materials to develop non-

1    royalty bearing products.  The reverse engineering prohibition covers both copying

2    as well as developing modified products using the ViaSat SDFEC.

3            Reverse engineering includes more than just copying; it includes situations like

4    this, where the goal of the analysis is to develop an improved product.  *See e.g. Bowers*

5    *v. Baystate Technologies, Inc.*, 320 F. 3d 1317 (Fed. Cir. 2003) (reverse engineering

6    "means ordinarily" to study or analyze (a device, as a microchip for computers) in

7    order to learn details of design, construction, and operation, perhaps to produce a

8    copy **or an improved version**.") (citations omitted).  In developing its Accused

9    Products, ███████████████████████████████████████████████

10   ███████████████████.  Exh. 15 (Narayanan Depo.) 176:11-14.  Acacia's emails

11   show ████████████████████████████████████████

12   █████████████ Exh. 17 (Narayanan Report) at 66 ████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████

16   ████████████████████████████████ Acacia's characterization

17   of those activities as merely performance comparisons is an argument about what

18   the evidence shows.  This argument raises, at best, disputed issues of fact.

19           Acacia's contention that ViaSat suffered no damages as a result of Acacia's

20   reverse engineering is meritless.  The contract requires a royalty payment for any

21   product that incorporates "any part" of the Licensed Materials.  By incorporating

22   ViaSat's Licensed Materials and breaching its obligation to use them only for royalty

23   bearing products, Acacia deprived ViaSat of the benefit of its bargain.  ViaSat has

24   substantial evidence of the damages caused by Acacia's breaches.  Exh. 20 (Prowse

25   Report); see also Fuerst Dec. ¶¶ 3-5.  Indeed, Acacia's expert ██████████████

26   ████████████████████████████████████████████████████

27   ███████████████████████████████████████████████

28   █████████████████████ Exh. 18 (Vardy Report) ¶ 88.  The value of that unique

1   technology ██████████████. *See, e.g.,* Exh. 20 (Prowse Report) ¶¶ 25, 26;

2   Dkt. No. 98-1 (Fitzgerald Dec., Exhs. 27-31).  Whether the contract royalty rate or

3   some other measure is appropriate to compensate ViaSat for the theft of its

4   technology is a question for trial.  Acacia is not entitled to summary judgment on

5   liability, however, merely because it questions the amount of ViaSat's damages.

6          A contract need not specify what damages are available in the event of breach,

7   in order for them to be recoverable.  But that is what Acacia argues, in saying

8   Section 8(b) "provides for no royalty payment."  "One who is injured by the breach

9   of a contract is entitled to compensation for the injury received.  The compensation

10  should be such as will place him in the same position that he would have been in if

11  the contract had been performed.  The measure of damages is the loss actually

12  sustained as a result of the breach of the contract is that amount sufficient to place

13  the non-breaching party in the same position as if the breach not occurred."  *White v.*

14  *Metropolitan Merchandise Mart*, 107 A. 2d 892 (1954).  Here, had Acacia complied with

15  the contract, it would have paid royalties on the backwards compatible products to

16  ViaSat.  Those unpaid royalties are the best measure of contract damages.  "Doubts

17  about the extent of damages are generally resolved against the party in breach.  A

18  party who has, by his breach, forced the injured party to seek compensation in

19  damages should not be allowed to profit from his breach where it is established that

20  a significant loss has occurred."  *PharmAthene, Inc. v. SIGA Technologies, Inc.*, 2014 WL

21  3974167 at *8 (Del. Ch. Aug. 8, 2014).  ViaSat lost revenue from giving Acacia

22  exclusivity in the 100 Gps market, lost royalties on products incorporating ViaSat's

23  Background Information and Licensed Materials, and suffered the uncompensated

24  use of valuable SDFEC technology that took millions to develop.  Fuerst Dec. ¶ 4.

25                      **III.    CONCLUSION**

26          For the foregoing reasons, ViaSat respectfully requests that the Court deny

27  Acacia's motion.

28  Dated:  February 12, 2018                    By: s/ *Kenneth M. Fitzgerald*

## **CERTIFICATE OF SERVICE**

I certify that today I am causing to be served the foregoing document by CM/ECF notice of electronic filing upon the parties and counsel registered as CM/ECF Users.  I further certify that, to the extent they are not registered CM/ECF Users, I am causing the foregoing document to be served by electronic means via email upon counsel for Acacia Communications, Inc., per the agreement of counsel.

Dated:   February 12, 2018                          s/ *Kenneth M. Fitzgerald*
                                                                Kenneth M. Fitzgerald, Esq.