FITZGERALD KNAIER LLP
   Kenneth M. Fitzgerald, Esq. (SBN: 142505)
   kfitzgerald@fitzgeraldknaier.com
   David M. Beckwith, Esq. (SBN: 125130)
   dbeckwith@fitzgeraldknaier.com
   Keith M. Cochran, Esq. (SBN: 254346)
   kchochran@fitzgeraldknaier.com
402 West Broadway, Suite 1400
San Diego, California 92101
Tel: (619) 241-4810
Fax: (619) 955-5318

WARREN LEX LLP
   Matthew S. Warren, Esq. (SBN: 230565)
   16-463@cases.warrenlex.com
   Patrick M. Shields, Esq. (SBN: 204739)
   16-463@cases.warrenlex.com
2261 Market Street, No. 606
San Francisco, California 94114
Tel: (415) 895-2940
Fax: (415) 895-2964

Attorneys for Plaintiff and Counter Defendant
ViaSat, Inc.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ViaSat, Inc., *a Delaware corporation*, <br><br>    Plaintiff and Counter Defendant, <br><br>  v. <br><br> Acacia Communications, Inc., *a Delaware corporation*, <br><br>    Defendant and Counter Claimant, | Case No.: 3:16-cv-00463-BEN-JMA <br><br> **[REDACTED] Plaintiff ViaSat, Inc.'s Reply Memorandum of Points and Authorities In Support of Motion for Partial Summary Judgment** <br><br> **[SUBJECT TO MOTION TO FILE UNDER SEAL]** <br><br> Date: March 5, 2018 <br> Time: 10:30 a.m. <br> Place: Courtroom 5A <br>        221 West Broadway <br>        San Diego, CA 92101 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

) Dist. Judge: Hon. Roger T. Benitez
) Hon. Magistrate Jan M. Adler
) Case Initiated: January 21, 2016

## I. INTRODUCTION

In its motion, ViaSat presented extensive evidence – from Acacia's own internal emails, Accused Product specifications, and the testimony of its witnesses – showing that Acacia used ViaSat's Licensed Materials, Background Information, and encoder source code for purposes expressly prohibited by the License Agreement. Acacia does not offer any meaningful *factual* defense to this large body of evidence, much less any exculpatory facts sufficient to raise a genuine issue for trial. Instead, Acacia dismisses it all as just "a handful of documents" and, in a hopelessly conclusory fashion, states, "To the extent these documents are relevant at all, their meanings and implications are disputed." Opp. at 17:11-14.[1] Nothing of real substance follows. It is not a real defense to say simply, "We disagree." *See Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986); F.R.C.P 56(e)(2). But that is apparently the best Acacia can do with the overwhelming evidence of its wrongdoing.

Acacia's legal defense, based largely on its Section 3(b) license argument, fails. Acacia's reading of one phrase from that section contradicts numerous provisions in the Agreement, the rest of Section 3(b) itself, and well-established principles of contract interpretation. Acacia's interpretation also conflicts with its own prior conduct, and the *complete* negotiation history of the Agreement.

With its moving papers, ViaSat also presented Acacia's own admissions – from Acacia's briefs, and the reports and testimony of its experts – that Acacia's backwards compatible products use ViaSat's trade secrets. Rather than presenting contrary evidence to create a triable issue of fact on the element of misappropriation, Acacia sidesteps its copying of confidential design information and source code by addressing different elements of the claim, not presented for the Court's adjudication. Acacia disputes whether ViaSat's trade secrets qualify as such, and who owns them. As set forth in ViaSat's opposition to Acacia's motion for summary

---

[1] *See also* Opp. at 24:5-6 ("Acacia contests ViaSat's characterizations of those facts.").

1 judgment of no liability (Dkt. No. 106), and as will be established when ViaSat files
2 its opposition to Acacia's motion for summary judgment on trade secret rights (Dkt.
3 No. 93), there are genuine issues of fact on those issues. But those are not the issues
4 presented in this motion. There is no dispute that Acacia uses what ViaSat claims as
5 its trade secrets. Partial summary judgment is therefore warranted.

