FITZGERALD KNAIER LLP
    Kenneth M. Fitzgerald, Esq. (SBN: 142505)
    kfitzgerald@fitzgeraldknaier.com
    David M. Beckwith, Esq. (SBN: 125130)
    dbeckwith@fitzgeraldknaier.com
    Keith M. Cochran, Esq. (SBN: 254346)
    kcochran@fitzgeraldknaier.com
402 West Broadway, Suite 1400
San Diego, California 92101
Tel: (619) 241-4810
Fax: (619) 955-5318

WARREN LEX LLP
    Matthew S. Warren, Esq. (SBN: 230565)
    16-463@cases.warrenlex.com
    Patrick M. Shields, Esq. (SBN: 204739)
    16-463@cases.warrenlex.com
2261 Market Street, No. 606
San Francisco, California 94114
Tel: (415) 895-2940
Fax: (415) 895-2964

Attorneys for Plaintiff and Counter Defendant
ViaSat, Inc.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ViaSat, Inc.,**<br>*a Delaware corporation,*<br><br>Plaintiff<br>and Counter Defendant,<br><br>v.<br><br>**Acacia Communications, Inc.,**<br>*a Delaware corporation,*<br><br>Defendant<br>and Counter Claimant, | ) Case No.: 3:16-cv-00463-BEN-JMA<br>)<br>) **[REDACTED] Plaintiff Viasat,**<br>) **Inc.'s Memorandum of Contentions**<br>) **of Fact and Law**<br>)<br>) **[SUBJECT TO MOTION TO FILE**<br>) **UNDER SEAL]**<br>)<br>) Dist. Judge: Hon. Roger T. Benitez<br>) Hon. Magistrate Jan M. Adler<br>) Case Initiated: January 21, 2016<br>)<br>)<br>)<br>) |

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................ 1

II.  VIASAT'S CLAIMS ...................................................................................... 4

     A.   First Claim:  Breach of Contract .................................................... 4

     B.   Second Claim:  Breach of the Implied Covenant of Good
          Faith and Fair Dealing ................................................................... 10

     C.   Third Claim:  Misappropriation of Trade Secrets ......................... 11

     D.   Viasat's Disclosure Pursuant to Local Rule 16.1(f)(3)(c)
          Regarding Breach of Contract Claim ............................................ 14

III. VIASAT'S RESPONSE AND AFFIRMATIVE DEFENSES TO
     ACACIA'S COUNTERCLAIMS ................................................................ 16

IV.  ANTICIPATED EVIDENTIARY ISSUES ............................................... 21

          1.   Evidence of Viasat's Patent Applications Is
               Irrelevant and Will Confuse the Jury ................................. 21

          2.   Acacia's Counterclaims for Breach of Contract 2-6
               Are Unsupported by Damage Evidence and Will
               Confuse the Jury ................................................................. 22

          3.   Acacia's Trade Secret Misappropriation Damages
               Evidence Fails to Correspond to the Claims for
               Relief, Is Irrelevant and Will Confuse the Jury ............... 23

          4.   Acacia's Evidence of Supposed Independent
               Development of IP Contained in the SDFEC Core
               is Irrelevant and Will Confuse the Jury ............................. 24

          5.   Evidence Related to Acacia's Newly Minted, Unpled,
               Breach of Contract Claims is Inadmissible and Will
               Mislead the Jury ................................................................. 25

          6.   Contract Negotiation Evidence Is Inadmissible to
               Contradict the Terms of the Parties' Written
               Contract Regarding Agreed Royalty Terms ..................... 25

          7.   Testimony Elicited Using an Incomplete and
               Misleading Exhibit Is Inadmissible and Will Mislead
               the Jury ............................................................................... 26

8.  Damage Theories Based on "lock out" or Non-Use of Backward-Compatibility in the Accused Products are Inadmissible, Lack Evidentiary Support, and Will Mislead the Jury ................................................................ 26

9.  Evidence of Acacia's Collateral Litigation Against Viasat is Irrelevant, Unduly Time Consuming, and Will Mislead the Jury ................................................................ 27

10. Evidence of Narrowing of Issues Before Trial is Irrelevant, Unduly Time Consuming, and Will Mislead the Jury ................................................................ 27

11. Acacia's Retained Expert Witnesses Have Offered Opinions that Are Inadmissible Under Federal Rule of Evidence 702 and *Daubert* ........................................ 27

V.  LEGAL CONTENTIONS AND ANTICIPATED ISSUES OF LAW .......................................................................................... 27

1.  The License Agreement Defines Ownership of the IP in the SDFEC Core, Regardless of Who Contributed to the IP ...................................................... 27

2.  Viasat's Damages Claims Are Not Limited by the Limitation of Liability Clause of the License Agreement ...................................................................... 28

3.  Viasat's Trade Secrets Satisfy the Definition of Trade Secrets under California's Trade Secret Act ................... 29

4.  A Trade Secret May be Comprised of Partly or Entirely Non-Secret Elements and Still Merit Protection ...................................................................... 31

5.  Acacia's Contention that Viasat's Trade Secret 2 Could Be Readily Ascertained by Reverse Engineering Conflicts with Contractual Prohibitions Against Reverse Engineering, and is Contrary to California's Trade Secret Definition ................................. 32

6.  Acacia Fails to Present A Basis For Federal Court Jurisdiction ................................................................ 33

7.  Acacia Cannot Establish Ownership Rights in the Viasat Patent Family Merely by Examining Statements in the Patent Specifications ......................... 34

8.   Acacia's Prayer for Injunctive Relief is Legally
     Barred by Its Disclosure of Its Trade Secrets in
     Acacia's Patent Applications and Failure to Analyze
     Viasat Patent Claims Against Acacia Trade Secrets
     and Viasat Products ........................................................... 35

VI.   ACACIA'S COUNTERCLAIMS RELATED TO VIASAT AND
      ACACIA PATENTS MAY NOT BE TRIED TO A JURY ........................ 36

VII.  ABANDONMENT OF ISSUES ........................................................ 37

# TABLE OF AUTHORITIES

**CASES**

*02 Micro Int'l Ltd. V. Monolithic Power Sys., Inc.,*
    420 F. Supp.2d 1070 (N.D. Cal. 2006) .......................................... 29, 32

*3M v. Pribyl,*
    259 F.3d 587 (7th Cir. 2001) .......................................... 32

*ABBA Rubber Co. v. Seaquist,*
    235 Cal. App.3d (1991) .......................................... 33

*Adams v. Johns-Manville Corp.,*
    876 F.2d 702 (9th Cir. 1989) .......................................... 37

*Alcatel USA, Inc. v. DGI Techs.,*
    166 F.3d 772 (5th Cir. 1999) .......................................... 33

*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.,*
    226 Cal. App.4th 26 (2014) .......................................... 31, 32

*Arachnid, Inc. v. Merit Indus., Inc.,*
    939 F.3d 1574 (Fed. Cir. 1991) .......................................... 33, 34

*AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.,*
    633 F.3d 966 (8th Cir. 2011) .......................................... 30

*Beard Research, Inc. v. Kates,*
    8 A.3d 573 (Del. 2010 .......................................... 32

*Board of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.,*
    583 F.3d 832 (Fed. Cir. 2009) .......................................... 33

*Counsel of the Dorset Condo. Apartments v. Gordon,*
    801 A.2d 1 (Del. 2002) .......................................... 6

*Data General Corp. v. Digital Computer Controls, Inc.,*
    *297 A.2d 437 (Del. 1972)* .......................................... *29, 30*

*Data Mgmt. Internationalé, Inc. v. Saraga,*
    2007 WL 2142848 (Del. Sup. Ct. July 2007) .......................................... 28

*DCV Holdings, Inc. v. ConAgra, Inc.,*
    889 A.2d 954 (Del. 2005) .......................................... 7

*Delphi Petroleum v. Magellan Terminals Holdings, L.P.,*
    2015 WL 3885947 (Del. Sup. Ct. June 2015) .......................................... 29

*Delta & Pine Land Co. v. Monsanto Co.,*
    2006 WL 1510417 (Del. Ch. 2006) .......................................... 7

*Digital Development Corp. v. International Memory Systems,*
    185 U.S.P.Q. 136 141 (S.D. Cal. 1973) .................................................................. 31

*DSC Communications Corp. v. Pulse Communications, Inc.,*
    170 F.3d 1354 (Fed. Cir. 1999) ............................................................................... 33

*DVD Copy Control Ass'n Inc. v. Bunner,*
    116 Cal. App. 4th 241 (2004) ................................................................................. 30

*Embotelladora Electropura S.A. de C.V. v. Accutek Packaging Equip. Co.,*
    2017 WL 3288492 (S.D. Cal. Aug. 2017) ............................................................. 29

*Gellman v. Telular Corp.,*
    2010 WL 5173212 at *4 (E.D. Tex. Dec. 2010) ................................................... 33

*Hambrecht & Quist Venture Partners v. American Medical Internatl., Inc.,*
    38 Cal.App.4th 1532 (1995) .................................................................................... 19

*HealthNet of Cal., Inc. v. Dept. of Health Servs.*
    113 Cal. App. 4th 224 (2003) ................................................................................. 29

*In re IAC/InterActive Corp.,*
    948 A.2d 471 (2008) ................................................................................................... 8

*In re Providian Credit Card Cases,*
    96 Cal. App.4th 292 (2002) ..................................................................................... 29

*Israel Bio-Eng'g Project v. Amgen, Inc.,*
    475 F.3d 1256 (Fed. Cir. 2007) ............................................................................... 34

*J.A. Jones Constr. Co. v. Dover,*
    372 A.2d 540 (Del. Sup. Ct. 1977) ......................................................................... 28

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996) .................................................................................................. 36

*Medtronic MiniMed, Inc. v. Nova Biomedical Corp.,*
    2009 WL 10671420 at *4 (Del. Ch. 2017) ........................................................... 30

*Mrs. Fields Brand, Inc. v. Interbake Foods LLC,*
    2017 WL 2729860 (Del. Ch. 2017) .......................................................................... 6

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ............................................................................... 34

*Premier Displays & Exhibits v. Cogswell,*
    2009 WL 8623588 at *3 (C.D. Cal. Dec. 23) ......................................................