## II.  DISCUSSION

### A.  Acacia Misunderstands ViaSat's Motion.

8 At the outset, Acacia misapprehends the nature of ViaSat's motion. As to the
9 breach of contract claim, the motion is simple, and it is factual. Put simply, the
10 evidence shows that Acacia materially breached the License Agreement. ViaSat's
11 motion set forth the operative contract language, and the extensive documentary
12 evidence and testimonial admissions showing that Acacia breached the prohibitions
13 on use of Licensed Materials and Background Information for any purpose other
14 than making Licensed (royalty-bearing) Products. No complex legal analysis is
15 necessary to reach this conclusion. Thus, Acacia cannot avoid summary judgment
16 by complaining that ViaSat's motion does not include more law. As to the trade
17 secret misappropriation claim, ViaSat made clear that it seeks partial summary
18 judgment on only the misappropriation element of its claim. ViaSat does not seek to
19 adjudicate its entire claim. One may obtain partial summary judgment on any single
20 element of a claim, or on any material fact, under Fed. R. Civ. P. 56(a) and 56(g).
21 Acacia cannot avoid partial summary judgment by raising defenses that are irrelevant
22 to the misappropriation element, which is how ViaSat narrowly framed its motion.

### B.  Acacia's Contract Interpretation Arguments Fail.

24 The linchpin of Acacia's opposition is the argument that it had a royalty-free
25 license under Section 3(b) of the Agreement to make use of ViaSat's Background
26 Information, if Acacia "might need" it to fully exploit the Foreground Information.
27 Opp. at 12:9. As set forth more fully in ViaSat's opposition to Acacia's motion for
28 summary judgment on liability (Dkt. No. 106), Acacia's interpretation is

unreasonable, and would negate all of the provisions in the Agreement that limit Acacia's use of the Background Information and Licensed Materials to Licensed Products. *See* Dkt. No. 106 at 8-15. ViaSat incorporates those arguments here, but will not repeat them.

### 1. Acacia's Section 3(b) Argument Contravenes Basic Rules of Contract Interpretation.

The interpretive cannon of *ejusdem generis* provides that "where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are *not to be construed* in their widest extent, but are to be held as applying *only to* persons or things of the same general kind or class as those specifically mentioned." *In re IAC/InterActive Corp.*, 948 A.2d 471, 496 (2008) (emphasis added, quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (2004)). Here, Section 3(b) states that so long as Acacia is using the Background Information for Licensed Products, it may go beyond the enumerated activities of "design, simulation, implementation, manufacture, or sale of Licensed Products." The general catch-all "or otherwise" phrase appearing immediately thereafter must be read as applying only to the class of activities permitted for Licensed Products. The "or otherwise" catch-all permits additional activities that are not encompassed within the specifically enumerated activities of "design, simulation, implementation, manufacture, and sale" of Licensed Products.[2] It does not apply to the wide extent of granting Acacia a completely separate, royalty-free license. Reading it this way would contravene Delaware law. *See id.,* 948 A.2d at 496.

Acacia's interpretation would re-write the phrase in 3(b) limiting Acacia's right to use Background Information for one "sole and exclusive purpose" (Licensed

---

[2] Acacia may, for example, test Licensed Products incorporating Background Information, market them, advertise them, prepare specifications and product sheets about them, display them at trade shows, or otherwise do things attendant to selling Licensed Products incorporating ViaSat's Background Information.

Products) by changing "for the sole and exclusive *purpose*," which is emphatically singular, to "for the *purposes* of design, simulation . . . and sale of Licensed Products *and* otherwise in connection with ACACIA's exploitation of the Foreground Information." This would change "purpose" to be plural when there clearly was one *singular* purpose permitted under Section 3(b), as evident from that purpose being "sole and exclusive." One can't have sole and exclusive [singular] purpose*s* [plural].