*Radio Corp. of Am. v. Philadelphia Storage Battery Co.,*
    6 A.2nd 329 (Del. 1939) ............................................................................................. 6

*Rhino Assocs., L.P. v. Berg Mfg. & Sales Corp.,*
    482 F. Supp. 2d 537 (M.D. Pa. 2007) .................................................................... 34

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.,*
  2008 WL 166950 at *45 (N.D. Cal. Jan. 2008) ...........................................30

*SkinMedica, Inc. v. Histogen, Inc.,*
  869 F. Supp. 2d (S.D. Cal. 2012) ................................................................32

*Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.,*
  401 F. Supp. 1102 (E.D. Mich. 1975) ........................................................31

*Syncsort, Inc. v. Innovative Routines, Intl, Inc.,*
  2011 WL 3651331 (D. N.J. Aug 2011) .......................................................30

*Telerate Systems, Inc. v. Caro,*
  689 F.Supp. 221 (S.D.N.Y. 1988) .............................................................. 30

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
  135 S. Ct. 831 (2015) ..................................................................................34

*UniRAM Tech, Inc. v. Taiwan Semiconductor Mfg. Co.,*
  *617 F. Supp.2d 938 (N.D. Cal. 2007)* ........................................................32

## STATUTES

6 Del. C. § 2001(1) ............................................................................................32

35 U.S.C. §1 ......................................................................................................18

Cal. Civ. Code § 1668 .......................................................................................29

Cal. Civ. Code § 3426.1(a) ...............................................................................32

Cal. Civ. Code § 3426.1(d)(2) ..........................................................................30

Cal. Civ. Code § 3426.3 ....................................................................................13

Cal. Civ. Code § 3426.4 ....................................................................................13

Cal. Civ. Code § 3426.6 ....................................................................................19

Del. Code Title 10 §8106 ..................................................................................19

F.R.C.P. 26(a)(3) ..............................................................................................21

## TREATIES

Restatement (Third) of Unfair Competition § 39 cmt. f (1995) ........................32

# I.     INTRODUCTION

In 2009, defendant and counterclaimant Acacia Communications, Inc. ("Acacia") set out to develop 100 Gigabit per second ("Gbps") fiber optic modems capable of sending large quantities of data over long distances.  A key component of these modems are Application Specific Integrated Circuit ("ASIC") chips, which perform both digital signal processing (or "DSP") and soft decision forward error correction ("SDFEC") functions.  Plaintiff and counterclaim defendant Viasat, Inc. ("Viasat") possessed unique expertise in the field, and was asked by Acacia to provide the intellectual property cores for the DSP and SDFEC functions in Acacia's planned chips.  Acacia did not know what type of forward error correction code to use, and its personnel had no industry experience with forward error correction codes or forward error correction technology.

After Acacia signed a Non-Disclosure Agreement, Viasat provided Acacia with confidential details about its proprietary SDFEC design, including a proprietary Turbo Product Code ("TPC") base code structure.  Before receiving Viasat's recommendation, Acacia had been contemplating using a more widely implemented code type--LDPC--unaware of the advantages of using a TPC code for forward error correction at 100 Gbps speeds.

Recognizing Viasat's expertise and lacking any of its own, on November 20, 2009, Acacia entered into the IP Core Development and License Agreement ("the License Agreement") with Viasat.  The License Agreement required Viasat to develop intellectual property cores, specifically a "DSP Core," and an "SDFEC Core," working with Acacia's engineers.[1]  The parties agreed that while Acacia would own certain rights in the newly developed implementation of Viasat's pre-existing DSP Core, Viasat would own all intellectual property rights in the SDFEC Core, regardless of whether Acacia made contributions to it during the development effort.

---

[1] Capitalized terms herein are defined terms under the License Agreement.

Specifically, the License Agreement provides that Viasat owns all intellectual property in the "Background Information" and "Licensed Materials," both defined terms, regardless of who suggested what feature:

> ACACIA acknowledges that all Intellectual Property Rights in the Background Information and the Licensed Materials are and will remain the sole property of VIASAT, including all modifications, improvements, and derivative works relating to the Background Information and Licensed Materials, **including but not limited to all modifications, improvements, and derivative works requested or suggested by ACACIA**.

License Agreement § 8(a) (emphasis added). The definitions of "Background Information" and "Licensed Materials" both expressly include the SDFEC Core. Viasat therefore owns all Intellectual Property Rights in the SDFEC Core under the terms of § 8(a), above, including any SDFEC information jointly developed by the parties pursuant to the License Agreement or suggested solely by Acacia.

The License Agreement calls for Acacia to pay royalties to Viasat for products that utilize Viasat's Licensed Materials. Thus, any products sold by Acacia that include all or any part of the SDFEC Core require the payment of royalties to Viasat. Acacia paid royalties on its Everest and K2 products, and then decided that it wanted to eliminate the royalty payments for future products. But when Acacia set out to develop its own SDFEC, it learned that its customers wanted Acacia's new products to be backwards compatible with the older Everest products. Backward compatibility was impossible to achieve without using key portions of Viasat's SDFEC Core, including Viasat's trade secrets. Acacia therefore decided to include the backward compatibility (and therefore the key portions of Viasat SDFEC Core developed for the Everest product) in the new Acacia Sky, Denali and Meru products (the "Accused Products") while refusing to pay royalties to Viasat for the use of the SDFEC Core.

The Accused Products also make unauthorized use of Viasat's trade secrets. Acacia promised to keep these trade secrets confidential, and to use them only for

licensed, royalty-bearing products. When confronted, Acacia initially told Viasat that Acacia had independently developed the Accused Products without any use of the Viasat SDFEC Core or Viasat's Background Information. Discovery showed Acacia's claim of independent development to be false. Acacia's founder transmitted Viasat's Confidential Information to the lead engineer working on the Acacia Accused Products using a USB memory stick, taking pains not to email it from a company email account to avoid later discovery. Acacia's engineers cut and pasted Viasat's Licensed Materials into Acacia's own low level specifications (including even the typos from Viasat's confidential documents), and they incorporated Viasat's trade secrets in Acacia's Accused Products. In written discovery responses, Acacia falsely denied using Viasat's trade secrets, but Acacia's engineers and expert witness were forced to admit that Acacia uses Viasat's trade secrets to achieve backward compatibility in the Accused Products.

Acacia's theft proved very lucrative to its founders and key employees, because they took the company public on the strength of Viasat's technology, quickly attaining a $4 billion market capitalization. Acacia does not sell meaningful quantities of any product that does not incorporate at least parts of Viasat's SDFEC. Put differently, nearly 100% of Acacia's revenues during the life of the company derive, at least in part, from Acacia's use of Viasat's SDFEC technology.

Through the second quarter of 2017, Acacia generated revenues of ███ ███ selling the Accused Products. Acacia has refused to provide updated sales and profit information after Q2 2017, despite being requested to provide this information by Viasat. ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ On Viasat's trade secret misappropriation claim, Viasat's damages expert has concluded that, as of mid-2017, Acacia was unjustly enriched by at least ███████████ profit, through the use of Viasat's trade secrets.

The extensive evidence of Acacia's willful copying, and the demonstrable falsity of its "independent creation" story, supports Viasat's charge of willful misappropriation.  Under the Uniform Trade Secret Act, Viasat may therefore recover up to two times its actual damages, and its attorneys' fees.  This amount currently exceeds ███████.

## II.   VIASAT'S CLAIMS

Viasat has pled and will pursue the following claims, supported by the following facts and points of law.

**A.     First Claim: Breach of Contract.**

In 2009, Acacia approached Viasat to obtain technical assistance in developing a 100 Gbps fiber optic modem because Viasat possessed technical expertise in optical modem development and SDFEC technology that Acacia lacked.

Viasat agreed to work with Acacia, and shared Viasat technical expertise, know-how and Trade Secrets, pursuant to a NDA, and a License Agreement that protected Viasat's Confidential Information and intellectual property ("IP").  Viasat and Acacia signed a written NDA dated as of June 10, 2009.  Viasat and Acacia signed a written License Agreement dated November 20, 2009.  The License Agreement is governed by Delaware law.

The License Agreement requires Acacia to pay royalties to Viasat for all products that incorporate all or any part of Viasat's SDFEC Core.

The License Agreement provides that "[u]se of the Licensed Materials for any product other than the Licensed Product is strictly prohibited unless ACACIA has entered into a separate written Agreement with VIASAT for such use."  License Agreement § 4(a).

The License Agreement also prohibits Acacia from reverse engineering Background Information or Licensed Materials.

Acacia sold a 100 Gbps fiber optic modem product referred to as "Everest," and a 40 Gbps modem product called "K2," that each included Viasat's SDFEC Core. Acacia paid Viasat royalties for those sales.

Acacia wanted to develop its own SDFEC for future products to avoid the royalty obligation to Viasat. However, Acacia determined that Viasat's SDFEC was an important market differentiator and that its customers loved and wanted this SDFEC in future products. In addition, Acacia determined that its customers wanted future Acacia products to be "backwards-compatible" with Acacia's Everest product so that its "customers can continue to derive long-term value from their investments" in earlier Acacia products.