Acacia also argues that if it uses Background Information in a way that does not create a Licensed Product, and does meet Section 3(b), then Section 3(b) exempts Acacia from Section 8(b)'s prohibition on the use of Background Information for any purpose other than Licensed Products, because Section 3(b) is a separate license, as stated in Section 4(a). Opp. at 14:14-18; 16:4-8. This attempt to shoe-horn its Section 3(b) license theory into the language of the contract fails, for the simple reason that Section 3(b) is not a "separate written Agreement with VIASAT," as Section 4(a) requires. It states, plainly: "Use of the Licensed Materials for any product other than the Licensed Product is strictly prohibited unless ACACIA has entered a separate written Agreement with VIASAT for such use." There was no "separate written Agreement" from the License Agreement permitting Acacia to use ViaSat's low level specifications, encoder source code, SDFEC simulation tools, or other Licensed Materials to make non-Licensed Products.

Acacia is also wrong in suggesting it was free to make use of ViaSat's Background Information, unless it was delivered to Acacia after the contract was signed. Acacia agreed in the License Agreement that all Background Information, which included ViaSat's pre-existing SDFEC information (like the White Paper) belonged to ViaSat. Exh. 22 §§ 8(a)-(b). Acacia also agreed to adhere to its prior NDA, which limited Acacia's right to use such information (including the White Paper) to the sole purpose of exploring a transaction. *Id.* § 9, Exh. 23 (NDA).

**2.     The Agreement Expressly Prohibits Unauthorized Use.**

Attempting to reconcile the obvious conflict between its interpretation of the

"or otherwise" language in Section 3(b) and the rest of the Agreement, Acacia attempts some interpretive gymnastics to obfuscate the simple truth. First, in a weird and unnecessary construct, Acacia turns the contract on its head. Rather than acknowledging the express restrictions on its right to use ViaSat's SDFEC information, Acacia frames the contract as giving ViaSat only very limited rights to constrain Acacia's use of the Background Information. From that premise, Acacia argues that the contract does not imply other rights, "like a general right to prevent 'use,' [that] are "**not** implied." Opp. at 13:4-6 (emphasis in original). But ViaSat is not relying on a contractually *implied* right to prevent "use" of Background Information. ViaSat is relying on *express* prohibitions on Acacia's use of Background Information for anything other than making Licensed Products, as stated in Sections 4(a), 3(b), 8(a)-(c) and 9, among other provisions.

Acacia states: "The Agreement's express terms preclude ViaSat from pursuing claims based only on 'use.'" Opp. at 2:27-28. False. There are no such "express terms" in the Agreement. To the contrary, Section 4(a) "strictly" prohibits Acacia's "use" of Licensed Materials "for any product other than the Licensed Product." Section 3(b) also limits use of Background Information to only Licensed Products.

### 3.   The Negotiation History Undermines Acacia's Interpretation.

Tellingly, right after asserting that the "Agreement's express terms" bar ViaSat's claim, Acacia resorts to discussing "earlier drafts" of the Agreement, rather than the Agreement itself. There, Acacia states the earlier drafts "had language that "prohibited such 'use,' but that language was dropped from the final Agreement." Opp. at 2:28-3:1. This is all irrelevant.[3] It is also false, as an important part of the negotiation history (Exh. 60), omitted from Acacia's version, shows Acacia is wrong.

---

[3] Where contract language is clear, as here, negotiation history is irrelevant. *Alliance Data Systems Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 760 (2009).