Acacia was obligated under the terms of License Agreement to make Viasat's Confidential Information available only to those of its employees having a need to know and solely for purposes of creating Licensed Products.

To make its products backwards compatible with Everest, Acacia was required to, and did, use Viasat's Licensed Materials, Background Information, trade secrets, IP, and portions of Viasat's SDFEC Core, all of which could only be used under the License Agreement to develop royalty-bearing Licensed Products.

Acacia failed to pay royalties or compensate Viasat for the use of its Licensed Materials, Background Information, trade secrets, IP, and SDFEC Core, as required under the License Agreement.

Acacia denied using Viasat's Background Information and Licensed Materials to develop its backwards compatible products when initially confronted by Viasat years before this lawsuit was filed. Acacia falsely claimed it had independently developed its own SDFEC without making any use of Viasat's contractually-protected documents and information. Acacia made these contentions because Acacia understood the contract to prohibit its use of Viasat's Background Information and Licensed Materials to develop non-royalty bearing products. "In giving effect to the parties' intentions, it is generally accepted that the parties'

conduct before any controversy has arisen is given great weight." *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2017 WL 2729860, at *17 (Del. Ch. June 26, 2017); *Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 6 A.2d 329, 340 (Del. 1939).

Viasat has performed all obligations on its part to be performed under the terms of the NDA and the License Agreement.

Acacia breached at least Sections 4, 8, and 9 of the License Agreement by improperly using Background Information and Licensed Materials in and to develop products Acacia claims are not Licensed Products, and on which it failed to pay royalties. Acacia also breached Section 8 of the License Agreement by reverse engineering Viasat's confidential Background Information and Licensed Materials for the purpose of creating products Acacia claims are not Licensed Products, and on which it refuses to pay royalties. Acacia also breached Sections 8 and 9 of the License Agreement, and breached the NDA, the substantive terms of which are incorporated in the License Agreement, by making Viasat's Confidential Information available to Acacia engineers for purposes of developing the Accused Products, and by sharing that information with external consultants and contract manufacturers.

Acacia's recently contrived argument -- that Section 3(b) of the License Agreement permitted it to use this information to develop non-royalty bearing products -- would negate numerous provisions of the contract, the interpretive cannon of *ejusdem generis*, and is belied by Acacia's own conduct in denying that it made use of Licensed Materials and Background Information. Well-settled rules of contract interpretation compel the Court to reject Acacia's opportunistic misreading of the Agreement.

When interpreting a contract, a court must give effect to every provision in a contract, choosing an interpretation that harmonizes each provision, rather than one in which contradictions result. *Counsel of the Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del. 2002). Acacia's reading of Section 3(b) of the License Agreement would defeat the many provisions in the contract that prohibit Acacia from making

use of Background Information or Licensed Materials for any purpose other than Licensed (royalty bearing) Products. These provisions include:

- Acacia received a "limited . . . license (i) to make, have made, use, reproduce and make derivative works of the Licensed Materials, *solely* for the design, simulation, implementation and manufacture of Licensed Products, and (ii) to . . . sell . . . Licensed Products incorporating the Licensed Materials on a worldwide basis. *Use of the Licensed Materials for any product other than the Licensed Product is strictly prohibited unless ACACIA has entered into a separate written Agreement with VIASAT for such use.*" § 4(a) (emphases added).

- "'Permitted Use'" means use by Acacia of the Licensed Materials in accordance with Clause 4." § 1(n).

- Acacia's license was expressly conditioned on Acacia's "payment of a per unit Recurring Royalty Fee." § 4(b).

- Acacia agreed that "all Intellectual Property Rights in the Background Information and the Licensed Materials" remain ViaSat's property, including any "modifications, improvements, and derivative works requested or suggested by ACACIA." § 8(a).

- "ACACIA may not modify or prepare derivative works of any Background Information and/or Licensed Materials it receives from VIASAT under this Agreement in whole or in part, except with respect to the purposes of Licensed Products." § 8(b).

- "Licensed Products" is defined to include "*any* integrated circuits . . . that incorporate all *or any part* of the Licensed Materials (regardless of whether or not the Licensed Materials are enabled or disabled in such Licensed Product)." § 1(l).

If Acacia were correct, the Court would have to read all of these restrictive provisions out of the License Agreement. Courts reject such unreasonable interpretations. *Delta & Pine Land Co. v. Monsanto Co.*, 2006 WL 1510417, at *4 (Del. Ch. May 24, 2006) ("contracts must be interpreted in a manner that does not render any provision 'illusory or meaningless.'"). Moreover, "specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). The specific provisions

cited above control here, even if the Court questions whether the more general "or otherwise" phrase in Section 3(b) raises an ambiguity.

In any event, any question about such ambiguity is easily resolved by applying the interpretive cannon of *ejusdem generis*, which provides that "where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." *In re IAC/InterActive Corp.*, 948 A.2d 471, 496 (2008) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (2004)). Here, Section 3(b) states that so long as Acacia is using the Background Information for Licensed Products, it may go beyond the explicitly enumerated activities of "design, simulation, implementation, manufacture, or sale of Licensed Products." The general catch-all "or otherwise" phrase appearing immediately thereafter must be read as applying only to the class of activities permitted for Licensed Products.[2] The "or otherwise" catch-all permits additional activities that are not encompassed within the specifically enumerated activities of "design, simulation, implementation, manufacture, and sale" of Licensed Products. It does not apply to the wide extent of granting Acacia a completely separate, royalty-free license. Reading it this way would contravene Delaware law. *See In re IAC/InterActive Corp.*, 948 A.2d at 496.

Acacia's interpretation would also re-write the phrase in 3(b) limiting Acacia's right to use Background Information for one purpose -- Licensed Products -- by changing "for the sole and exclusive *purpose*," which is emphatically singular, to "for

---

[2] Acacia may, for example, test Licensed Products incorporating Background Information, market them, advertise them, communicate with customers about them, prepare specifications and product sheets about them, display them at trade shows, or otherwise do things attendant to selling Licensed Products that incorporate ViaSat's Background Information.

the *purposes* of design, simulation . . . and sale of Licensed Products and otherwise in connection with ACACIA's exploitation of the Foreground Information." Acacia's interpretation would re-write "purpose" to be plural when there clearly was one *singular* purpose permitted under Section 3(b), as evident from that purpose being "sole and exclusive." One cannot have sole and exclusive [singular] purpose*s* [plural].

Through Q2 2017, Acacia generated revenues of ███ million selling the Accused Products. ███████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████ The unpaid royalties continue to accrue, and Acacia should be ordered to produce updated sales and profit information to enable the jury to assess the correct amount of contract damages through the date of trial.

Viasat's breach of contract damages are not limited by Section 13 of the License Agreement, as Acacia contends, for several reasons. First, Acacia breached Section 9 of the License Agreement and the NDA, which Section 13 specifically exempt from any limitation of liability. Second, applying Section 13 to limit royalties Viasat could recover under the License Agreement would directly conflict with the provisions of Section 4, which are controlling. Third, Acacia's interpretation of Section 13 is contrary to Delaware law because it is unreasonable, unclear, and contrary to the reasonable expectations of the parties, and because the royalty rate on royalty-bearing products was not difficult to ascertain at the time of contracting.

The key evidence supporting Viasat's breach of contract claim are Viasat's low-level specifications of the SDFEC modules, the drafts and final versions of the low-level specifications of same modules for the Accused Products, the License Agreement and NDA between Acacia and Viasat, the source code of the SDFEC and Accused Products, Acacia's discovery responses, Acacia's financial documents, the e-mail communications produced by Acacia and Viasat, and testimony of Dr. Prakash Chitre, Russell Fuerst, Chandra Raj, Sameep Dave, Dr. Bill Thesling,

Lawrence Esker , Dr. Fan Mo, Ted Gammell, Matt Nimon, Christian Rasmussen, Dr. Gary Martin, Bhupendra Shah, Larry Pellach, Pierre Humblet, Peter Monson, Benny Mikkelsen, Murugesan Shanmugaraj, Dr. Mehmet Aydinlik and expert witnesses Dr. Marwan Hassoun, Dr. Krishna Narayanan, and Dr. Stephen Prowse. Filed concurrently herewith and incorporated herein by reference is the pretrial disclosure required by F.R.C.P. 26(a)(3) which includes a list of expected witnesses, expert witnesses and their qualifications and summary of opinions, proposed trial exhibits and designated deposition testimony in support of all of Viasat's claims and defenses to Acacia's counterclaims.

**B.** **Second Claim: Breach of the Implied Covenant of Good Faith and Fair Dealing.**

Acacia breached the implied covenant of good faith and fair dealing in the License Agreement by improperly using Viasat's Background Information, Licensed Materials, SDFEC Core and trade secrets for purposes other than the development of royalty-bearing products, by falsely denying that it had done so when confronted by Viasat about its backwards compatible products, by falsely representing that ViaSat's Background Information had been safeguarded in restricted directories inaccessible to engineers working on the Accused Products, and by refusing ViaSat's requests for information relating to the development of the Accused Products, and the sales and profits earned by Acacia on those products. Acacia stonewalled Viasat with false claims designed to shield Acacia's improper use of Viasat Background Information, Licensed Materials, trade secrets, and SDFEC Core, and to deprive Viasat of royalties owed under the License Agreement.

Through Q2 2017, Acacia generated revenues of ████████ selling the Accused Products. ██████████████████████████████████████
█████████████████████████████████████████████
█████████ The unpaid royalties continue to accrue.