1 ████████████████████████████████████████
2 ████████████████████████████████████████
3 ████████████████████████████████████████
4 ████████████████████████████████████████
5 ████
6 ████████████████████████████████
7 ████████████████████████████████
8 ████████████████████████████████
9 ████████████████████████████████
10 ████████████████████████████████
11 ████████████████████████████████
12 ████████████████████████████████
13 ████████████████████████████████████████
14 ████████████████████████████████████████
15 ████████████████████████████████████████
16 ████████████████████████████████████████
17 ████████████████████████████████████████
18 ████████████████████████████████████████

19 ██████████████████  In light of the negotiated prohibition on use of Background Information for anything other than Licensed Products, it is simply false for Acacia to say, as it does in its opposition, that the "negotiations actually added language that expressly permits Acacia's activities." Opp. at 3:25-26. To the contrary, the negotiations actually added language that expressly limits Acacia's use of Background Information to Licensed Products. The final contract unambiguously prohibits Acacia from using Licensed Materials or Background Information for anything other than royalty bearing, Licensed Products. Exh. 22 §§ 4(a), 8(b), 3(b).

**4. The License Agreement Is Not Overly Restrictive.**

Acacia contends that ViaSat's reading of the Agreement would effectively bar Acacia from competing with ViaSat. Opp. at 2:22-24. Not so. The Agreement allows Acacia to compete with ViaSat; it merely requires Acacia to develop its own SDFEC technology independently "from scratch," as it claimed was the case when its backwards compatible products first came to light. *See* Dkt. No. 106 at 6:7-19; 13:12-22.

Acacia also asserts that its purported royalty-free license to use Background Information under Section 3(b) was necessary, and that without it, the Agreement "would all but preclude Acacia from using its Foreground Information." Opp. at 13:16-17. The only evidence cited to support this assertion are paragraphs from Dr. Vardy's report explaining ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Fine. Acacia could have designed a new SDFEC, taking the Everest DSP into account. Dr. Vardy does not state, and Acacia provides no evidence to show, that doing so was impracticable, or even difficult. Acacia *chose* to include backwards compatibility as a desirable feature of its newer products, thinking its customers would like it. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Indeed, Acacia admits it was perfectly able to make such products without backwards compatibility. Dkt. No. 83 at 3:13-15 ("Acacia later realized that backward compatibility with Everest provided little actual value, and dropped it from products after Meru."). In sum, there is no evidence that Acacia could only "reasonably and fully" use the DSP Core by making products that interoperate with ViaSat's SDFEC.

Overall, things are much simpler than Acacia makes them seem. The contract prohibits Acacia from using Licensed Materials or Background Information to develop products on which it did not pay royalties. Acacia understood it that way, which is why Acacia initially claimed it had developed the Accused Products

independently, "from scratch," without any access to ViaSat's coding or the Background Information, which Acacia said was stored in restricted directories.[4] And Acacia understood it was not supposed to use the highly proprietary information in ViaSat's White Paper, which is why ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### C.   Acacia's Trade Secret Arguments Are Unavailing, Or Irrelevant.

Acacia admits: "There is no dispute that interoperability between the Accused Products and the Royalty-Bearing Products requires at least the first six of ViaSat's [asserted trade secrets]" and "the Accused Products all have such interoperability modes." Dkt. No. 83 at 16:24-17:1 (emphases added). Indeed, Acacia's expert ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Acacia indisputably uses ViaSat's Trade Secrets 1-6, in other words.

Acacia attempts to mislead by emphatically stating that "Acacia did **not** incorporate into the Accused Products **any** of the encrypted decoder RTL or netlists that are part of the Licensed Materials." Opp. at 17:5-6 (emphasis in original). Acacia **did** incorporate into the accused Products **encoder** RTL, which is part of the SDFEC Core, and which Acacia had no license to use. Exh. 11 (Martin) 67:4-73:18; 75:19-79:10; 92:18-25; Exh. 61 (Shah) 63:24-64:4. A burglar who steals jewelry is not

---

[4] Acacia touts "unequivocal, sworn testimony" that access to Background Information was restricted, citing snippets of testimony from Bhupen Shah and Benny Mikkelsen. Opp. at 25:1-3. Their complete testimony shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ More importantly, it is undisputed that Acacia's engineers did access that information, and used it to develop the Accused Products, which is why Acacia is now forced to argue it had a license to do so.

innocent because he did not **also** take the cash. It is no defense for Acacia to say it only stole RTL code from part of the SDFEC Core (the encoder).[5] Moreover, some of the ViaSat trade secrets admittedly used by Acacia ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Acacia's 30(b)(6) designee also admits ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Acacia also disputes ViaSat's ownership of its trade secrets, and argues some were actually developed by Acacia. These arguments are irrelevant to the narrow issue posed by ViaSat's motion, which is whether Acacia used ViaSat's claimed secrets.[7] These contentions also incorrect, as a matter of law.