1    Viasat's damages arising from Acacia's breach of the implied covenant of
2  good faith and fair dealing are not limited by Section 13 of the License Agreement
3  for the same reasons stated above, and because the application of such a limit would
4  be inequitable and allow Acacia to earn a windfall from its repeated willful breaches
5  of the covenant of good faith and fair dealing.

6    The key evidence supporting this claim are Viasat's low-level specifications of
7  the SDFEC Core modules, the drafts and final versions of the low-level
8  specifications for the same modules of the Accused Products, the License
9  Agreement and NDA between Acacia and Viasat, the source code of the SDFEC
10  and Accused Products, Acacia's discovery responses, Acacia's financial documents,
11  the e-mail communications produced by Acacia and Viasat and testimony of Dr.
12  Prakash Chitre, Russell Fuerst, Chandra Raj, Sameep Dave, Dr. Bill Thesling,
13  Lawrence Esker, Dr. Fan Mo, Ted Gammell, Matt Nimon, Christian Rasmussen, Dr.
14  Gary Martin, Bhupendra Shah, Larry Pellach, Pierre Humblet, Peter Monson, Benny
15  Mikkelsen, Murugesan Shanmugaraj, Dr. Mehmet Aydinlik and expert witnesses Dr.
16  Marwan Hassoun, Dr. Krishna Narayanan, and Dr. Stephen Prowse.

17  **C.    Third Claim: Misappropriation of Trade Secrets.**

18    Viasat possesses particular expertise in the field of optical modems and
19  SDFEC development.

20    Viasat developed and owns Trade Secrets[3] in these fields and makes
21  reasonable efforts to protect the confidentiality of these Trade Secrets, including
22  using internal company safeguards and disclosing such Trade Secrets to customers
23  and prospects pursuant to contractual confidentiality agreements.

24

25

26

27
_____
28  [3] Viasat's Trade Secrets are identified with specificity in the Amended Trade Secret
     Identification, attached as Exhibit A hereto.

Viasat disclosed the Trade Secrets to Acacia pursuant to contractual restrictions on their disclosure and use set forth in NDAs, an Interim Agreement, and a License Agreement.

The License Agreement explicitly states that all SDFEC Core IP (including trade secrets) belong to Viasat.

Viasat's Trade Secrets are not generally known in the industry.  Viasat's Trade Secrets possess economic value as a consequence of not being generally known in the industry.

Acacia was contractually prohibited from using, disclosing, or reverse engineering Viasat's Trade Secrets.  Moreover, Viasat's Trade Secrets are not readily ascertainable by reverse engineering.

Use of Viasat's Trade Secrets is necessary for Acacia's Accused Products to obtain backwards-compatibility with Everest products.

Acacia misappropriated Viasat's Trade Secrets by using them to (i) develop the Accused Products and (ii) provide SDFEC-related functionality in the Accused Products.  This conduct is a violation of the use and confidentiality restrictions contained in the License Agreement.  Acacia now admits the Accused Products use at least Trade Secrets No. 1–6.

Acacia's misappropriation of Viasat's Trade Secrets was willful, as evidenced by at least:  (a) Acacia's founders' use of private emails to hide the evidence of providing a lead Acacia engineer with access to Viasat confidential SDFEC information; (b) Acacia's failure to apprise any engineers of the contractual restrictions on Acacia's use of Viasat's SDFEC Core, Licensed Materials, and Background Information; (c) Mr. Bhupen Shah's decision to (wrongfully) instruct Acacia engineers to treat the SDFEC Core, Licensed Materials, and Background Information as Acacia's IP, and his instruction to copy them to whatever extent those engineers felt appropriate; (d) Acacia's false claims that it had segregated Viasat's confidential information in secure directories, when in fact there were no

such restrictions on Acacia employees' access to that information; (e) Acacia's copying of Viasat's SDFEC module low-level specification; (f) Acacia's copying of Viasat source code from the SDFEC encoder; (g) Acacia's false statements of independent development; (h) Acacia's ruse of promising a new development agreement to Viasat in order to pump Viasat for additional technical information; (i) Acacia's attempt to poach Viasat's key engineers responsible for the creation of the SDFEC Core, Licensed Materials and Background Information; (j) Acacia's false denials of use of Viasat Confidential Information in sworn deposition testimony and discovery responses; and (k) Acacia's willful concealment from Viasat of the fact that it was developing backwards compatible modes in unlicensed products.

Under the California Uniform Trade Secrets Act, Viasat is entitled to recover damages measured by its actual loss and/or Acacia's unjust enrichment. Through Q2 2017, Acacia generated revenues of █████████ selling the Accused Products. ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████

Viasat's trade secret damages are not limited by Section 13 of the License Agreement, as Acacia contends, for several reasons. First, Acacia breached Section 9 of the License Agreement and the NDA, which Section 13 specifically exempt from any limitation of liability. Second, as a matter of law, a party cannot contractually limit their future liability for intentional torts. Third, Acacia's interpretation of Section 13 is contrary to Delaware law because it is unreasonable, unclear, and contrary to the reasonable expectations of the parties, and because it would result in a measure of damages bearing no reasonable relationship to the actual harm caused by Acacia's misappropriation.

Under the California Uniform Trade Secrets Act, for Acacia's willful misappropriation, Viasat may recover exemplary damages up to two times its actual damages, and its attorneys' fees. Cal. Civ. Code §§ 3426.3, 3426.4.

The key evidence supporting this claim are Viasat's low-level specifications of the SDFEC Core modules, the drafts and final versions of the low-level specifications for the same modules of the Accused Products, the License Agreement and NDA between Acacia and Viasat, the source code of the SDFEC and Accused Products, the pre-litigation letters sent between Viasat and Acacia, Acacia's discovery responses, Acacia's financial documents, the e-mail communications produced by Acacia and Viasat and the testimony of Dr. Prakash Chitre, Russell Fuerst, Chandra Raj, Sameep Dave, Dr. Bill Thesling, Lawrence Esker, Dr. Fan Mo, Ted Gammell, Matt Nimon, Christian Rasmussen, Dr. Gary Martin, Bhupendra Shah, Larry Pellach, Pierre Humblet, Peter Monson, Benny Mikkelsen, Murugesan Shanmugaraj, Dr. Mehmet Aydinlik and expert witnesses Dr. Marwan Hassoun, Dr. Krishna Narayanan, and Dr. Stephen Prowse.

## D. ViaSat's Disclosure Pursuant to Local Rule 16.1(f)(3)(c) Regarding Breach of Contract Claim.

Viasat claims for Breach of Contract are based on written agreements between Acacia and Viasat.

Acacia breached Section 8 of the License Agreement. Section 8(a) provides that:

> [A]ll Intellectual Property Rights in the Background Information and the Licensed Materials are and will remain the sole property of VIASAT, including all modifications, improvements, and derivative works relating to the Background Information and Licensed Materials, including but not limited to all modifications, improvements, and derivative works requested or suggested by ACACIA.

Consistent with this, Acacia agreed in Section 8(b) that it would not:

> decompile, reverse engineer, disassemble, or otherwise reduce any Background Information and/or Licensed Materials it receives from VIASAT under this Agreement to a human-perceivable form . . . Acacia may not modify or prepare derivative works of any Background Information and/or Licensed Materials it receives from VIASAT under this Agreement in whole or in part, except with respect to the purposes of the Licensed Products. . . . ACACIA acknowledges that any Background Information and/or Licensed

Materials it receives from VIASAT under this Agreement represents valuable property of VIASAT . . . .

The License Agreement expressly defines Background Information and Licensed Materials to include the SDFEC Core owned by Viasat. Acacia breached Section 8(b) by using Background Information and/or Licensed Materials for purposes other than the Licensed Products. Acacia used SDFEC Core technology owned by Viasat in the Sky, Denali and Meru Accused Products and refuses to pay royalties for such use.

Acacia also breached Section 4(a) of the License Agreement which prohibits using Licensed Materials (including the SDFEC Core) for products other than Licensed Products. Acacia breached Section 4(b) of the License Agreement by using Licensed Materials (including the SDFEC Core) for products on which it did not pay royalties. Acacia uses SDFEC Core technology owned by Viasat in the Sky, Denali and Meru Accused Products and refuses to pay royalties for such use.

Acacia also breached Section 9 of the License Agreement, which incorporates the obligations of the NDA, by its unauthorized use and disclosure of Viasat's Confidential Information. The written NDA dated June 10, 2009 between Viasat and Acacia prohibits Acacia from disclosing Confidential Information even to Acacia's own employees, except on a need-to-know basis: "The Receiving Party will make Confidential Information available only to those of its employees, consultants and contractors having a need to know and solely

for the Purpose of this Agreement . . . ." NDA at § 4(b). Section 9 of the License Agreement incorporates this restriction from the NDA. License Agreement at § 9.

Viasat has calculated its breach of contract damages using Acacia's MD&A Data Book worksheets produced by Acacia, and the royalty fee per instantiation in Section 4(b) of the License Agreement, multiplying the number of instantiations in the Accused Products sold by Acacia by the contract royalty rate of ▮ per instantiation. For the Acacia Sky and Meru modules, as well as Sky and Meru ASICs

there is one instantiation of the SDFEC technology per unit. For the Acacia Denali-based ASIC and module products there are two instantiations of the SDFEC technology per unit. Therefore, the number of Sky and Meru ASICS and modules is multiplied by the royalty rate of ████ ████████████████████████████████
████████████████████████████████████████

Between 2014 and Q2 2017 Acacia sold ██████████ of its Sky module and ██████ units of its Sky ASIC products. ████████████████████████████████ ████████████████████████████████████ Between 2014 and Q2 2017 Acacia sold ██████ units of it Denali module and ██████ units of its Denali ASIC. ██████████████████████████████████████████████ ████████████████ Between 2014 and Q2 2017 Acacia sold ████ units of its Meru module and ████ units of its Meru ASIC. ████████████████████████████ ████████████████████████████████████. In total Acacia owes royalties of ████████ for its sale of the Sky, Denali and Meru products through Q2 2017. Acacia owes additional royalties on sales since Q2 2017, but Acacia has failed to produce any documents or information regarding those sales, despite request from Viasat.