Acacia disputes ViaSat's exclusive ownership of the SDFEC (including the SDFEC Core, Background Information and Licensed Materials) to ViaSat. After quoting Section 8(a), which states that all Intellectual Property Rights in those materials belong to ViaSat, including "*all* modifications, improvements, and derivative works requested or suggested by ACACIA," Acacia states – without citing anything – that: "While Section 8(a) also refers to suggestions by Acacia, that

---

[5] Not for lack of trying. Acacia ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Acacia now claims it was free to use ViaSat's encoder source code however it wanted. Opp. at 22:26-27 ("whatever Acacia did with the unencrypted encoder source code, it was unrestricted because that code was not Licensed Materials."). This is quite an evolution from Acacia's initial defense. *See* Exh. 20 ("Acacia did not have access to the details or coding of the SDFEC Core."). It is also wrong. The encoder is part of the SDFEC Core.

[6] And as explained elsewhere, Acacia was expressly prohibited from using more than just encrypted decoder RTL and netlists.

[7] ViaSat does not make a "blanket request for judgment" on this claim, as Acacia states. Opp. at 20:4.

concerns, at most, suggests Acacia made prior to the Agreement and any assignment in prior agreements." Opp. at 15:1-3. Where does the Agreement say that? It doesn't. What evidence supports that? There is none. Acacia simply invents the idea that "ViaSat does not exclusively own contributions that Acacia made to the SDFEC Core under the Agreement." *Id.* at 15:3-4. The Agreement unambiguously says ViaSat does. The parties had a fairly simple deal. They agreed to divvy up ownership of the technology resulting from their collaboration. ViaSat would have the SDFEC Core, and Acacia would get the DSP Core, regardless of who contributed what to which, except that ViaSat also got to keep its pre-existing or separately developed DSP intellectual property, part of its Background Information. This makes irrelevant Acacia's entire line of argument about who contributed to the specifications, and whether they contain Background Information (Opp. at 20:18-27). Under Section 4(a), Licensed Materials could only be used to make Licensed Products. ViaSat's trade secrets, and virtually all the information necessary to write RTL code to match ViaSat's proprietary SDFEC Core design, can be found in ViaSat's low-level specifications (i.e., the Licensed Materials). Dave Dec. ¶¶ 5-6.[8]

Use of trade secrets in breach of an agreement is misappropriation under the UTSA. Cal. Civ. Code § 3426.1(a); 6 Del. C. § 2001(1); *Beard Research, Inc. v. Kates*, 8 A.3d 573 (2010). By using the specifications and other SDFEC information in violation of the contractual restrictions, Acacia misappropriated ViaSat's trade secrets. Partial summary judgment on the misappropriation element should enter.

Dated: February 26, 2018     By: s/ Kenneth M. Fitzgerald

---

[8] With its motion, ViaSat submitted Acacia's actual SDFEC product specifications, and ViaSat ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Acacia does not contend, much less submit any evidence, that its Accused Products differ from these product specifications.

**CERTIFICATE OF SERVICE**

I certify that today I am causing to be served the foregoing document by CM/ECF notice of electronic filing upon the parties and counsel registered as CM/ECF Users. I further certify that, to the extent they are not registered CM/ECF Users, I am causing the foregoing document to be served by electronic means via email upon counsel for Acacia Communications, Inc., per the agreement of counsel.

Dated:   February 26, 2018                               s/ *Kenneth M. Fitzgerald*
                                                                          Kenneth M. Fitzgerald, Esq.