The License Agreement also stipulates that Royalties not paid within 30 days are subject to a late payment fee of 1.5% per month. Acacia has incurred late fees of ████████ in late fees through the end of Q2 2017, making the total amount then owed by Acacia under the breach of contract claim ████████ This damage calculation will be updated once Acacia produces updated financial information reflecting additional sales after Q2 2017.

### III. VIASAT'S RESPONSE AND AFFIRMATIVE DEFENSES TO ACACIA'S COUNTERCLAIMS

The information Acacia has identified as its alleged Trade Secrets and alleged "Foreground Information" contained in Viasat's provisional patent applications are

common formulas and basic concepts in digital signal processing, well-known in the industry long before Acacia contends it developed the information.

Acacia's alleged Trade Secrets are not secret and do not have economic value because they are secret. Furthermore, Acacia has not made reasonable efforts to keep its alleged Trade Secrets secret.

Viasat has not misappropriated any of Acacia's alleged Trade Secrets because they are not trade secrets and because Viasat has not improperly acquired, used, or disclosed the alleged Trade Secrets.

Viasat has not breached the License Agreement because none of Acacia's alleged Trade Secrets constitute Foreground Information. Put differently, Acacia does not own any of its alleged trade secrets. To the extent that these technologies could conceivably be considered protectable trade secrets or patentable inventions, they are owned by Viasat.

Acacia has not shown that any issued claim from any Viasat patent incorporates any of its alleged Trade Secrets or any "Foreground Information."

Acacia published its alleged Trade Secrets in its own patent applications and other documents, thus destroying their status as alleged Trade Secrets and precluding any damages for alleged breach of any confidentiality clause relating to the information.

Acacia's damages claims are based on Viasat's alleged uses of the purported Acacia Trade Secrets where those alleged uses post-date Acacia's own publication of the purported Trade Secrets in a public patent filing.

Viasat's employees Fan Mo and Sameep Dave do not believe the Acacia patents, for which Acacia identified them as co-inventors, contain any novel, non-obvious inventions. Thus, Fan Mo and Sameep Dave could not truthfully sign an inventor's oath claiming to be the "first" to invent the claimed inventions. Fan Mo and Sameep Dave were not obligated to participate with Acacia in any patent prosecution activities related to Acacia patents.

Viasat had no obligation to participate with Acacia in the prosecution of Acacia patents which did not contain any novel, non-obvious inventions.

Acacia's prosecution of its patents was not blocked by Viasat, Fan Mo or Sameep Dave.  Acacia thus suffered no injury as a result of Fan Mo and Sameep Dave not signing assignments of patent rights.

The assignment provisions of the License Agreement relating to Foreground Information do not obligate Viasat, Fan Mo or Sameep Dave to participate in prosecution of U.S. patent applications or to assign non-existent patent rights.

Viasat has not licensed any patents purportedly containing any Acacia Trade Secret.

Viasat did not breach any obligation to assist Acacia in perfecting any rights in Foreground Information.

Acacia has not identified any damages resulting from the lack of patent assignments from Fan Mo or Sameep Dave.

Viasat denies that Acacia has been damaged by any alleged breach of contract or any alleged misappropriation of Trade Secrets.  Viasat further denies that it has been unjustly enriched by any alleged use of Acacia's alleged Trade Secrets.  If Acacia were to prevail on its claim for misappropriation of trade secrets, its recoverable damages would be less than ███████.

Viasat has pled and will pursue the following affirmative defenses.

**A.    First Affirmative Defense:**  Acacia's counterclaims fail to state a claim on which relief can be granted.  35 U.S.C. §1, *et. seq.*, does not provide for any claim of patent misappropriation.

**B.    Second Affirmative Defense:**  Acacia's counterclaims are barred by the doctrine of unclean hands.  Acacia engaged in false and deceptive conduct in copying Viasat's Confidential Information, secretly sharing Viasat's Confidential Information using private email accounts and removable memory sticks in an effort to avoid detection, responded to inquiries from Viasat with false statements of

1    independent development, fraudulently pumped Viasat for technical information

2    under false pretenses of a potential second development agreement, and provided

3    false discovery responses regarding use of Viasat Confidential Information,

4    Background Information, Licensed Materials, and Trade Secrets.

5    **C.**    **Third Affirmative Defense:** Acacia's counterclaims are barred by the

6    doctrine of laches. At no time before Acacia was sued did Acacia ever bring claims

7    based on Viasat's purported use of Acacia Foreground Information, or Viasat's

8    patenting of technologies purportedly based on that Foreground Information. By

9    not raising these concerns sooner, Acacia lulled Viasat into a sense of security with

10    respect to its patent applications and its refusal to provide inventor assignments to

11    Acacia. Acacia only raised these issues in counterclaims years later, after Viasat had

12    relied to its detriment on the state of affairs left unchallenged by Acacia at the time

13    of the events.

14    **D.**    **Fourth Affirmative Defense**: Acacia's first claim for relief for

15    misappropriation is barred by the three-year statute of limitations. The statute of

16    limitation for misappropriation is three years. Cal. Civil Code §3426.6. The Viasat

17    patent applications that supposedly contain the misappropriated information were

18    published on July 26, 2012. The statute of limitation thus ran no later than July 26,

19    2015. Viasat filed this lawsuit on January 21, 2016, and Acacia's counterclaims for

20    patent misappropriation, filed on February 19, 2016, are therefore time-barred.

21      Acacia's second through sixth claims for relief for breach of contract are

22    barred by the three-year statute of limitations. The License Agreement provides that

23    Delaware law governs. The statute of limitation for breach of contract in Delaware is

24    three years. Del. Code Title 10 §8106. California law is clear that where the

25    contracting entities are incorporated in Delaware, a Delaware choice of law

26    provision, including the Delaware statute of limitation, is enforceable. *Hambrecht &*

27    *Quist Venture Partners v. American Medical Internat., Inc.*, 38 Cal.App.4th 1532 (1995).

28    The Viasat patent applications, that supposedly forms the basis for the breach of

contract asserted in claim two, four, five and six, were published on July 26, 2012. The statute of limitation for breach of contract for these claims accrued no later than July 26, 2012 and thus ran no later than July 26, 2015. Viasat filed this lawsuit on January 21, 2016, and Acacia's counterclaims for breach of contract asserted in claim two, four, five and six, filed on February 19, 2016, are therefore time-barred.

Acacia's third claim for relief for breach of contract for failure to assist in assigning rights in the Acacia patents accrued no later than May 22, 2012 when Acacia filed a petition with the Patent and Trademark office seeking permission to proceed with the prosecution of its patent applications without the assignment of Mo and Dave. The statute of limitation for breach of contract for Acacia's claim three thus ran no later than May 22, 2015. Viasat filed this lawsuit on January 21, 2016, and Acacia's counterclaims for breach of contract for failure to assign, filed on February 19, 2016, are therefore time-barred.

**E.      Fifth Affirmative Defense:** Acacia's counterclaims for breach of contract are barred in whole or in part by Acacia's breach of contract, which discharged Viasat's obligations thereunder. The key evidence supporting Viasat's defenses are Viasat's low-level specifications of the SDFEC modules, the drafts and final versions of the low-level specifications of same modules for the Accused Products, the License Agreement and NDA between Acacia and Viasat, the source code of the SDFEC and Accused Products, Acacia's discovery responses, Acacia's and Viasat's financial documents, the e-mail communications produced by Acacia and Viasat, prior art indicating Acacia's trade secrets are well known concepts, Acacia's published patent applications, and testimony of Dr. Prakash Chitre, Russell Fuerst, Chandra Raj, Sameep Dave, Dr. Bill Thesling, Lawrence Esker , Dr. Fan Mo, Ted Gammell, Matt Nimon, Christian Rasmussen, Dr. Gary Martin, Bhupendra Shah, Larry Pellach, Pierre Humblet, Peter Monson, Benny Mikkelsen, Murugesan Shanmugaraj, Dr. Mehmet Aydinlik and expert witnesses Dr. Marwan Hassoun, Dr. Krishna Narayanan, Dr. Stephen Prowse and Dr. Ivan Djordjevic. Filed concurrently

herewith and incorporated herein by reference is the pretrial disclosure required by F.R.C.P. 26(a)(3), which includes a list of expected witnesses, expert witnesses and their qualifications and summary of opinions, proposed trial exhibits and designated deposition testimony in support of all of Viasat's claims and defenses to Acacia's counterclaims.

## IV.   ANTICIPATED EVIDENTIARY ISSUES

Viasat identifies the following evidentiary issues and its positions on those issues.

### 1.   Evidence of Viasat's Patent Applications Is Irrelevant and Will Confuse the Jury

Acacia seeks to compare figures from the specification of Viasat provisional patent applications with figures from Exhibit C to the License Agreement in an effort to claim Acacia's ownership over Viasat's patents. This evidence is irrelevant and has the potential to confuse the jury. In addition to the fact that ownership of patent rights is a dispute resolved in state court, the scope of a patent is defined not by the figures in the specification, but by the language of the claims at the end of the patent. Patent specifications and figures frequently contain information that is not contained or claimed in the patent claims. Moreover, provisional patent applications contain no claims.  It is not enough to show that the specifications contain similar figures. Because the legally-construed claims of the Viasat patent family have never been compared to Acacia's trade secrets, and because Viasat's provisional patent applications do not even contain claims, comparing figures from Exhibit C of the License Agreement to figures in the specifications of the  provisional patent applications or specifications of issued Viasat patents is a legally irrelevant exercise, destined to mislead and confuse the jury.

In addition, Acacia fails to tie any damages claim to the comparison of figures in Viasat patent applications and figures from Exhibit C to the License Agreement. Viasat has not licensed any of its patents. Nor has Acacia indicated how it suffered

Plaintiff Viasat, Inc.'s Memorandum of Contentions of Fact and Law

any monetary harm from the inclusion of any of the figures in question in the Viasat provisional patent specifications. Acacia's damages expert offered no opinion on how the alleged inclusion of Foreground Information in a Viasat patent specification damaged Acacia.

### 2. Acacia's Counterclaims for Breach of Contract 2-6 Are Unsupported by Damage Evidence and Will Confuse the Jury

Acacia counterclaims 2-6 assert various claims for breach of contract. A necessary element for any breach of contract claim is damages proximately caused by the breach. Acacia fails to provide any evidence that it suffered any damage from the alleged breach in any of these claims for relief. Thus, presenting these claims to the jury will result in confusion and waste of time.

Acacia's breach of contract regarding Foreground Information suffers the same flaw as noted above—alleged inclusion of Foreground Information in a patent specification does not necessarily mean the patent **claims** include or depend upon Foreground Information. Acacia failed to compare legally-construed claims to the Foreground Information. Acacia therefore has no basis to argue any Viasat patent should be assigned to Acacia. Nor did Acacia provide any evidence on how any alleged inclusion of Foreground Information in a patent specification is necessary to any of Viasat's patent claims. Acacia's damages expert offers no opinion on how the alleged inclusion of Foreground Information in a Viasat patent specification damaged Acacia.

Acacia's breach of contract regarding Alleged Failure to Assist in Assigning Foreground Information fails to identify any damages or injury suffered as a result of Viasat's refusal to participate in Acacia's prosecution of its patent applications. Acacia's prosecution of the patents has not been blocked, nor has Acacia offered any evidence that it has suffered damages as a result of the alleged lack of assignment. Acacia's breach of contract regarding Alleged Failure to Provide or Disclose Foreground Information also makes no sense since the claim is based on

information disclosed to Acacia in Exhibit C of the License Agreement. Obviously the Foreground Information **was disclosed** to Acacia, since the claim is based on alleged Foreground Information forth in Exhibit C to the parties' License Agreement. Viasat cannot breach the License Agreement for allegedly failing to disclose Foreground Information that Acacia's own claim states is included in an Exhibit to the License Agreement. But, as with the patent misappropriation claim above, since there is no analysis of the Viasat patent **claims**, there is no showing that the **claims** include Foreground Information. Acacia fails to identify any evidence of damage or injury from the alleged inclusion of Foreground Information in the Viasat patent specifications. Acacia's damages expert offered no opinion on how the alleged failure to provide or disclose Foreground Information damaged Acacia.

Acacia's breach of contract regarding Alleged Breach of Confidentiality identifies no evidence of damages from Viasat's inclusion of alleged Foreground Information in Viasat's patent specification. Acacia's damages expert offered no opinion on how the alleged inclusion of Foreground Information in a Viasat patent specification damaged Acacia. Acacia's own provisional patent applications published the same information, thus making the information public. There is no analysis or evidence showing how the publication of Viasat patent application caused Acacia any injury.

### 3. Acacia's Trade Secret Misappropriation Damages Evidence Fails to Correspond to the Claims for Relief, Is Irrelevant and Will Confuse the Jury

Acacia alleges that Viasat impermissibly used Acacia's trade secrets by filing patent applications and by incorporating those trade secrets into Viasat products and services covered by Viasat patents. *See* Acacia Answer and Counterclaim ¶ 80. To establish this contention, the claims of the Viasat patents must first be construed by the Court and then compared to (1) the alleged Acacia trade secrets and (2) the Viasat products and services. Acacia never performed this necessary analysis.

Acacia never asked the Court to construe the claims of the Viasat patents. Acacia's technical expert offered no opinion on the claims of the Viasat patents and never compared the claims to Acacia's trade secrets or Viasat's products.

In addition, the Viasat products upon which Acacia's expert computed his damages were developed and sold long after Acacia published the alleged Acacia trade secrets in its own patent applications. Acacia filed provisional patent applications containing all of the claimed trade secrets on March 7, 2011. The Acacia patent applications containing these trade secrets were published on September 13, 2012. Yet Acacia's damages expert relied on revenues Viasat earned long after Acacia had already published its own alleged trade secrets to the world. Acacia failed to provide any evidence how Viasat misappropriated trade secrets in products it developed years after Acacia had already disclosed those secrets in its own patent filings.

### 4. Acacia's Evidence of Supposed Independent Development of IP Contained in the SDFEC Core Is Irrelevant and Will Confuse the Jury.

Acacia seeks to offer testimony that its own engineers were the source of some of the information identified as Viasat Trade Secrets or which is otherwise included in the SDFEC Core. This testimony will confuse the jury and any such evidence is irrelevant because the contractual terms of the License Agreement provide that Viasat owns all the IP in the SDFEC Core regardless of whether it was suggested by Acacia's engineers. Section 8(a) of the License Agreement provides that Viasat owns all intellectual property rights in the SDFEC Core, regardless of who created them: "all Intellectual Property Rights in the Background Information and the Licensed Materials are and will remain the sole property of VIASAT, including all modifications, improvements, and derivative works relating to the Background Information and Licensed Materials, including but not limited to all

modifications, improvements, and derivative works requested or suggested by ACACIA."

### 5. Evidence Related to Acacia's Newly Minted, Unpled, Breach of Contract Claims is Inadmissible and Will Mislead the Jury.

Acacia has suggested in deposition that ViaSat allegedly violated a six-month covenant not to compete in the 100 Gbps market by working on a project in the 40 Gbps market segment. Acacia has not pled any breach of contract claim based on this supposed breach, so it is irrelevant to any issue in the case, and would be used by Acacia solely to attempt to prejudice ViaSat in the eyes of the jury. Any claim for breach of contract based on ViaSat supposedly violating the non-compete would be meritless, as it is undisputed that the project at issue, Project Polo, was a 40 Gbps product, which is not covered by the terms of the non-compete. Moreover, any such claim for breach of conduct is time-barred in any event, since Acacia learned of the supposed breach in March 2010, but has still not filed suit against Viasat for this conduct.[4]

### 6. Contract Negotiation Evidence Is Inadmissible to Contradict the Terms of the Parties' Written Contract Regarding Agreed Royalty Terms.

Acacia has argued in summary judgment briefing that ViaSat's royalty-based damages reflect a "windfall" because Viasat's pre-agreement negotiations expressed a willingness to consider a fully paid up development fee, rather than royalty-based compensation. Such evidence is irrelevant and will confuse the jury in light of the parties' actual agreement to share in the risk and reward of Acacia's products through an agreed royalty-based compensation agreement. The agreed-upon royalty

---

[4] Even if the Court were to find that Acacia successfully pleaded a cause of action for violation of the contractual non-compete with its counterclaims in Feb. 19, 2016, the cause of action would still be time-barred.

amount cannot be usurped with pre-contract evidence of alternative negotiating positions that were not adopted in the final written agreement.

**7.    Testimony Elicited Using an Incomplete and Misleading Exhibit Is Inadmissible and Will Mislead the Jury.**

Acacia questioned Viasat witnesses using an altered document, Exhibit 322. Acacia failed to include a sequential page of the document;[5] an attachment that specifically addressed the topics upon which the Viasat witnesses were being questioned. When confronted with having used an incomplete and misleading exhibit, Acacia's counsel provided no explanation for the conduct. All testimony elicited from Viasat witnesses relating to Exhibit 322 should be excluded.

**8.    Damage Theories Based on "lock out" or Non-Use of Backward-Compatibility in the Accused Products are Inadmissible, Lack Evidentiary Support, and Will Mislead the Jury.**

Acacia argued for the first time in a rebuttal damages report that, based on oral interviews with Acacia employees, a certain percentage of Acacia's customers did not use, or where "locked out" of, the technology enabling backwards compatibility with Everest products. These contentions should be excluded as Acacia never produced evidence of such a "lock out." Acacia's damages expert claimed at his deposition that Acacia had promised him data to support this contention, but no such data has been provided to the expert or to Viasat. Viasat was precluded from conducting discovery to challenge this new theory, it was not supported by evidence produced in the litigation and should thus be excluded.

---

[5] The document at issue contained only four pages, bearing Bates Numbers Viasat002582-Viasat002585. Exhibit 322 is missing the document bearing Bates Number Viasat0258**3**. The material on the page labelled Viasat002583 is directly relevant to the topics on which the Viasat witnesses were being questioned.

**9. Evidence of Acacia's Collateral Litigation Against Viasat is Irrelevant, Unduly Time Consuming, and Will Mislead the Jury.**

Acacia has initiated collateral litigation against Viasat in Massachusetts state court. Evidence of this litigation and its claims should be excluded from trial as it is irrelevant, unduly time consuming and will mislead the jury.

**10. Evidence of Narrowing of Issues Before Trial is Irrelevant, Unduly Time Consuming, and Will Mislead the Jury.**

During the course of litigating this case, Viasat has narrowed the scope of its trade secret claims against Acacia. Evidence of narrowing of claims, or previously asserted claims that are no longer at issue should be excluded from trial. Prior claims no longer at issue are irrelevant, unduly time consuming and will mislead the jury.

**11. Acacia's Retained Expert Witnesses Have Offered Opinions that Are Inadmissible Under Federal Rule of Evidence 702 and *Daubert***

Acacia's experts have offered opinions on legal issues, opinions that contradict the incontrovertible facts, "opinions" that merely lip sync the testimony of fact witnesses, and opinions that apply the wrong legal standard. These opinions are inadmissible under Rule 702 and *Daubert* for the reasons stated in Viasat's Motion to Exclude Expert Testimony, Docket No. 95.

**V. LEGAL CONTENTIONS AND ANTICIPATED ISSUES OF LAW**

Viasat identifies the following issues of law and its positions on those issues.

**1. The License Agreement Defines Ownership of the IP in the SDFEC Core, Regardless of Who Contributed to the IP.**

The License Agreement specifies that all intellectual property in the SDFEC Core belongs to Viasat. The License Agreement defines Background Information to include the SDFEC Core, including all technical data, manuals and other documentation and data related thereto. The License Agreement defines Licensed Materials to include the SDFEC Core provided to Acacia in whatever form

provided, including all changes, additions, revisions, manuals and documentation. The License Agreement specifies that Viasat owns all intellectual property rights in Background Information and Licensed Materials including all modifications, improvements and derivative works requested or suggested by Acacia.

Acacia's contention that it was the source of certain aspects of the SDFEC Core is legally irrelevant, in light of the contractual provisions giving Viasat ownership over all IP in the SDFEC Core.

**2.     Viasat's Damages Claims Are Not Limited by the Limitation of Liability Clause of the License Agreement.**

The Limitation of Liability Clause of the License Agreement does not preclude or limit Viasat from recovering damages for Acacia's breach of the NDA or breach of Section 9 of the License Agreement.  Section 13 of the License Agreement does not apply to Viasat's claims because it expressly excludes breaches of Section 9 and breaches of the NDA.  That is, in fact, the very first line of Section 13: " EXCEPT FOR BREACHES OF CLAUSE 9 (CONFIDENTIALITY) OR THE NDA . . . . " Ex. 2 § 13.

The Limitation of Liability Clause of the License Agreement does not preclude or limit Viasat from recovering unpaid royalty amounts from Acacia's use of Background Information and Licensed Materials for un-licensed Accused Products.  The Limitation of Liability Clause of the License Agreement does not limit or preclude Viasat from recovering Acacia's unjust enrichment arising from its intentional tort of trade secret misappropriation.  Under Delaware law, a party cannot contractually limit liability for intentional torts.  *Data Mgmt. Internationalé, Inc. v. Saraga*, 2007 WL 2142848, *4 (Del. Sup. Ct. July 25, 2007). ("[T]he exculpatory clause will not eliminate liability for an intentional tort.") (citing Restatement (Second) of Contracts § 195 ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.")); *J.A. Jones Constr. Co. v. Dover*, 372 A.2d 540, 545 (Del. Sup. Ct. 1977)

("A party may not protect itself against liability for its own fraudulent act or bad faith."); *Delphi Petroleum v. Magellan Terminals Holdings, L.P.*, 2015 WL 3885947, *24 (Del. Sup. Ct. June 23, 2015) ("It is undisputed that parties cannot absolve themselves for their own conduct amounting to fraud. However, as to claims that fall somewhere short of fraud, such as claims for bad faith [breach of contract], the Court must undergo a factual analysis that is premature on summary judgment."). Misappropriation of trade secrets is an intentional tort. *02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1091 (N.D. Cal. 2006). California law also will not enforce a limitation of liability for intentional torts. *See Embotelladora Electropura S.A. de C.V. v. Accutek Packaging Equip. Co.*, 2017 WL 3288492, *4-6 (S.D. Cal. Aug. 2, 2017); *Health Net of Cal., Inc. v. Dept. of Health Servs.* 113 Cal. App. 4th 224, 233 (2003); Cal. Civ. Code § 1668. Section 13 of the License Agreement therefore cannot limit Acacia's liability for misappropriation.

## 3. Viasat's Trade Secrets Satisfy the Definition of Trade Secrets under California's Trade Secret Act.

The issue of whether information constitutes a trade secret is a question of fact. *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 300-301 (2002). Whether information is secret is "a relative concept and requires a fact-intensive analysis." *Premier Displays & Exhibits v. Cogswell*, 2009 WL 8623588 at *3 (C.D. Cal. Dec. 23, 2009) (citing *DVD Copy Control Ass'n Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004)). The parties' treatment of the information prior to the litigation is relevant. *See Data General Corp. v. Digital Computer Controls, Inc.* 297 A. 2d 437 (Del. 1972) (degree of dissemination and sufficiency of efforts to protect secrets are material to issue of secrecy and preclude summary judgment). The evidence will show that Viasat made substantial efforts to protect the confidentiality of its Trade Secrets including restricting employee access, encrypting confidential data, marking internal and external documents with confidentiality legends, and requiring that employees, potential customers, and business partners sign non-disclosure agreements. Viasat's

low-level specifications containing the Trade Secrets were marked on every page with a legend indicating: "Viasat Proprietary—Use or disclosure is governed by the statement of the title page of this document." *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011) (proprietary legends on documents or confidentiality agreements are common factors in determining secrecy).

California's version of the UTSA does not require absolute secrecy, only "efforts that are reasonable under the circumstances to maintain secrecy." Cal. Civ. Code § 3426.1(d)(2). *See also Data General Corp. v. Digital Computer Controls, supra.* (absolute secrecy not required under Delaware law; degree of dissemination is factual issue precluding summary judgment). What is "reasonable under the circumstances" is a fact-intensive inquiry that is rarely appropriate on summary judgment. *See Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*, 2009 WL 10671420, at *4 (C.D. Cal. May 22, 2009) (citing *AT&T Comm'ns of Cal., Inc. v. Pacific Bell*, 2000 WL 1277937, at *2 (9th Cir. Sept. 8, 2000)); *Syncsort Inc. v. Innovative Routines, Int'l , Inc.*, 2011 WL 3651331 (D. N.J. Aug. 18, 2011) (holding trade secret status not destroyed where public disclosure is "sufficiently obscure or transient or otherwise limited" so that it was not made "generally known to the relevant people."); *DVD Copy Control Ass'n Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004); *Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, 2008 WL 166950, *45 (N.D. Cal. Jan. 17, 2008) (court concluded that posts on the Chinese website did not destroy the secrecy of the information at issue because there was "no evidence, that these postings were 'generally known to the relevant people.'") (quoting *DVD Copy Control*).

Acacia's treatment of the Viasat trade secrets prior to the litigation is also material to the issue of secrecy and lack of general knowledge in the industry. *See Telerate Systems, Inc., v. Caro* 689 F. Supp. 221, 232 (S.D.N.Y. 1988) ("Caro's steadfast denials of knowledge of the secrecy of the STP is curious when it is considered that the document he authored for Telerate, which describes in detail the STP, bears a legend that the information therein contained is proprietary in nature and may not

be reproduced without the express consent of Telerate."); *Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp*, 401 F. Supp. 1102, 1116 (E.D. Mich. 1975) ("Confidentiality of information can be determined from the manner in which defendants themselves treated the information prior to the litigation."). After Acacia copied the trade secrets from Viasat's confidential documents, Acacia then added a legend of its own to its documents, reading: "The data contained herein is considered confidential and proprietary. Any dissemination of the data contained herein without the explicit permission from Acacia Communications Inc. is strictly prohibited."

The use of improper means to acquire the trade secrets is also evidence of their confidentiality. *Digital Development Corp. v. International Memory Systems*, 185 U.S.P.Q. 136 at 141, (S.D. Cal. 1973). Here, an Acacia co-founder purposefully used a non-Acacia email account to transmit Viasat's confidential Background Information to the private email account of another co-founder, with instructions to deliver the Confidential Information to an Acacia engineer on a USB stick, explaining █████████████████████████████████████████████████ █████████████████ This e-mail exchange reflects Acacia's knowledge that the information was confidential, and that Acacia needed to conceal its illicit use of the information.

**4.    A Trade Secret May be Comprised of Partly or Entirely Non-Secret Elements and Still Merit Protection.**

Acacia contends that because some attributes of the claimed Viasat trade secrets were known in the industry, the combination of those attributes with other characteristics and components do not qualify for trade secret protection. California law provides otherwise. *Altavion, Inc. v. Konica Minolta Systems Laboratory Inc.*, 226 Cal. App. 4th 26, 48 (2014) ("Altavion's implementation of DST was potentially protectable as a "combination of characteristics and components" regardless of whether particular design concepts separately qualified for protection as trade

Plaintiff Viasat, Inc.'s Memorandum of Contentions of Fact and Law

secrets"); *O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.,* 420 F. Supp.2d 1070, 1089–90 (N.D. Cal. 2006); *see also UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.,* 617 F. Supp. 2d 938, 942 (N.D. Cal. 2007). "[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *3M v. Pribyl,* 259 F.3d 587, 595-96 (7th Cir. 2001); *see also SkinMedica, Inc. v. Histogen Inc.,* 869 F. Supp. 2d 1176, 1194 (S.D. Cal. 2012) ("A trade secret may [be] comprised of partly or entirely non-secret elements and still merit protection."); Restatement (Third) of Unfair Competition § 39 Comment f (1995). Disclosing only general design concepts and not underlying design details does not preclude a finding of secrecy. *Altavion, Inc. v. Konica Minolta Systems Laboratory Inc.* 226 Cal. App. 4th 26, 58-59 (2014).

5. **Acacia's Contention that Viasat's Trade Secret 2 Could Be Readily Ascertained by Reverse Engineering Conflicts with Contractual Prohibitions Against Reverse Engineering, and is Contrary to California's Trade Secret Definition.**

Acacia contends Viasat's Trade Secret 2 could be readily ascertained by reverse engineering. However, the License Agreement at § 8(b) expressly prohibits Acacia from reverse engineering the Viasat SDFEC. It is well established that reverse engineering in breach of a contract is an improper means of obtaining trade secrets. 1 Milgrim, supra, ¶ 1.05[5] at p. 1-244. Indeed, the California UTSA and Delaware UTSA specifically define acquisition of trade secrets in breach of an agreement as improper. Cal. Civ. Code § 3426.1(a); 6 Del.C. § 2001(1); *Beard Research, Inc. v. Kates,* 8 A.3d 573 (Del. 2010). Accordingly, numerous courts have held that reverse engineering is an improper means where it is accompanied by a breach of a license, or other improper conduct. *See, e.g., DSC Communications Corp. v.*

*Pulse Communications, Inc.* 170 F.3d 1354, 1364-65 (Fed. Cir. 1999); *Alcatel USA, Inc. v. DGI Techs.*, 166 F.3d 772, 784-86 (5th Cir. 1999).

Moreover, California adopted the UTSA definition of trade secrets that does not limit trade secrets to information that cannot be readily ascertained by reverse engineering. *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 21 (1991) ("In short, our Legislature chose to exclude from the definition only that information which the industry already knows, as opposed to that which the industry could easily discover. **Therefore, under California law, information can be a trade secret even though it is readily ascertainable, so long as it has not yet been ascertained by others in the industry**") (emphasis added). *See also* Milgrim on Trade Secrets § 15.01 ("The fact that a matter may be susceptible of independent development or reverse engineering does not thereby make it 'generally known' or 'readily ascertainable by proper means.' It is actual, not theoretical, independent development or reverse engineering that serves as a defense."). Acacia does not identify anyone in the industry that has reverse engineered Viasat's Trade Secret 2.

**6.     Acacia Fails To Present A Basis For Federal Court Jurisdiction.**

Title 35, Acacia's sole purported source of authority for its claim for patent misappropriation, does not create a federal cause of action for equitable ownership of patents. Where, as here, a claim to patent rights is based on contract, the claimant must seek a remedy under state law. *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580 (Fed. Cir. 1991). The "preliminary question of equitable ownership is not a federal question." *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580 (Fed. Cir. 1991); *see also Board of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841 (Fed. Cir. 2009), *aff'd*, 563 U.S. 776 (2011) ("The question of ownership of patent rights is typically a question resolved by state courts under state law."); *Gellman v. Telular Corp.*, No. 07282, 2010 WL 5173213, at *4 (E.D. Tex. Dec. 14, 2010), *aff'd*, 449 F. App'x 941 (Fed. Cir. 2011).

Acacia cannot rely upon the patent laws to obtain the solely equitable relief it seeks: transfer of property. Where, as here, "there is no diversity jurisdiction and plaintiff's equitable title to the patent must be established solely by the application of equitable principles, the case is not one arising under the patent laws, and the District Court is without jurisdiction of the claim for infringement until and unless plaintiff's claim of equitable ownership is first adjudged valid by a court having jurisdiction of that question." *Arachnid*, 939 F.2d at 1580 (quoting *Papazian v. Am. Steel & Wire Co. of N. J.*, 155 F. Supp. 111, 117 (N.D. Ohio 1957)). In this action, of course, Acacia is not asserting claims of infringement, but only seeks a judgment requiring replevin of the "ViaSat Patent Family," as well as damages for their allegedly wrongful disclosure. But those are state law claims, not Federal claims. Because the non-existent claim for patent misappropriation is Acacia's sole basis for federal court jurisdiction over this matter, the case should be remanded to California Superior Court.

**7.    Acacia Cannot Establish Ownership Rights in the Viasat Patent Family Merely by Examining Statements in the Patent Specifications**

In the event the Court does not remand the case to State court, it is a bedrock tenet of patent law that 'an invention presumptively belongs to its creator.'" *Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1263 (Fed. Cir. 2007). To overcome this presumption, a party disputing ownership must establish ownership over patent claims, not merely statements in the specification. "An inventor may assert ownership only over those designs encompassed within the claims section of the patent." *Rhino Assocs., L.P. v. Berg Mfg. & Sales Corp.*, 482 F. Supp. 2d 537, 544 (M.D. Pa. 2007) (citing *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)).  "Whatever the scope of the inventor's right under the patent before the introduction of claims, the law has limited that right to the claims as written in the patent." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 849 (2015).

In the face of these bedrock principles, Acacia offers only one witness, Dr. Paul Prucnal, who addressed or even considered whether the "ViaSat Patent Family" contains any Acacia intellectual property. Dr. Prucnal did not look at any actual patents or patent claims in the "ViaSat Patent Family," but considered only the specifications of Viasat's '278 and '263 provisional applications. This failure of proof is fatal to Acacia's claims relating to Viasat's Patent Family.

**8. Acacia's Prayer for Injunctive Relief is Legally Barred by Its Disclosure of Its Trade Secrets in Acacia's Patent Applications and Failure to Analyze Viasat Patent Claims Against Acacia Trade Secrets and Viasat Products.**

Acacia seeks injunctive relief as follows:

(a) requiring Viasat to assign all rights in the Viasat patent Family to Acacia. This claim for injunctive relief fails because Acacia failed to compare any legally-construed Viasat patent claims to Acacia's alleged trade secrets;

(b) prohibiting Viasat from filing or pursuing any further patent applications based on Foreground Information. This claim for injunctive relief fails because Acacia failed to offer evidence that Viasat pursued any patent applications based on Foreground Information;

(c) prohibiting Viasat from making, using, offering to sell, or selling any Covered Products. This claim for injunctive relief fails because Acacia failed to compare any legally-construed Viasat patent claims to Viasat products. Acacia also published its alleged Trade Secrets in September 13, 2012 thus relinquishing any possible future trade secret protection;

(d) requiring Viasat to undertake its best efforts to have Sameep Dave and Fan Mo assign their rights in the Acacia patents to Acacia. This claim for injunctive relief fails because Dave and Mo do not believe they are the first to invent any of the claims asserted in the Acacia patents. Viasat has no contractual obligation to force Dave and Mo to agree that the Acacia claims are patentable, that Dave and Mo are

the first to invent any of the claims, or that Dave and Mo must assign any patent rights to Acacia; and

(e) prohibiting Viasat and any of Viasat's employees, agents, and those acting in concert with them from disclosing or using Acacia's trade secrets. This claim for injunctive relief fails because Acacia has already disclosed the alleged trade secrets in published Acacia patent applications.

## VI.   ACACIA'S COUNTERCLAIMS RELATED TO VIASAT AND ACACIA PATENTS MAY NOT BE TRIED TO A JURY

Acacia alleges Viasat's patents were "misappropriated" or the License Agreement was breached, because figures from the specification of Viasat patent applications are similar to figures from Exhibit C to the License Agreement. Acacia contends that it owns the information in these figures and therefore it should own Viasat's patents. Acacia's Summary Judgment opposition indicates that it wants the jury to compare the language of a claim in one Viasat patent, with the language from figures from Exhibit C to the License Agreement to establish its claims. This approach improperly presents to the jury issues reserved exclusively for the Court. Acacia's theory of recovery requires (1) a determination by the Court-not a jury-of the proper scope of all the Viasat patent claims; and (2) an evidentiary basis for the Jury to compare the Court-construed claims with the scope of Acacia's purported ownership of confidential technology.

Acacia's effort to simply throw patents and technical information at the jury usurps the exclusive role of the Court to construe the claims of the Viasat patents at issue. *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996). Simply put, it is not a jury issue to determine the scope of the Viasat patents. Acacia's effort to involve the jury in such a process by presenting evidence or argument regarding the Viasat patents must be excluded.

Acacia's third claim for relief for breach of contract for Viasat's alleged failure to compel its employees to assign patent rights to Acacia patents is a non-jury issue of specific performance of a contract. Acacia's damages expert fails to identify any evidence that Acacia suffered any monetary loss as a result of this purported failure to assign. Acacia's counterclaim and prayer for relief seek an order from the Court compelling Viasat to specifically perform the License Agreement through a mandatory injunction. *See* Answer and Counterclaim ¶ 61 and Prayer for Relief, Section C. Federal law is clear that there is no right to a jury trial for a claim of specific performance of a contract. *See e.g. Adams v. Johns-Manville Corp.* 876 F. 2d 702 (9th Cir. 1989). All evidence and argument relating to Acacia's third claim for relief for alleged failure to assist in obtaining assignments should not be presented to the jury.

## VII.   ABANDONMENT OF ISSUES

Viasat has not abandoned any issues raised in the pleadings. Viasat has narrowed the scope of its trade secret cause of action, however the claim for relief has not been abandoned.


Dated:   May 7, 2018                                      FITZGERALD KNAIER LLP


By: s/ *David M. Beckwith*
     Kenneth M. Fitzgerald, Esq.
     David M. Beckwith, Esq.
     Keith M. Cochran, Esq.

     -and-

     WARREN LEX LLP
     Matthew S. Warren, Esq.
     Patrick M. Shields, Esq.

     Attorneys for Plaintiff and Counter
     Defendant ViaSat, Inc.

## CERTIFICATE OF SERVICE

I certify that today I am causing to be served the foregoing document by CM/ECF notice of electronic filing upon the parties and counsel registered as CM/ECF Users. I further certify that, to the extent they are not registered CM/ECF Users, I am causing the foregoing document to be served by electronic means via email upon counsel for Acacia Communications, Inc., per the agreement of counsel.

Dated: May 7, 2018

s/ *David M. Beckwith*

David M. Beckwith, Esq.